SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
STACEY ROSENBERG, Cal. Bar No. 187121
THEODORE A. COHEN, Cal. Bar No. 151427
SHADI FARZAN, Cal. Bar No. 301610
333 S. Hope Street, 43rd Floor
Los Angeles, California 90071
Telephone: (213) 620-1780
Facsimile: (213) 620-1398
E mail: srosenberg@sheppardmullin.com
tcohen@sheppardmullin.com
sfarzan@sheppardmullin.com
Attorneys for Secured Creditor First-Citizens Bank & Trust Company, Successor by Merger to CIT Bank, N.A., as Administrative Agent and Lender

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**RIVERSIDE DIVISION**

| | |
|---|---|
| In re<br><br>Silver Creek Industries, LLC,<br><br>Debtor | Case No. 6:23-bk-11677-SY<br><br>Chapter 11<br><br>**RESERVATION OF RIGHTS AND LIMITED OBJECTION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING: (1) SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS AND INTERESTS IN ACCORDANCE WITH PROVISIONS OF ASSET PURCHASE AGREEMENT; (2) ASSUMPTION AND ASSIGNMENT OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS; (3) REJECTION OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS; AND (4) ABANDONMENT OF PROPERTY**<br><br>Date: May 30, 2023<br>Time: 1:30 P.M.<br>Place: Courtroom 302<br>3420 Twelfth Street<br>Riverside, CA 92501 |

**TABLE OF CONTENTS**

**Page**

**I. INTRODUCTION** .......... 4

**II. THE STALKING HORSE BIDDER IS NOT BOUND** .......... 6

**III. THE PURCHASE PRICE ALLOCATION IS NOT BINDING ON CIT FOR PURPOSES OF DISTRIBUTION OF SALE PROCEEDS** .......... 6

**IV. CURE COSTS FOR ASSIGNED CONTRACTS ARE UNKNOWN AND COULD MATERIALLY IMPACT CIT'S RECOVERY** .......... 8

**V. CIT HAS CONSENT RIGHTS TO HOW SALES PROCEEDS ARE DISTRIBUTED AT CLOSING AND IS ENTITLED TO A DISTRIBUTION AT CLOSING** .......... 9

**VI. DEBTOR AND THE STALKING HORSE BIDDER SHOULD CONFIRM THAT NO AVOIDANCE ACTIONS ARE BEING TRANSFERRED IN THE SALE** .......... 10

**VII. CONCLUSION** .......... 10

## TABLE OF AUTHORITIES

**Page(s)**

Cases

*Mission Iowa Wind Co. v. Enron Corp.*
291 B.R. 39 (U.S.D.C. S.D.N.Y. 2003) .......... 7

*In Re P.D.M. Co.*
523 B.R. 558 (Bankr. W.D. Mich. 2015) .......... 7

Statutes

26 U.S.C. §§ 1060(c) and 1313(a) .......... 6

Internal Revenue Code .......... 6

Secured Creditor First-Citizens Bank & Trust Company, Successor by Merger to CIT Bank, N.A. ("CIT" or "First Citizens") hereby submits this reservation of rights and limited objection (the "Limited Objection") to the *Motion For Order Authorizing: (1) Sale Of Substantially All Of The Assets Of The Debtor Free And Clear Of Liens And Interests In Accordance With Provisions Of Asset Purchase Agreement; (2) Assumption And Assignment Of Unexpired Leases And Executory Contracts; (3) Rejection Of Unexpired Leases And Executory Contracts; And (4) Abandonment Of Property* (the "Sale Motion") [Dkt. Nos. 101 and 110] filed by debtor Silver Creek Industries, LLC ("Debtor"). Undefined terms herein have the same definitions set forth in the Sale Motion.

## I.

## INTRODUCTION

As described in Sections II(A) and (B) of CIT's Reservation of Rights and Limited Objection to Debtor's Emergency Motion for Order Authorizing Use of Any Cash Collateral of Secured Claimants [Dkt No. 37] and the Declaration of John Cleary in support thereof [Dkt. No. 42], both of which are incorporated herein, CIT is Debtor's senior secured creditor holding a blanket lien on Debtor's assets securing a defaulted loan with a balance exceeding $48 million. As set forth in CIT's Statement In Support of Sale Process and Other Matters filed May 2, 2023 [Dkt. No. 38] in connection with Debtor's Sales Procedures Motion [Dkt. No. 31], CIT is supportive of the sale process in this case. Moreover, recognizing the realities of the situation, so long as the allocation of the purchase price to the Lease (defined below) for distribution purposes is agreed to (and a $6 million allocation is not agreeable to CIT)[1] and the other issues set forth below are addressed before the closing of the sale, CIT is generally supportive of the sale of the Marketed Assets for a purchase price that will yield no

[1] CIT, the Debtor and the Committee are in negotiations to attempt to reach agreement on an allocation of the purchase price to the Lease for purposes of distribution of sales proceeds.

less than $13 million cash as set forth in the Asset Purchase Agreement, with a possibility that the price will be bid up through an auction if there is at least one Qualified Bidder other than the Stalking Horse Bidder.

However, as the Court has recognized, CIT is likely to suffer a significant loss and end up with an unsecured deficiency claim that is multiple times greater than its recovery on account of its collateral, even if CIT were to receive the entire $13 million cash (or ultimate purchase price) from the sale. As set forth below, CIT has several concerns regarding the terms of the sale that need to be addressed, all of which bear on whether CIT is better off with a sale on the terms set forth in the Asset Purchase Agreement or a liquidation, and whether CIT should consent to the release of its lien in connection with the proposed sale.

Throughout this case to date, Debtor has repeatedly stated that this case is being run for the benefit of CIT. Such statement simply is not true. Debtor states in the Sale Motion that it expects to make material distributions to unsecured creditors from not only excluded assets, but also sales proceeds (page 4, lines 1-4). For example, Debtor and the Stalking Horse Bidder have agreed between themselves to allocate $6 million of the $13 million cash portion of the purchase price to Debtor's asserted under-market real property lease (the "Lease") being acquired by the Stalking Horse Bidder, which Lease Debtor contends is not subject to CIT's lien. If Debtor prevails on the lien issue and the proposed allocation is approved for purposes of distribution of proceeds of sale,[2] 46% of the cash portion of the purchase price will go to unsecured creditors - - and CIT's cash collateral will have been used to get to a sale closing that is significantly for the benefit of unsecured creditors.

If $6 million of sales proceeds were to be allocated to the Lease (which, as noted above, is not agreeable to CIT) and Debtor were to prevail on the lien issue, not only would the distribution on CIT's collateral be reduced to $7 million, but depending on the amount of

---

[2] As set forth below, even if the allocation agreed to by Debtor and the Stalking Horse Bidder is binding between them, it cannot bind CIT for purposes of distribution of sale proceeds, the value of the Lease, or other purposes.

cure costs not subject to the cap in excess of $200,000, CIT's secured recovery could be further reduced significantly. At some point, CIT's recovery on account of its collateral from sales proceeds could be lower than the liquidation value of CIT's collateral. CIT will not agree to release its lien on the Marketed Assets unless prior to the closing of the sale (i) the parties have agreed on the amount of the purchase price to be allocated to the Lease,[3] and (ii) the other issues below have been addressed.

## II.

## THE STALKING HORSE BIDDER IS NOT BOUND

The Asset Purchase Agreement attached to the Sale Motion is not signed by the Debtor or the Stalking Horse Bidder, and is not in final form. Because the Asset Purchase Agreement has not been signed and the schedules have not been completed, presumably the Stalking Horse Bidder has not remitted the $750,000 deposit. Since filing the Sale Motion, Debtor has not filed a signed version of the Asset Purchase Agreement. Therefore, the Stalking Horse Bidder is not bound or obligated under the Asset Purchase Agreement, and the bid deadline is only three (3) business days from now, while the auction is only four (4) business days from now.

## III.

## THE PURCHASE PRICE ALLOCATION IS NOT BINDING ON CIT FOR PURPOSES OF DISTRIBUTION OF SALE PROCEEDS

Pursuant to Section 3.04 of the Asset Purchase Agreement, Debtor and the Stalking Horse Bidder have agreed to allocate to the Lease $6 million of the $13 million cash portion of the purchase price that comes to the estate. The language of Section 3.04 makes clear that

[3] As noted above, CIT, the Debtor and the Committee are in negotiations to attempt to reach agreement on an allocation of the purchase price to the Lease for purposes of distribution of sales proceeds.

Debtor and the Stalking Horse Bidder are allocating the purchase price for tax purposes. For example, Debtor and the Stalking Horse Bidder reference Sections 1060(c) and 1313(a) of the Code and the Treasury Regulations promulgated thereunder. Under the definitions in the Asset Purchase Agreement, the "Code" is the Internal Revenue Code. Similarly, Section 3.04 contains references to IRS Form 8594, Tax Returns, and the Internal Revenue Service.

Notwithstanding the allocation of the purchase price for tax purposes, CIT should not be bound by such allocation for purposes of valuing the Lease, distributions of proceeds of sale and what proceeds of sale are proceeds of CIT's collateral. Debtor has submitted no evidence regarding the value of the Lease.

Courts that have considered this issue have concluded that a purchase price allocation agreed to by a debtor-seller and buyer is not binding on other parties. *See*, *e.g.*, *Mission Iowa Wind Co. v. Enron Corp.*, 291 B.R. 39, 43 (U.S.D.C. S.D.N.Y. 2003) ("it is incumbent upon the bankruptcy court in these circumstances not to defer in conclusory fashion to the debtors' business judgment but to consider on the merits whether the price allocated to the U.S. Asset Sellers was a fair reflection of those assets' relative value and to make findings of fact on that question"); *In Re P.D.M. Co.*, 523 B.R. 558, 560 (Bankr. W.D. Mich. 2015) (court did not approve transaction in part on basis that purchase price allocation agreed to by the parties to the sale could prejudice one set of creditors and there was no basis offered for such allocation other than the agreement of the parties to the sale).

The parties must reach agreement on the purchase price allocation for purposes of Lease value and distribution of sales proceeds before the sale closes. CIT will not agree to release its lien on the Marketed Assets unless the parties have reached agreement. As noted above, CIT, the Debtor and the Committee are in negotiations to attempt to reach agreement

on an allocation of the purchase price to the Lease for purposes of distribution of sales proceeds. If they are able to do so, CIT will advise the Court upon doing so.

## IV.

## CURE COSTS FOR ASSIGNED CONTRACTS ARE UNKNOWN AND COULD MATERIALLY IMPACT CIT'S RECOVERY

Pursuant to Section 7.08(b) of the Asset Purchase Agreement, the Stalking Horse Bidder must pay up to an additional $200,000 in Cure Costs, and any Cure Costs above $200,000 will be paid out of the $13 million portion of the purchase price. Schedule 7.08(a) to the Asset Purchase Agreement sets forth "Cure Amounts" for all of Debtor's executory contracts that may be assumed and assigned. CIT's understanding (the "Understanding") is that (i) all "Cure Amounts" on "Customer Contracts" or "Sub Contractor" contracts listed on Schedule 7.08(a) (or the actual Cure Costs if different than as listed on Schedule 7.08(a)), are Assumed Liabilities as Construction Law Obligations under Section 2.01(c)(iii) of the Asset Purchase Agreement to the extent that such contracts are Acquired Contracts, and as such, are not subject to the $200,000 cap, and (ii) only the "Cure Amounts" for the contracts listed on Schedule 7.08(a) as "Vendor" contracts (or the actual Cure Costs, if different than as listed on Schedule 7.08(a)), are subject to the $200,000 cap. CIT seeks confirmation from the Debtor and the Stalking Horse Bidder that CIT's Understanding is correct.

Even if CIT's Understanding is correct, counterparties to the contracts, especially the "Vendor" contracts (which are subject to the $200,000 cap), may raise objections to the Cure Amounts listed on Schedule 7.08(a). To the extent that Cure Costs for the Lease exceed $200,000, the purchase price will be reduced. To the extent that Cure Costs are owed on the Lease, the purchase price reduction should be shared pro rata between the Lease proceeds of sale and the proceeds of sale for the Other Marketed Assets. For example, if total "Vendor" contract Cure Costs are $500,000, the purchase price would be reduced by $300,000

($500,000 minus $200,000). If the Cure Costs on the Lease were $350,000 of the $500,000, that would account for 70% of the "Vendor" contract Cure Costs ($350,000 divided by $500,000). Based thereon, $210,000 (70%) of the purchase price reduction should be allocated to the Lease and $90,000 (30%) of the purchase price reduction should be allocated to the rest of the Marketed Assets. And if CIT's Understanding is not correct and the "Sub Contractor" contracts are subject to the $200,000 cap, depending on what contracts the Stalking Horse Bidder wants to acquire, Cure Costs likely will significantly exceed $200,000.

## V.

## CIT HAS CONSENT RIGHTS TO HOW SALES PROCEEDS ARE DISTRIBUTED AT CLOSING AND IS ENTITLED TO A DISTRIBUTION AT CLOSING

As noted above, the agreement in the Asset Purchase Agreement between Debtor and the Stalking Horse Bidder to allocate $6 million of the purchase price to the Lease is not binding on CIT. Moreover, CIT will not agree to release its lien on the Marketed Assets unless the parties have agreed to the amount of such allocation (and as noted above, the parties are in negotiations).

CIT should receive a distribution of sales proceeds upon closing. Section 4.02(a)(iv) of the Asset Purchase Agreement provides that Debtor designates an account for purchase price funds to be sent and Section 11.15(a)(i) designates Debtor's principal to receive and apply the purchase price. However, pursuant to the Sales Procedures Memorandum approved by the Court, (i) the sale order determines how proceeds are to be distributed (Section S), and (ii) CIT has consent rights on the sale order with respect to distribution of sales proceeds (Section L). Based thereon, CIT should receive the proceeds of sale net of the to-be-agreed-upon allocation of the purchase price to the Lease.

## VI.

## DEBTOR AND THE STALKING HORSE BIDDER SHOULD CONFIRM THAT NO AVOIDANCE ACTIONS ARE BEING TRANSFERRED IN THE SALE

In the Sale Motion, Debtor states that "all preference, fraudulent transfer and other bankruptcy avoidance claims under Chapter 5 of the Bankruptcy Code, *except as may be limited by the Asset Purchase Agreement*" (emphasis added), are excluded assets (page 9, lines 15-17). Under Section 2.01(a)(vii) of the Asset Purchase Agreement, the Stalking Horse Bidder is acquiring the bankruptcy avoidance actions listed on Schedule 2.01(a)(vii). Schedule 2.01(a)(vii) provides "None". CIT seeks confirmation that Schedule 2.01(a)(vii) is final, and that the Stalking Horse Bidder will not be acquiring any bankruptcy avoidance claims. To the extent that the Stalking Horse Bidder does seek to acquire any bankruptcy avoidance claims, notice and an opportunity to be heard should be provided to creditors, and the Stalking Horse Bidder should be required to pay additional consideration for such claims, beyond that provided in the Asset Purchase Agreement.

## VII.

## CONCLUSION

Before CIT can determine whether to consent to the release of its lien in connection with the sale, its concerns should be addressed as set forth herein. CIT respectfully requests that (i) Debtor and the Stalking Horse Bidder confirm (a) CIT's Understanding as to Cure Costs, and (b) that no avoidance actions are included in the sale, and (ii) the sale order (a) provide that the purchase price allocation in the Asset Purchase Agreement is not binding on CIT and that irrespective of the allocation for tax purposes under the Asset Purchase Agreement, the allocation for purposes of distribution of sales proceeds shall be pursuant to

agreement of Debtor, the Committee and CIT, and (b) authorize and direct that sales proceeds net of the allocation to the Lease for distribution purposes be paid to CIT at closing.

Dated: May 19, 2023

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By *\/s/ Theodore A. Cohen*

THEODORE A. COHEN
Attorneys for Secured Creditor First-Citizens Bank & Trust Company, Successor by Merger to CIT Bank, N.A., as Administrative Agent and Lender

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 333 S. Hope Street, 43rd Floor, Los Angeles, California 90071

A true and correct copy of the foregoing document entitled (*specify*): **RESERVATION OF RIGHTS AND LIMITED OBJECTION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING: (1) SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS AND INTERESTS IN ACCORDANCE WITH PROVISIONS OF ASSET PURCHASE AGREEMENT; (2) ASSUMPTION AND ASSIGNMENT OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS; (3) REJECTION OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS; AND ABANDONMENT OF PROPERTY** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.** **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On May 19, 2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Theodore A Cohen** tcohen@sheppardmullin.com, mtzeng@sheppardmullin.com
- **Thomas R Fawkes** thomas.fawkes@tuckerellis.com, brittany.falkner@tuckerellis.com
- **Abram Feuerstein** abram.s.feuerstein@usdoj.gov
- **James Ficenec** james.ficenec@ndlf.com
- **Clifford Kerry Fields** ckfields@fieldslg.com, marnellb@fieldslg.com
- **Michael I. Gottfried** mgottfried@elkinskalt.com, cavila@elkinskalt.com,lwageman@elkinskalt.com,docketing@elkinskalt.com
- **Everett L Green** everett.l.green@usdoj.gov
- **Jennifer C Hayes** jhayes@mckennalong.com, aworthing@mckennalong.com
- **Leslie R Horowitz** leslie.horowitz@offitkurman.com, arvin.setaghaian@offitkurman.com
- **Lance N Jurich** ljurich@loeb.com, pmatsuda@loeb.com;ladocket@loeb.com;ljurich@ecf.courtdrive.com
- **Matthew I Kaplan** matthew.kaplan@tuckerellis.com, sofia.escalante@tuckerellis.com
- **Zi Chao Lin** zi.lin@tuckerellis.com, kristin.mccarthy@tuckerellis.com;thomas.fawkes@tuckerellis.com;jason.ben@tuckerellis.com
- **Christopher E Ng** cng@gglts.com
- **Robert E Opera** ropera@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com
- **Jennifer Pruski** jpruski@trainorfairbrook.com
- **Cameron C Ridley** Cameron.Ridley@usdoj.gov
- **Todd C. Ringstad** becky@ringstadlaw.com, arlene@ringstadlaw.com
- **Edward Rubacha** er@jhkmlaw.com, docket@jhc.law;am@jhc.law
- **Peter T Steinberg** mr.aloha@sbcglobal.net
- **United States Trustee (RS)** ustpregion16.rs.ecf@usdoj.gov
- **S Christopher Yoo** cyoo@fbtlaw.com, vdelgado@fbtlaw.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On NA, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on May 19, 2023, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

JUDGE: VIA FEDERAL EXPRESS
The Honorable Scott Yun
United States Bankruptcy Court
3420 Twelfth Street, Suite 345 / Courtroom 302
Riverside, CA 92501-3819

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 19, 2023 | Margo Tzeng | */s/ Margo Tzeng* |
| --- | --- | --- |
| *Date* | *Printed Name* | *Signature* |