ROBERT E. OPERA -- State Bar No. 101182
ropera@wghlawyers.com
PETER W. LIANIDES – State Bar No. 160517
plianides@wghlawyers.com
**WINTHROP GOLUBOW HOLLANDER, LLP**
1301 Dove Street, Suite 500
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111

General Insolvency Counsel for
Silver Creek Industries, LLC, Debtor and Debtor-in-Possession

TODD C. RINGSTAD – State Bar No. 97345
todd@ringstadlaw.com
**RINGSTAD & SANDERS, LLP**
4910 Birch Street, Suite 120
Newport Beach, CA 92660
Telephone: (949) 851-7450
Facsimile: (949) 851-6926

General Insolvency Counsel for
Silver Creek Industries RS, LLC and Silver Creek Leasing, LLC,
Debtors and Debtors-in-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## RIVERSIDE DIVISION

| | |
|---|---|
| In re:<br><br>☐ SILVER CREEK INDUSTRIES, LLC<br>☐ SILVER CREEK LEASING, LLC<br>☐ SILVER CREEK INDUSTRIES RS, LLC<br>☒ All Debtors.<br><br>Debtors and<br>Debtors-in-Possession. | Jointly Administered under<br>Case No. 6:23-bk-11677-SY with<br>Case No. 6:23-bk-12165-SY and<br><br>Case No. 6:23-bk-12167-SY<br><br>Chapter 11 Proceedings<br><br>**DEBTORS' FIRST AMENDED JOINT DISCLOSURE STATEMENT ACCOMPANYING DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN**<br><br>Date:     October 19, 2023<br>Time:     1:30 p.m.<br>Place:     Courtroom 302<br>           3420 Twelfth Street<br>           Riverside, CA 92501 |

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 2

II.  DEFINITIONS AND RULES OF CONSTRUCTION ........................................... 7

  A.  Defined Terms .......................................................................................... 7
  B.  Rules of Interpretation .............................................................................. 24
  C.  Exhibits .................................................................................................... 25

III.  OVERVIEW OF THE CHAPTER 11 PROCESS, THE PLAN AND
     VOTING ON THE PLAN ...................................................................... 25

  A.  The Chapter 11 Process ............................................................................ 25
  B.  Overview of the Debtors' Proposed Plan .................................................. 26

SUMMARY OF CLAIMS AND INTERESTS UNDER THE PLAN ................................. 26

  C.  Plan Confirmation, Voting on the Plan and Objections to the Plan............. 27
     1.  Voting on the Plan .......................................................................... 28
     2.  Deadline for Voting for or Against the Plan ..................................... 29
     3.  Time and Place of the Confirmation Hearing ................................... 29
     4.  Deadline For Objecting to the Confirmation of the Plan ................... 29
     5.  Plan Confirmation ........................................................................... 30
     6.  Identity of Person to Contact for More Information Regarding this
        Disclosure Statement or the Plan .................................................. 31

IV.  BACKGROUND OF THE DEBTORS .................................................................. 31

  A.  Description and History of the Debtors and the Debtors' Businesses ........... 31
     1.  General Description of the Debtors .................................................. 31
     2.  Financial Performance of SCI ......................................................... 33
     3.  Secured Claims Asserted Against the Debtors ................................. 33
  B.  SCI's Financial Difficulties ....................................................................... 35
     1.  COVID-19 Pandemic/Change in Business Mix ............................... 35
     2.  Losses on Residential Projects ........................................................ 35
     3.  Surety Bond Issues .......................................................................... 36
     4.  Burdensome Secured Debt ............................................................... 36
  C.  Debtors' Disputes with CIT ...................................................................... 37
  D.  Chapter 11 Filings .................................................................................... 37
  E.  Debtors' Postpetition Management ............................................................ 37
  F.  Debtors' Current Financial Condition ....................................................... 38
  G.  Significant Events During the Cases. ......................................................... 38
     1.  SCI's "First Day" Motions .............................................................. 38
     2.  Debtors' Employment of Professionals ............................................ 39
     3.  Joint Administration of the Debtors' Cases [Docket No. 147] .......... 39
     4.  Order Establishing Monthly Compensation Procedures
        [Docket No. 285] .......................................................................... 39
     5.  Appointment of Committee/Committee's Employment
        of Counsel .................................................................................... 40
     6.  Filing of Bankruptcy Schedules ...................................................... 40

|        | 7.  | Asset Sale Transaction ........................................................................ | 40 |
|        | 8.  | Sale Procedures Motion ...................................................................... | 40 |
|        | 9.  | Sale Motion........................................................................................ | 41 |
|        | 10. | Bids for Debtors' Assets/Auction ...................................................... | 41 |
|        | 11. | Asset Purchase Agreement ................................................................. | 42 |
|        | 12. | Sale Hearing/Sale Order .................................................................... | 42 |
|        | 13. | Closing of Asset Sale Transaction ..................................................... | 42 |
|        | 14. | Results of Asset Sale Transaction/Debtors' Remaining Assets......... | 43 |
|        | 15. | Proposed Settlement with CIT ............................................................ | 43 |

V.    LITIGATION AND OBJECTIONS TO CLAIMS............................................ 47

    A.    Litigation Commenced Prior to the Petition Date......................................... 47
    B.    Litigation Commenced After the Petition Date. ............................................ 47

VI.   DESCRIPTION OF THE PLAN ...................................................................... 48

A.    Basic Structure of the Plan. ............................................................................ 48
B.    Classification and Treatment of Claims. ......................................................... 49
C.    Unclassified Claims. ....................................................................................... 50
D.    Classification of Claims and Interests Under the Plan.................................... 53

VII.  TREATMENT OF CLASSES UNDER THE PLAN ....................................... 55

A.    Class 1 -- Any Allowed Secured Claims Including any Allowed
     Secured Claim of CIT. ................................................................................. 55
B.    Class 2 -- Allowed Priority Non-Tax Claims ................................................. 56
C.    Class 3 -- Allowed General Unsecured Claims ............................................... 56
D.    Class 4 -- Allowed Subordinated Claims........................................................ 60
E.    Class 5 -- Allowed Interests............................................................................ 62

VIII. MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN.............. 62

A.    Overview    ..................................................................................................... 62
B.    Condition Precedent to Plan Confirmation..................................................... 62
C.    Conditions Precedent to the Effectiveness of the Plan ................................... 63
D.    Implementation of Plan................................................................................... 63
E.    Corporate Action............................................................................................. 64
F.    Liquidating Trust/Liquidating Trust Trustee .................................................. 64
G.    Responsibilities of Debtors' Managers ........................................................... 66
H.    Liquidating Trust Assets/Plan Administration................................................ 66
I.    Powers and Duties of the Committee After the Effective Date/Appointment
     of Advisory Committee................................................................................. 68
J.    Powers and Duties of the Debtors After the Effective Date ........................... 68
K.    Causes of Action ............................................................................................. 68
L.    Liquidating Trust Trustee's Right to Retain Professionals and Non-Professionals .. 69
M.    Disposition of Liquidating Trust Assets ......................................................... 70
N.    Compromise of Controversies ........................................................................ 70
O.    Bankruptcy Court Approval Relative to Post-Confirmation Matters ....................... 71

P.      Liquidating Trust Trustee Certification ........................................................... 71
Q.      Final Decree .................................................................................................... 71
R.      Substantive Consolidation. ............................................................................. 72
S.      Implementation of Liquidating Trust. ............................................................ 72
T.      Inter-Company Claims. ................................................................................... 73
U.      Distributions. .................................................................................................. 73
V.      Objections to Disputed Claims. ...................................................................... 75
W.      Treatment of Disputed Claims ....................................................................... 76
X.      Litigation. ....................................................................................................... 78
Y.      Executory Contracts And Unexpired Leases. ................................................. 80
Z.      Post-Effective Date Notice. ............................................................................ 81
AA.    Miscellaneous Plan Provisions. ..................................................................... 81

IX.     EFFECT OF CONFIRMATION OF THE PLAN ........................................... 81

A.      1141 ................................................................................................................ 82
B.      Injunction/Release. ......................................................................................... 82
C.      Binding Effect of Plan .................................................................................... 82
D.      Vesting of Assets ............................................................................................ 82
E.      No Discharge of a Debtor ............................................................................... 82

X.      LIMITATION OF LIABILITY ...................................................................... 83

A.      No Liability for Solicitation or Participation ................................................. 83
B.      Good Faith ...................................................................................................... 83
C.      Limitation of Liability Regarding Plan Confirmation. .................................. 83

XI.     CERTAIN RISK FACTORS TO BE CONSIDERED .................................... 83

A.      Risk that the Debtors Will Have Insufficient Cash for the Plan
        to Become Effective ....................................................................................... 84
B.      Risk Regarding the Distributions to Be Made to Creditors. .......................... 84
C.      Bankruptcy Risks. .......................................................................................... 84

XII.    CONFIRMATION OF THE PLAN .................................................................. 85

A.      Introduction. ................................................................................................... 85
B.      Votes Necessary to Confirm the Plan. ........................................................... 85
C.      Votes Necessary for a Class to Accept the Plan. ........................................... 86
D.      Treatment of Non-Accepting Classes. ........................................................... 86
E.      Request for Confirmation Despite Non-Acceptance by Impaired Class(es). .......... 87
F.      Feasibility of the Plan. .................................................................................... 88
G.      Liquidation Analysis. ..................................................................................... 101

XIII.   CERTAIN UNITED STATES FEDERAL TAX CONSEQUENCES
        OF THE PLAN ................................................................................................ 108

A.      Introduction. ................................................................................................... 108
B.      Consequences to the Debtors. ........................................................................ 108

C.      Withholding of Taxes.  ............................................................................................ 108

XIV.   RECOMMENDATION AND CONCLUSION.......................................................... 109

# TABLE OF AUTHORITIES

**Statutes**

11 U.S.C. § 101-1532 ............................................................................................................... 11
11 U.S.C. § 101(5) ................................................................................................................... 13
11 U.S.C. § 101(16) ................................................................................................................. 17
11 U.S.C. § 101(27 .................................................................................................................. 17
11 U.S.C. § 102 ....................................................................................................................... 24
11 U.S.C. § 326(a) ................................................................................................................. 107
11 U.S.C. § 327 ....................................................................................................................... 21
11 U.S.C. § 328 ....................................................................................................................... 21
11 U.S.C. § 330 ....................................................................................................................... 21
11 U.S.C. § 331 ....................................................................................................................... 21
11 U.S.C. § 350 ....................................................................................................................... 12
11 U.S.C. § 363(a) ................................................................................................................... 38
11 U.S.C. § 363(f) ................................................................................................................... 41
11 U.S.C. § 501 ....................................................................................................................... 82
11 U.S.C. § 502 .................................................................................................................. 3, 82
11 U.S.C. § 502(d) .................................................................................................................. 10
11 U.S.C. § 502(g) .................................................................................................................. 82
11 U.S.C. § 502(h) .............................................................................................................. 8, 82
11 U.S.C. § 502(i) ................................................................................................................... 82
11 U.S.C. § 503(b) ................................................................................................ 7, 19, 50, 21
11 U.S.C. § 503(b)(9) ........................................................................................... 7, 19, 23, 47
11 U.S.C. § 503(b)(1)(D) ....................................................................................................... 51
11 U.S.C. § 506 ...................................................................................................... 10, 15, 56
11 U.S.C. § 506(a) ............................................................................................................ 10, 23
11 U.S.C. § 510 ....................................................................................................................... 10
11 U.S.C. § 542 ....................................................................................................................... 10
11 U.S.C. § 543 ....................................................................................................................... 10
11 U.S.C. § 544 ....................................................................................................................... 10
11 U.S.C. § 545 ....................................................................................................................... 10
11 U.S.C. § 547 ....................................................................................................................... 10
11 U.S.C. § 548 ....................................................................................................................... 10
11 U.S.C. § 549 ....................................................................................................................... 10
11 U.S.C. § 550 ....................................................................................................................... 10
11 U.S.C. § 551 ....................................................................................................................... 10
11 U.S.C. § 552 ....................................................................................................................... 10
11 U.S.C. § 553 ....................................................................................................................... 10
11 U.S.C. § 507(a) ............................................................................................................... 9, 21
11 U.S.C. § 507(a)(4) ................................................................................................................. 9
11 U.S.C. § 507(a)(5) ................................................................................................................. 9
11 U.S.C. § 507(a)(7) ................................................................................................................. 9
11 U.S.C. § 507(a)(8) ............................................................................................................ 9, 21
11 U.S.C. § 507(b) ..................................................................................................................... 7
11 U.S.C. § 522 ....................................................................................................................... 75
11 U.S.C. § 541 .................................................................................................................. 10, 16
11 U.S.C. § 542 ....................................................................................................................... 75
11 U.S.C. § 543 ....................................................................................................................... 75

11 U.S.C. § 544 ...............................................................................................................75
11 U.S.C. § 545 ...............................................................................................................75
11 U.S.C. § 547 ...............................................................................................................75
11 U.S.C. § 548 ...............................................................................................................75
11 U.S.C. § 549 ...............................................................................................................75
11 U.S.C. § 550 ...............................................................................................................75
11 U.S.C. § 553 ................................................................................................10, 74, 75
11 U.S.C. § 726(a)(2)(C) ................................................................................................18
11 U.S.C. § 726(a)(3) ......................................................................................................18
11 U.S.C. § 726(a)(4) ........................................................................................................9
11 U.S.C. § 726(a)(5) ...............................................................................................58, 60
11 U.S.C. § 1103(a) .........................................................................................................21
11 U.S.C. § 1111(b) ..........................................................................................................9
11 U.S.C. § 1122 .............................................................................................................49
11 U.S.C. § 1123 .............................................................................................................49
11 U.S.C. § 1123(a) .........................................................................................................49
11 U.S.C. § 1123(a)(1) ....................................................................................................50
11 U.S.C. § 1123(a)(4) ....................................................................................................49
11 U.S.C. § 1123(a)(5) ....................................................................................................67
11 U.S.C. § 1123(a)(7) ....................................................................................................67
11 U.S.C. § 1123(b)(3)(B) ..............................................................................................67
11 U.S.C. § 1124 ........................................................................................3, 31, 49, 53
11 U.S.C. § 1125 ........................................................................................................2, 15
11 U.S.C. § 1125(b) ..........................................................................................................2
11 U.S.C. § 1125(e) .........................................................................................................83
11 U.S.C. § 1126(c) .........................................................................................................31
11 U.S.C. § 1126(f) ....................................................................................................3, 50
11 U.S.C. § 1126(g) .........................................................................................................50
11 U.S.C. § 1128(a) ..................................................................................................14, 29
11 U.S.C. § 1128(b) .........................................................................................................30
11 U.S.C. § 1129 .............................................................................................................30
11 U.S.C. § 1129(a) ..................................................................................................31, 88
11 U.S.C. § 1129(a)(7) ..................................................................................................101
11 U.S.C. § 1129(a)(8) ..............................................................................................86, 88
11 U.S.C. § 1129(a)(1)-(7), and (9)-(16) .......................................................................85
11 U.S.C. § 1129(a)(11) ...........................................................................................88, 89
11 U.S.C. § 1129(b) ...............................................................................31, 85, 86, 87, 88
11 U.S.C. § 1141 ...............................................................................................................4
28 U.S.C. § 1930 ...............................................................................................................7
28 U.S.C. § 1961(a) ..................................................................................................21, 24

**Other Authorities**

4027 of the CARES Act ..................................................................................................34

**Rules**

Rule 3001 ........................................................................................................................21
Rule 3018(a) ......................................................................................................................3
Rule 3022 .........................................................................................................................72
Rule 9006(a) ..............................................................................................................12, 24

**I.**

**<u>INTRODUCTION</u>**

Silver Creek Industries, LLC, Silver Creek Industries RS, LLC and Silver Creek Leasing, LLC, the Debtors in the Cases, provide this Disclosure Statement to Creditors.[1]  This Disclosure Statement is furnished for the purpose of soliciting acceptances to the Debtors' Plan which has been filed with the Bankruptcy Court.  A copy of the Plan accompanies this Disclosure Statement.

1125 of the Bankruptcy Code requires that, at the time when the Plan is delivered to Creditors, the Plan be accompanied by this Disclosure Statement.[2]  The purpose of this Disclosure Statement is to provide adequate information of a kind, and in sufficient detail, so far as is reasonably practicable, in light of the nature and history of the Debtors and the condition of the Debtors' books and records, to enable a typical Creditor to make an informed judgment about the Plan and to enable such Creditor to determine whether it is in its best interest to vote for (accept) or against (reject) the Plan.

This Disclosure Statement contains a description of the Plan and other information relevant to a Creditor's decision whether to vote to accept or to reject the Plan.  The Debtors urge Creditors to read this Disclosure Statement because it contains important information concerning the Debtors' history, business, assets and liabilities and because it sets forth a summary of the Plan.

This Disclosure Statement does not purport to be a complete description of the Plan, the financial data pertaining to the Debtors, the applicable provisions of the Bankruptcy Code, or any other matters that may be deemed significant by Creditors.  Out of practical necessity, this Disclosure Statement represents an attempt to summarize extensive financial data, legal documents and legal principles, including provisions of the Bankruptcy Code, and set them forth in an understandable, readable form.  Thus, although the Debtors have attempted to describe fairly and accurately the matters set forth and discussed in this Disclosure Statement, the Debtors desire

---

[1] The definitions of the capitalized terms used in this Disclosure Statement are contained in Article II of this Disclosure Statement.

[2] Section 1125(b) provides, in pertinent part, as follows:

An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

to emphasize that the documents referred to or summarized in this Disclosure Statement (including, without limitation, historical financial information for the Debtors' business operations) are available for review by contacting SCI's attorneys, Winthrop Golubow Hollander, LLP ("WGH") (Attn:  Robert E. Opera, Esq.), at the address set forth at the upper left-hand corner of the first page of this Disclosure Statement.

If a Creditor does not fully understand this Disclosure Statement, or feels that the information provided herein is insufficient to enable it to determine whether to accept or to reject the Plan, it is invited to make written inquiry of SCI's attorneys, WGH (Attn:  Robert E. Opera, Esq.), at the address set forth at the upper left-hand corner of the first page of this Disclosure Statement.

While this Disclosure Statement provides a summary of the provisions of the Plan, if any inconsistency exists between the Plan and this Disclosure Statement, the provisions of the Plan are controlling.  Therefore, Creditors are urged to review carefully the provisions of the Plan.

Only holders of Claims allowed under  502 of the Bankruptcy Code or Claims temporarily allowed for voting purposes under Rule 3018(a) of the Federal Bankruptcy Rules, and whose Claims are in those Classes of Claims that are "impaired" under the Plan, are entitled to vote to accept or reject the Plan.[3]  Classes of Claims that are not impaired are conclusively presumed to have voted to accept the Plan pursuant to  1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan.

Voting on the Plan, by each holder of a Claim entitled to vote on the Plan, is important. To vote to accept or reject the Plan, a Creditor must indicate its acceptance or rejection thereof on the ballot that accompanies this Disclosure Statement and return it, by mail or by e-mail transmission, to WGH (Attn:  Ms. Jeannie Martinez) such that the ballot is actually received by WGH by 5:00 p.m. on _____, 2023.  The mailing address for WGH is listed in the upper left-hand corner of the first page of this Disclosure Statement.  Each Class of Creditors allowed to vote on the Plan will be deemed to have accepted the Plan if the Plan is accepted by valid ballots cast by

---

[3] Under section 1124 of the Bankruptcy Code, a Class of Claims is impaired if the legal, equitable, or contractual rights of the Claims in the Class are altered.

Creditors in that Class holding at least two-thirds (2/3) in dollar amount and more than one half (1/2) in number of the Allowed Claims of Creditors in that Class actually voting on the Plan. **ONLY PROPERLY EXECUTED BALLOTS TIMELY TENDERED TO COUNSEL FOR THE DEBTORS WILL BE COUNTED AS HAVING VOTED ON THE PLAN.**

Since mail delays may occur, and because time is of the essence, it is important that ballots be returned well in advance of the date specified hereinabove as the deadline for WGH to receive ballots.  Unless otherwise allowed by the Bankruptcy Court, any ballots received after such deadline will <u>not</u> be included in any calculation to determine whether the Debtors' Creditors have accepted or rejected the Plan.

At the Confirmation Hearing, the Bankruptcy Court will determine, pursuant to  1129 of the Bankruptcy Code, whether the Plan has been accepted by the necessary Classes created under the Plan, and, if not, whether the Bankruptcy Court should, nevertheless, confirm the Plan.  If at such hearing the Bankruptcy Court should determine that the Plan meets all of the requirements for confirmation prescribed by the Bankruptcy Code, the Bankruptcy Court will enter a Confirmation Order.  Pursuant to  1141 of the Bankruptcy Code, the effect of the Confirmation Order will be to make the provisions of the Plan binding upon the Debtors, each Creditor, regardless of whether the Creditor voted to accept the Plan, and upon each Interest Holder.

Pursuant to  1128 of the Bankruptcy Code, any party-in-interest may object to the confirmation of the Plan.  The Bankruptcy Court has fixed _____, 2023, at 5:00 p.m., as the deadline for filing an objection to the Plan and for serving a copy thereof upon the following: SCI's attorneys, WGH Attn: Robert E. Opera, Esq., at the address set forth hereinabove; SCI RS's and SCL's attorneys, Ringstad & Sanders, LLP, Attn: Todd C. Ringstad, Esq., 4910 Birch Street, Suite 120, Newport Beach, CA 92660 (email address: todd@ringstadlaw.com); the Committee's counsel, Tucker Ellis LLP, Attn: Thomas R. Fawkes, Esq., 233 S. Wacker Dr., Suite 6950, Chicago, IL, 60606 (email address: thomas.fawkes@tuckerellis.com); and the United States Trustee.  The branch office of the United States Trustee in which the Cases are being administered is located at 3801 University Avenue, Suite 720, Riverside, CA 92501. Any objections or other

1  written communications to the United States Trustee respecting the Plan or the Cases should be

2  mailed to the attention of Ali Matin, Esq., at that address.

3          The Plan is a Chapter 11 plan proposed jointly by each of the Debtors.  The Plan

4  effectuates a substantive consolidation of the Debtors' Estates.  Accordingly, each Debtor's assets

5  and liabilities will be combined with each other Debtor's assets and liabilities, and each Creditor

6  will receive under the Plan Distributions from the same Liquidating Trust Assets, in accordance

7  with the terms and conditions of the Plan.

8          **THIS IS A SOLICITATION BY THE DEBTORS.  NO REPRESENTATIONS**

9  **CONCERNING THE DEBTORS, INCLUDING, BUT NOT LIMITED TO,**

10 **REPRESENTATIONS AS TO THEIR ASSETS, THE AMOUNT OF CLAIMS AGAINST**

11 **THE DEBTORS' ESTATES, OR ANY TAX EFFECT OF THE TRANSACTIONS**

12 **PROPOSED UNDER THE PLAN, ARE AUTHORIZED BY THE DEBTORS, OTHER**

13 **THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

14         **UNLESS SPECIFICALLY SET FORTH HEREIN TO THE CONTRARY, THE**

15 **INFORMATION CONTAINED OR REFERRED TO IN THIS DISCLOSURE**

16 **STATEMENT HAS NOT BEEN SUBJECT TO CERTIFIED AUDIT.  RECORDS KEPT**

17 **BY THE DEBTORS RELY FOR THEIR ACCURACY ON BOOKKEEPING**

18 **PERFORMED INTERNALLY BY THE DEBTORS.  THE DEBTORS BELIEVE THAT**

19 **EVERY REASONABLE EFFORT HAS BEEN MADE TO PRESENT FINANCIAL**

20 **INFORMATION AS ACCURATE AS IS REASONABLY PRACTICABLE GIVEN THE**

21 **NATURE AND HISTORY OF THE DEBTORS' BUSINESSES AND THE CONDITION**

22 **OF THE DEBTORS' BOOKS AND RECORDS.  HOWEVER, THE RECORDS KEPT BY**

23 **THE DEBTORS ARE NEITHER WARRANTED NOR REPRESENTED TO BE FREE OF**

24 **INACCURACY.  NEITHER COUNSEL TO THE DEBTORS, MANAGEMENT OF THE**

25 **DEBTORS, THE FINANCIAL ADVISORS TO THE DEBTORS NOR THE COMMITTEE**

26 **OR ITS COUNSEL HAS INDEPENDENTLY VERIFIED THE INFORMATION**

27 **CONTAINED HEREIN, OR MAKES ANY REPRESENTATIONS OR WARRANTIES**

28 **WITH RESPECT TO THE ACCURACY THEREOF.**

**NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR DISPUTED CLAIM OR CAUSE OF ACTION IS NOT IDENTIFIED IN THIS DISCLOSURE STATEMENT.  IN ACCORDANCE WITH THE PROVISIONS OF THE PLAN, THE DEBTORS (AND, UPON THE EFFECTIVE DATE OF THE PLAN, THE LIQUIDATING TRUST TRUSTEE) MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE OBJECTIONS TO CLAIMS OR CAUSES OF ACTION, WHETHER OR NOT SUCH OBJECTIONS OR CAUSES OF ACTION ARE IDENTIFIED IN THIS DISCLOSURE STATEMENT.**

**ALL PARTIES ENTITLED TO VOTE ON THE PLAN ARE URGED TO REVIEW CAREFULLY THE PLAN AND THIS DISCLOSURE STATEMENT PRIOR TO VOTING ON THE PLAN.  THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED IN ANY MANNER TO BE LEGAL, BUSINESS OR TAX ADVICE.  EACH CREDITOR SHOULD CONSULT WITH ITS OWN LEGAL COUNSEL, BUSINESS ADVISOR, CONSULTANT OR ACCOUNTANT PRIOR TO VOTING ON THE PLAN IN ORDER TO ENSURE A COMPLETE UNDERSTANDING OF THE TERMS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF THE CREDITORS OF THE DEBTORS TO ENABLE THEM TO MAKE AN INFORMED DECISION REGARDING THE PLAN.**

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT INDICATES ONLY THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION FOR THE PURPOSE OF SOLICITATION OF ACCEPTANCES TO THE PLAN BY THE DEBTORS, AND NOT ANY RECOMMENDATION REGARDING WHETHER A CREDITOR SHOULD VOTE TO ACCEPT OR TO REJECT THE PLAN.**

**ANY DISCUSSION OF TAX MATTERS CONTAINED HEREIN IS NOT INTENDED TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING ANY TAX OR TAX PENALTIES THAT MAY BE IMPOSED ON ANY PERSON.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED OR**

1    REFERRED TO IN PROMOTING, MARKETING OR RECOMMENDING A

2    PARTNERSHIP OR OTHER ENTITY, INVESTMENT PLAN, OR OTHER

3    ARRANGEMENT TO ANY PERSON.  ALL CREDITORS AND INTEREST HOLDERS

4    SHOULD CONSULT WITH THEIR OWN LEGAL COUNSEL AND/OR

5    ACCOUNTANTS AS TO LEGAL, TAX, AND OTHER MATTERS CONCERNING

6    THEIR CLAIMS OR INTERESTS.

7                                     II.

8                    **DEFINITIONS AND RULES OF CONSTRUCTION**

9    A.    **Defined Terms.**

10    The following terms (which appear in this Disclosure Statement as capitalized terms),

11    when used in this Disclosure Statement, have the meanings set forth below.

12    1.    "**Administrative Claim**" means a Claim for costs or expenses that are

13    allowable under s 503(b) or 507(b) of the Bankruptcy Code or 28 U.S.C. § 1930.  These

14    costs or expenses may include: (a) actual, necessary costs and expenses of preserving an

15    Estate after the Petition Date; (b) Ordinary Course Administrative Claims;

16    (c) Pre-Effective Date Professional Fee Claims; (d) Administrative Tax Claims; (e) United

17    States Trustee Fees; and (f)  503(b)(9) Claims.

18    2.    "**Administrative Claims Bar Date**" has the meaning set forth in Paragraph

19    VI(C)(1)(b) of this Disclosure Statement.

20    3.    "**Administrative Claims Objection Deadline**" has the meaning set forth in

21    Paragraph VI(C)(1)(c) of this Disclosure Statement.

22    4.    "**Administrative Tax Claim**" means a Tax Claim, other than a Secured

23    Claim, that a Governmental Unit asserts against a Debtor for any tax period that, in whole

24    or in part, falls within the period commencing on the Petition Date and ending on the

25    Effective Date.

26    5.    "**Advisory Committee**" means an advisory committee appointed pursuant

27    to the Plan which will provide advice and consultation to the Liquidating Trust Trustee as

28    more fully described in the Plan.

**6.** "**Allowed Administrative Claim**" means an Administrative Claim that is allowed as set forth in 3.1 of the Plan or otherwise by a Final Order.

**7.** "**Allowed Avoidance Action Payment Claim**" means an Allowed Claim based upon or arising from an entity's payment to a Debtor of a claim asserted against the entity pursuant to an Avoidance Action pursuant to 502(h) of the Bankruptcy Code. Any Allowed Avoidance Action Payment Claim is treated under the Plan as a Class 3A Claim.

**8.** "**Allowed Claim**" means a Claim against a Debtor (a) that is listed in the Bankruptcy Schedules filed with the Bankruptcy Court by such Debtor and not listed as disputed, contingent, unliquidated or unknown as to amount and as to which no timely objection has been filed; (b) with respect to which a Proof of Claim has been filed by the Bar Date, and as to which no timely objection has been filed or any timely objection has been determined, in whole or in part, by a Final Order in favor of the holder of the Claim; or (c) that has been resolved by a settlement agreement approved by Final Order of the Bankruptcy Court or otherwise allowed pursuant to the Plan. Pursuant to the Plan, the amount of an Allowed Claim against a Debtor is as follows: (i) if the Creditor did not file a Proof of Claim with the Bankruptcy Court on or before the Bar Date, the amount of the Creditor's Claim as listed in such Debtor's Bankruptcy Schedules as neither disputed, contingent, unliquidated nor unknown; or (ii) if the Creditor filed a Proof of Claim with the Bankruptcy Court on or before the Bar Date (1) the amount stated in such Proof of Claim if no objection to such Proof of Claim is filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or by order of the Bankruptcy Court, or (2) the amount thereof fixed by a Final Order of the Bankruptcy Court if an objection to such Proof of Claim is filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or by order of the Bankruptcy Court. Any Claim that is not filed by the Bar Date and that is listed in the Bankruptcy Schedules as disputed, unliquidated, contingent or unknown, or that is not allowed under the terms of the Plan, will be disallowed, and no Distribution will be made on account of such Claim. Any Claim disallowed by the Bankruptcy Court will not be an Allowed Claim under the Plan.

Pursuant to the Plan, no default interest or late charges or comparable fees, charges or penalties will be included as part of an Allowed Claim.

**9.** "**Allowed Class '**'*' Claim**" means an Allowed Claim classified in the specified Class.

**10.** "**Allowed Deficiency Claim**" means that portion of an Allowed Claim that is in excess of the value of any Collateral which is security for the repayment of such Claim, calculated in accordance with the provisions of 506 of the Bankruptcy Code. Unless the holder of an Allowed Deficiency Claim makes a timely election under 1111(b) of the Bankruptcy Code, such Allowed Deficiency Claim is treated as an Allowed Class 3 Claim under the Plan.

**11.** "**Allowed General Unsecured Claim**" means an unsecured Allowed Claim against a Debtor, however arising, not entitled to priority under 507(a) of the Bankruptcy Code, including, without limitation, an Allowed Deficiency Claim, an Allowed Rejection Claim or an Allowed Avoidance Action Payment Claim.

**12.** "**Allowed Priority Non-Tax Claim**" means an unsecured Allowed Claim entitled to priority pursuant to s 507(a)(4), 507(a)(5), or 507(a)(7) of the Bankruptcy Code.

**13.** "**Allowed Priority Tax Claim**" means an Allowed Claim entitled to priority under 507(a)(8) of the Bankruptcy Code.

**14.** "**Allowed Rejection Claim**" means any Allowed General Unsecured Claim based upon or arising from the rejection of an executory contract or unexpired lease pursuant to a Final Order of the Bankruptcy Court or pursuant to the Plan. Any Allowed Rejection Claim is treated as an Allowed Class 3A Claim under the Plan.

**15.** "**Allowed 726(a)(4) Claim**" means any Allowed Claim under 726(a)(4) of the Bankruptcy Code. Any Allowed 726(a)(4) Claim is treated as an Allowed Class 4 Claim under the Plan.

**16.** "**Allowed Secured Claim**" means an Allowed Claim against a Debtor that is secured by a valid and unavoidable Lien against property in which such Debtor's Estate has an interest, or which is subject to setoff under 553 of the Bankruptcy Code, to the

extent of the value, determined in accordance with 506(a) of the Bankruptcy Code, of the Secured Creditor's interest in such Estate's interest in such property, or to the extent of the amount subject to any setoff, as the case may be. Unpaid principal and any accrued interest allowable under 506 of the Bankruptcy Code with respect to an Allowed Secured Claim is computed as of the Effective Date, and the Allowed Secured Claim will thereafter bear interest as provided in the Plan.

17.    "**Allowed Subordinated Claim**" means any Allowed Claim that is subordinated to Allowed Class 3 Claims to the extent provided by the Bankruptcy Code or by a Final Order.

18.    "**Asset Purchase Agreement**" means that Asset Purchase Agreement, as amended, entered into by and among the Debtors, on one hand, and Silver Creek Modular, on the other hand, and approved by the Bankruptcy Court pursuant to the Sale Order.

19.    "**Asset Sale Transaction**" has the meaning set forth in Article I of the Plan.

20.    "**Assets**" means all assets and properties of a Debtor's Estate as set forth in 541 of the Bankruptcy Code.

21.    "**Auction**" has the meaning set forth in Paragraph IV(G)(10) hereof.

22.    "**Avoidance Action**" means an adversary proceeding, lawsuit or other action or proceeding filed pursuant to s 502(d), 506, 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552, 553 or other s of the Bankruptcy Code, an adversary proceeding, lawsuit or other action or proceeding based on applicable non-bankruptcy law that may be incorporated or brought under the foregoing s of the Bankruptcy Code, an adversary proceeding, lawsuit or other action or proceeding arising under, or relating to, any similar state law or federal law, and any other similar action or proceeding filed to recover property for or on behalf of a Debtor's Estate, or to avoid a Lien or transfer, whether or not such adversary proceeding, lawsuit, action or proceeding is initiated on or before the Effective Date.

**23.**    "**Avoidance Action Payment Claim**" means a Claim based upon or arising from an entity's payment to a Debtor of a claim asserted against the entity pursuant to an Avoidance Action.

**24.**    "**Avoidance Claim**"  means a claim or cause of action asserted pursuant to s 502(d), 506, 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552, 553 or other s of the Bankruptcy Code, a claim or cause of action based on applicable non-bankruptcy law that may be incorporated or brought under the foregoing s of the Bankruptcy Code, a claim or cause of action arising under, or relating to, any similar state law or federal law, and any other similar claim or cause of action asserted to recover property for or on behalf of a Debtor's Estate, or to avoid a Lien or transfer, whether or not such claim or cause of action is asserted on or before the Effective Date.

**25.**    "**Bankruptcy Code**" means the United States Bankruptcy Code, as set forth in 11 U.S.C. §§ 101-1532, as now in effect and as may be hereafter amended.

**26.**    "**Bankruptcy Court**" means the United States Bankruptcy Court for the Central District of California, Riverside Division.

**27.**    "**Bankruptcy Rules**" means, collectively, the Federal Bankruptcy Rules and the Local Bankruptcy Rules.

**28.**    "**Bankruptcy Schedules**" means the Schedules of Assets and Liabilities and Statement of Financial Affairs filed by a Debtor in its Case, as they may have been amended and as they may be amended hereafter from time to time.

**29.**    "**Bar Date**" means the last date for a Creditor whose Claim is not scheduled, or whose Claim is scheduled in a Debtor's Bankruptcy Schedules as disputed, contingent, unliquidated or unknown as to amount, to have filed a Proof of Claim.  The general Bar Date for filing a Proof of Claim on account of a prepetition Claim was September 15, 2023.

**30.**    "**BBMR**" means BBMR Enterprises, Inc., the holder of a Claim against SCI.

**31.** "**B. Riley**" means GlassRatner Advisory & Capital Group, LLC dba B. Riley Advisory Services.

**32.** "**BVA Inc.**" has the meaning set forth in Paragraph IV(A)(1) hereof.

**33.** "**BVA LLC**" has the meaning set forth in Paragraph IV(A)(1) hereof.

**34.** "**Business Day**" means any day other than a Saturday, Sunday or a legal holiday (as defined in Rule 9006(a) of the Federal Bankruptcy Rules).

**35.** "**Case**" means the case under Chapter 11 of the Bankruptcy Code commenced by a Debtor on the Petition Date.

**36.** "**Case Closing Date**" means the date on which the Bankruptcy Court enters a Final Decree closing the Debtors' Cases, in accordance with  350 of the Bankruptcy Code.

**37.** "**Cash**" means cash or cash equivalents including, but not limited to, bank deposits, checks or other similar forms of payment or exchange.

**38.** "**Causes of Action**" means any and all claims, demands, rights, actions, causes of action and suits of a Debtor or its Estate, of any kind or nature whatsoever, known or unknown, suspected or unsuspected, whether arising prior to, on or after the Petition Date, in contract or in tort, at law or in equity or under any other theory of law, that such Debtor or its Estate has or asserts, or may have or assert, against third parties, whether or not brought as of the Effective Date, and which have not been settled or otherwise resolved by a Final Order as of the Effective Date, including but not limited to: (a) rights of setoff, counterclaim or recoupment; (b) claims on contracts or for breaches of duties; (c) claims or defenses for fraud, mistake, duress or usury; (d) Avoidance Actions; (e) claims for Tax refunds; (f) claims to object to or to subordinate Claims; (g) claims to collect accounts receivable or other recoveries; (h) appeals; and (i) any other claims or demands which may be asserted against third parties.

**39.** "**CIT**" means First-Citizens Bank & Trust Company, Successor by Merger to CIT Bank, N.A., as Administrative Agent and Lender.

**40.** "**CIT Loan**" has the meaning set forth in Paragraph IV(A)(3) hereof.

41.     **"CIT Reimbursement Claim"** has the meaning set forth in Paragraph IV(G)(15)(b) hereof.

42.     "**Claim**" means a "claim" against a Debtor, as such term is defined in 101(5) of the Bankruptcy Code.

43.     "**Claim Documents**" has the meaning set forth in 13.21 of the Plan.

44.     "**Claims Objection Deadline**" means the latest of the following dates: (a) the one hundred eightieth (180th) day after the Effective Date; (b) with respect to a specific Claim, the ninetieth (90th) day after a Proof of Claim with respect to such Claim is filed by a Creditor; (c) with respect to a Claim that is not listed in the Bankruptcy Schedules, the ninetieth (90th) day after the Liquidating Trust Trustee learns of the existence of such Claim; (d) such greater period of limitation as may be fixed or extended by agreement between the Liquidating Trust Trustee and a Creditor; or (e) such greater period of limitation as may be fixed or extended by the Bankruptcy Court before or after the Claims Objection Deadline.  Pursuant to the Plan, the Liquidating Trust Trustee may seek from the Bankruptcy Court an order or orders extending the Claims Objection Deadline, on an ex parte basis, with no the need for notice to Creditors or a hearing thereon.

45.     "**Class**" means a group of Claims or Interests as classified in Article IV of the Plan.

46.     "**Collateral**" means any property or interest in property of a Debtor's Estate subject to a Lien of a Secured Creditor that is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable federal or state law.

47.     "**Committee**" means the duly appointed and acting Official Committee of Unsecured Creditors in SCI's Case.

48.     "**Compromise Motion**" has the meaning set forth in Paragraph IV(G)(15) hereof.

**49.** "**Confirmation**" means the entry of the Confirmation Order by the Bankruptcy Court.

**50.** "**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket.

**51.** "**Confirmation Hearing**" means the hearing before the Bankruptcy Court to consider the confirmation of the Plan pursuant to 1128(a) of the Bankruptcy Code, as such hearing may be continued from time to time.

**52.** "**Confirmation Hearing Date**" means the first date on which the Bankruptcy Court holds the Confirmation Hearing.

**53.** "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan under 1129 of the Bankruptcy Code.

**54.** "**Construction Law Claims**" means claims of subcontractors, vendors, materialmen and other claimants which could give rise in the absence of payment to surety bond claims, mechanic's lien claims, stop notice claims, preliminary notice claims or similar claims under California law or other applicable law. Under the Asset Purchase Agreement, SCI's liabilities for such claims are referred to as the "Construction Law Obligations."

**55.** "**Creditor**" means the holder of a Claim against a Debtor.

**56.** "**Cure Claims**" has the meaning set forth in Paragraph VIII(Z)(4) of this Disclosure Statement.

**57.** "**Cure Claims Schedule**" has the meaning set forth in Paragraph VIII(Z)(4) of this Disclosure Statement.

**58.** "**Cure Costs**" has the meaning set forth in Paragraph IV(G)(11) of this Disclosure Statement.

**59.** "**Debtors**" mean: Silver Creek Industries, LLC (Case No. 6:23-bk-11677-SY); Silver Creek Industries RS, LLC (Case No. 6:23-bk-12167-SY); and Silver Creek Leasing (Case No. 6:23-bk-12165-SY).

60.    "**Deficiency Claim**" means that portion of a Claim that is in excess of the value of the Collateral which is security for the repayment of such Claim, calculated in accordance with the provisions of 506 of the Bankruptcy Code.

61.    "**De Minimis Distribution**" has the meaning set forth in 7.2.3 of the Plan.

62.    "**Disbursing Agent**" means the entity charged with making Distributions under the Plan.  The Liquidating Trust Trustee will serve as Disbursing Agent under the Plan.

63.    "**Disclosure Statement**" means this First Amended Joint Disclosure Statement relating to the Plan, including, without limitation, all exhibits and schedules hereto, as approved by the Bankruptcy Court pursuant to 1125 of the Bankruptcy Code, as may be amended, modified or supplemented from time to time in accordance with the provisions of the Bankruptcy Code and Bankruptcy Rules.

64.    "**Disclosure Statement Order**" means the Final Order entered by the Bankruptcy Court approving this Disclosure Statement.

65.    "**Disputed Claim**" means any Claim, or any amount of a Claim, as to a Debtor as to which any of the following applies:  (a) a Proof of Claim has been filed and the dollar amount of such Claim is not specified in a fixed amount; (b) a Proof of Claim has been filed against such Debtor, to the extent to which the stated amount of such Claim against such Debtor exceeds the amount of such Claim listed in such Debtor's Bankruptcy Schedules; (c) a Proof of Claim has been filed against such Debtor and such Claim is not listed in such Debtor's Bankruptcy Schedules; (d) a Proof of Claim has been filed against such Debtor, and is listed in such Debtor's Bankruptcy Schedules as contingent, disputed, liquidated, or unknown as to amount; or (e) an objection, or request for estimation, has been filed by the Claims Objection Deadline and such objection or request for estimation has neither been withdrawn nor been denied by a Final Order.  Notwithstanding the foregoing, pursuant to the Plan, a Claim will not be a Disputed Claim as to any amount of the Claim that is allowed by a Final Order of the Bankruptcy Court.

**66.** "**Disputed Claims Reserve**" has the meaning set forth in Paragraph VIII(W)(3) of this Disclosure Statement.

**67.** "**Distribution**" means any transfer under the Plan of Cash to the holder of an Allowed Claim.

**68.** "**Effective Date**" means the fifteenth (15th) day following the waiver or satisfaction of the conditions set forth in 6.3 of the Plan.

**69.** "**ERTC**" means that Employee Retention Tax Credit claim that the Debtors intend to submit to the IRS.

**70.** "**Estate**" means the estate created in a Debtor's Case under 541 of the Bankruptcy Code.

**71.** "**Excluded Assets**" means the "Excluded Assets" not transferred to Silver Creek Modular, but retained by the Debtors, pursuant to the Asset Purchase Agreement, as defined in the Asset Purchase Agreement.

**72.** "**Expenses**" has the meaning set forth in 2.1.88 of the Plan.

**73.** "**Feasibility Analysis**" has the meaning set forth in Paragraph XII(F)(1) of this Disclosure Statement.

**74.** "**Federal Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as now in effect and as may be hereafter amended.

**75.** "**Final Decree**" has the meaning set forth in 6.17 of the Plan.

**76.** "**Final Order**" means an order or judgment of the Bankruptcy Court or other applicable court, as entered on the applicable docket, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or to obtain a rehearing is then pending or as to which any right to appeal, petition for certiorari, reargue, or obtain a rehearing is waived in writing in form and substance satisfactory to the Debtors prior to the Effective Date, or to the Liquidating Trust Trustee after the Effective Date, as applicable, or, in the event that an appeal, writ of certiorari, or proceeding for reargument or rehearing of such

order or judgment has been sought, such order or judgment is affirmed by the highest court to which such order or judgment was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing has expired.

77. "**General Unsecured Claim**" means any Claim that is not an Administrative Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim or a Subordinated Claim, including, without limitation, a Rejection Claim, a Deficiency Claim or an Avoidance Action Payment Claim.

78. "**Governance Agreements**" means, collectively, the operating agreements and other governance agreements of the Debtors.

79. "**Governmental Unit**" has the meaning set forth in  101(27) of the Bankruptcy Code.

80. "**Hartford**" means Hartford Fire Insurance Company and affiliates thereof. Prior to SCI's Petition Date, Hartford provided surety bonds to SCI.

81. "**Initial Distribution Date**" has the meaning set forth in  7.2.8 of the Plan.

82. "**Interest**" means an "equity security" in a Debtor, as such term is defined in  101(16) of the Bankruptcy Code, no matter how held, including, without limitation, an issued and outstanding membership interest in a Debtor, and all rights and interests arising thereunder, and all rights to acquire equity securities in a Debtor, including, without limitation, pursuant to options, warrants, employee plans, or similar agreements, contracts or instruments.

83. "**Interest Holder**" means a holder of an Interest.

84. "**IRS**" means the Internal Revenue Service.

85. "**Late-Filed Claim**" means any General Unsecured Claim described in s 726(a)(2)(C) or 726(a)(3) of the Bankruptcy Code.

86. "**Lien**" means any lien, security interest, mortgage, deed of trust, encumbrance, pledge or other charge against Assets of a Debtor.

87.    **"Liquidating Trust"** means that Liquidating Trust, established for the benefit of Creditors pursuant to the Liquidating Trust Agreement and implemented pursuant to the Plan.

88.    **"Liquidating Trust Account"** means a segregated, interest-bearing account to be established by the Liquidating Trust Trustee for the Debtors, into which the Liquidating Trust Trustee will deposit all Cash of the Debtors in accordance with the provisions of the Plan.

89.    **"Liquidating Trust Agreement"** means that certain Liquidating Trust Agreement, which is implemented pursuant to the Plan.  A true and complete copy of the Liquidating Trust Agreement is attached as **Exhibit "1"** to the Plan.

90.    **"Liquidating Trust Assets"** means the Assets of the Debtors to be administered by the Liquidating Trust Trustee pursuant to the Liquidating Trust Agreement and the Plan.

91.    "**Liquidating Trust Proceeds**" means the Cash in the Liquidating Trust Account available to make Distributions to holders of Allowed Class 3 Claims or Allowed Class 4 Claims under the Plan after payment of, or the establishment of an appropriate Reserve for paying, all Secured Claims, Administrative Claims, Priority Non-Tax Claims, Priority Tax Claims and Post-Effective Date Plan Expenses.

92.    **"Liquidating Trust Trustee"** means the Trustee appointed pursuant to the Liquidating Trust Agreement to administer the Plan and to make the Distributions provided by the Liquidating Trust Agreement and the Plan.  J. Michael Issa is appointed as the initial Liquidating Trust Trustee pursuant to the Liquidating Trust Agreement.

93.    "**Liquidating Trust Trustee Certification**" has the meaning set forth in Paragraph VIII(P) of this Disclosure Statement.

94.    "**Liquidation Analysis**" has the meaning set forth in Paragraph XII(G) of this Disclosure Statement.

95.    "**Local Bankruptcy Rules**" means the Local Bankruptcy Rules applicable to cases pending before the Bankruptcy Court, as now in effect and as may be hereafter amended.

96.    "**Monthly Compensation Order**" has the meaning set forth in Paragraph IV(G)(4) of this Disclosure Statement.

97.    "**Mr. Issa**" means J. Michael Issa, the Liquidating Trust Trustee to be appointed under the Plan.

98.    "**Mr. McGeever**" means James McGeever, the managing member of each Debtor as of the Petition Date.

99.    "**Net Recoveries**" means all Cash proceeds received after the Effective Date in connection with the assertion, litigation or settlement of a Cause of Action of a Debtor's Estate, _less_ only the fees and costs of a Professional or other expenses incurred by the Liquidating Trust Trustee in connection with such Cause of Action.

100.    "**Ordinary Course Administrative Claim**" means an Administrative Claim allowable under 503(b) of the Bankruptcy Code, that was incurred or is incurred in the ordinary course of a Debtor's operations or the administration of its Case, or the payment of which is provided for by an order of the Bankruptcy Court, exclusive of any Pre-Effective Date Professional Fee Claims, Administrative Tax Claims, United States Trustee Fees and any 503(b)(9) Claims.  For the purpose of the Plan, an Administrative Claim asserted by a lessor of real property or personal property to a Debtor is deemed to be an Ordinary Course Administrative Claim.

101.    "**Ordinary Course Motion Orders**" has the meaning set forth in Paragraph IV(G)(1)(c) of this Disclosure Statement.

102.    "**Payroll Motion**" has the meaning set forth in Paragraph IV(G)(1)(b) of this Disclosure Statement.

103.    "**Perris Real Property Lease**" means that lease agreement, as amended and modified, between Perris IV Industrial, LLC, as lessor, and SCI, as lessee, pursuant to which SCI leased that real property commonly known as 2830 Barrett Avenue, Perris

California. SCI operated its business from such real property. SCI assumed and assigned the Perris Real Property Lease to Silver Creek Modular pursuant to the Asset Sale Transaction.

104.    "**Petition Date**" means, in the case of SCI, April 24, 2023, the date on which SCI filed its voluntary Chapter 11 petition commencing its Case, and, in the case of SCI RS and SCL, May 22, 2023, the date on which SCI RS and SCL filed their voluntary Chapter 11 petitions commencing their Cases.

105.    "**Plan**" means that Second Amended Joint Chapter 11 Plan to which this Disclosure Statement refers, as may be amended, modified or supplemented from time to time in accordance with the provisions of the Bankruptcy Code and Bankruptcy Rules.

106.    "**Post-Effective Date Notice Parties**" has the meaning set forth in  13.14 of the Plan.

107.    "**Post-Effective Date Plan Expenses**" means all voluntary and involuntary costs, expenses, charges, obligations, or liabilities of any kind or nature, whether matured, unmatured, non-contingent, contingent, liquidated, or unliquidated incurred after the Effective Date related to the implementation of the Plan, including, but not limited to: (a) the Expenses associated with administering the Plan, including any taxes assessed against the Liquidating Trust Assets; (b) all United States Trustee Fees; (c) the Expenses associated with making the Distributions required by the Plan; (d) any Expenses associated with preparing and filing Tax returns and paying Taxes; (e) the Expenses of independent contractors, agents and Professionals providing services to the Liquidating Trust Trustee; and (f) the fees of the Liquidating Trust Trustee and the reimbursement of expenses to which the Liquidating Trust Trustee is entitled under the Plan.

108.    "**Postpetition Interest**" means any interest accrual on any Allowed claim from and after the Petition Date, in accordance with the provisions of s 5.3.1.3, 5.3.2.3 and 5.4.3 of the Plan.  Any Postpetition Interest, to the extent payable, shall accrue at the federal judgment rate, as set forth in 28 U.S.C. § 1961(a), in effect as of the Effective Date.

**109.** "**Pre-Effective Date Professional**" means a Professional employed in a Debtor's Case prior to the Effective Date pursuant to an order of the Bankruptcy Court in accordance with s 327, 328 or 1103(a) of the Bankruptcy Code.

**110.** "**Pre-Effective Date Professional Fee Claim**" means a Claim of a Pre-Effective Date Professional under s 327, 328, 330, 331 or 503(b) of the Bankruptcy Code for compensation for services rendered or expenses incurred prior to the Effective Date on behalf of a Debtor's Estate.

**111.** "**Priority Non-Tax Claim**" means a Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under 507(a) of the Bankruptcy Code.

**112.** "**Priority Tax Claim**" means a Claim entitled to priority under 507(a)(8) of the Bankruptcy Code.

**113.** "**Professional**" means any attorney, accountant, appraiser, auctioneer, broker, financial consultant, expert or other professional person.

**114.** "**Proof of Claim**" means a statement under oath filed in a Case by a Creditor in which the Creditor sets forth the amount claimed to be owed to it and detail sufficient to identify the basis for the Claim, and that is filed in accordance with the requirements of the Bankruptcy Code and the Bankruptcy Rules, including Rule 3001 of the Federal Bankruptcy Rules.

**115.** "**Pro Rata**" means proportionately so that the ratio of (a) the amount of Cash distributed on account of an Allowed Claim against a Debtor to (b) the amount of the Allowed Claim is the same as the ratio of (x) the amount of Cash available for distribution on account of all Allowed Claims against the Debtors in the Class in which that Allowed Claim is included to (y) the amount of all Allowed Claims in that Class.

The Pro Rata formula is illustrated as follows:

| (a) Amount of Cash distributed to a holder of an Allowed Claim | | (x) Total Cash available for distribution on account of Allowed Claims in that Class |
|---|---|---|
| = | | |
| (b) Amount of such Allowed Claim | | (y) Amount of all Allowed Claims in that Class |

Under the Plan, Allowed Class 3A Claims and any Allowed Class 3B Claim are combined for the purpose of calculating Pro Rata Distributions to be made to holders of Allowed Class 3 Claims.

Pursuant to the Plan, in calculating the Distributions to be made under the Plan, the Liquidating Trust Trustee, as Disbursing Agent under the Plan, is required to establish Reserves, on account of Disputed Claims, in accordance with the provisions of 8.4.3 of the Plan.

116.    **"Purchase Price"** means the "Purchase Price" paid by Silver Creek Modular, as such term is defined in the Asset Purchase Agreement.

117.    "**Purchased Assets**" has the meaning set forth in Paragraph IV(G)(7) of this Disclosure Statement.

118.    "**Rejection Claim**" means any General Unsecured Claim based upon or arising from the rejection of an executory contract or unexpired lease pursuant to a Final Order of the Bankruptcy Court or pursuant to the Plan.

119.    "**Representatives**" has the meaning set forth in 6.8.5 of the Plan.

120.    "**Reserves**" means, collectively, the Disputed Claims Reserve, the Unclaimed Property Reserve, and any other reserves that the Liquidating Trust Trustee, as Disbursing Agent under the Plan, is required to establish pursuant to the Plan.

121.    "**Sale Motion**" has the meaning set forth in Paragraph IV(G)(9) of this Disclosure Statement.

122.    **"Sale Order"** means that Order Granting Debtors' Motions for Order Authorizing: (1) Sale of Substantially All of the Assets of the Debtors Free and Clear of Liens and Interests in Accordance With the Provisions of Asset Purchase Agreement; (2) Assumption and Assignment of Unexpired Leases and Executory Contracts; (3) Rejection of Unexpired Leases and Executory Contracts and (4) Abandonment of Property, entered by the Bankruptcy Court on June 2, 2023, at Docket No. 200.

123.    "**Sale Procedures Order**" has the meaning set forth in Paragraph IV(G)(8) of this Disclosure Statement.

124.    "**SCI**" means Silver Creek Industries, LLC, a Debtor and a proponent of the Plan (Case No. 6:23-bk-11677-SY).

125.    "**SCI RS**" means Silver Creek Industries RS, LLC, a Debtor and a proponent of the Plan (Case No. 6:23-bk-12167-SY).

126.    "**SCL**" means Silver Creek Leasing, LLC, a Debtor and a proponent of the Plan (Case No. 6:23-bk-12165-SY).

127.    "**503(b)(9) Claim**" means a Claim asserted pursuant to  503(b)(9) of the Bankruptcy Code.

128.    "**726(a)(4) Claim**" means a Claim that is subject to the provisions of 726(a)(4) of the Bankruptcy Code.

129.    "**Secured Claim**" means a Claim that is secured by a Lien against property in which a Debtor's Estate has an interest or that is subject to setoff under  553 of the Bankruptcy Code.  Pursuant to the Plan, a Claim is a Secured Claim only to the extent of the value, as determined under  506(a) of the Bankruptcy Code, of the Secured Creditor's interest in the Collateral securing the Claim or to the extent of the amount subject to setoff, whichever is applicable.

130.    "**Secured Creditor**" means the holder of a Secured Claim.

131.    "**Settlement**" has the meaning set forth in Paragraph IV(G)(15) hereof.

132.    "**Settlement Agreement**" has the meaning set forth in Paragraph IV(G)(15) hereof.

133.    "**Silver Creek Modular**" means Silver Creek Modular, LLC, the "Buyer" of substantially all of the Debtors' assets pursuant to the Asset Purchase Agreement.

134.    "**Subordinated Claim**" means a Claim that is subordinated to Allowed Class 3 Claims to the extent provided by the Bankruptcy Code or a Final Order.

135.    "**Tax**" means any tax, charge, fee, levy, or other assessment by any federal, state, local or foreign taxing authority or other Governmental Unit, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax.

Pursuant to the Plan, "Tax" includes any interest, penalties or additions attributable to, or imposed on or with respect to, such assessments.

136.    "**Tax Claim**" means any Claim, prepetition or postpetition, relating to a Tax.

137.    "**United States Trustee**" means the Office of the United States Trustee for the Central District of California.

138.    "**United States Trustee Fees**" means all fees and charges assessed against a Debtor by the United States Trustee and due pursuant to  1930 of title 28 of the United States Code.

B.    **Rules of Interpretation**.

For the purpose of this Disclosure Statement, unless otherwise provided in this Disclosure Statement, (1) the rules of construction set forth in  102 of the Bankruptcy Code apply to this Disclosure Statement; (2) Rule 9006(a) of the Federal Bankruptcy Rules applies when computing any time period under the Plan referenced in this Disclosure Statement; (3) a term that is used in this Disclosure Statement and that is not defined in this Disclosure Statement has the meaning attributed to that term, if any, in the Bankruptcy Code or in the Bankruptcy Rules; (4) the definition given to any term or provision in the Plan supersedes any different meaning that may be given to that term or provision in this Disclosure Statement; (5) whenever it is appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural; (6) each pronoun stated in the masculine, feminine or neuter includes each of the masculine, feminine and neuter; (7) any reference to an exhibit, schedule, instrument or other document means such exhibit, schedule, instrument or other document as it has been, or may be, amended, modified, restated or supplemented as of the Confirmation Date, and any such exhibit, schedule, instrument or other document will be deemed to be included in this Disclosure Statement, regardless of when it is filed; (8) the phrases "under this Disclosure Statement," "hereof," "hereto," "hereunder," and similar words or phrases, refer to this Disclosure Statement in its entirety rather than to only a portion of this Disclosure Statement; (9) unless otherwise indicated, all references in this Disclosure Statement to paragraphs, articles or exhibits are

references to paragraphs, articles or exhibits in this Disclosure Statement; (10) paragraph captions and headings are used for convenience only and do not affect the meaning of this Disclosure Statement; (11) any reference to the holder of a Claim or Interest includes that entity's successor and assigns; and (12) a reference to "or" in this Disclosure is construed as not exclusive.

### C.    **Exhibits**.

All exhibits to this Disclosure Statement are incorporated into and are a part of this Disclosure Statement as if set forth in full herein.

### III.

### OVERVIEW OF THE CHAPTER 11 PROCESS, THE PLAN AND VOTING ON THE PLAN

### A.    **The Chapter 11 Process**.

Chapter 11 of the Bankruptcy Code provides debtors with a "breathing spell" within which to propose a restructuring of their obligations to third parties. The filing of a Chapter 11 bankruptcy petition creates a bankruptcy "estate" comprising all of the assets and property interests of the debtor. Unless a trustee is appointed by the bankruptcy court for cause (no trustee has been appointed in the Cases), a debtor remains in possession and control of all its assets as a "debtor-in-possession." The debtor may continue to operate its business in the ordinary course on a day-to-day basis without bankruptcy court approval. Bankruptcy court approval is required only for various kinds of transactions as to which the Bankruptcy Code requires approval (such as certain sale or financing transactions) and transactions out of the ordinary course of a debtor's business. The filing of the bankruptcy petition gives rise to what is known as the "automatic stay" which, generally, enjoins creditors from taking any action to collect or recover obligations owed by a debtor prior to the commencement of a Chapter 11 case. The bankruptcy court can, however, grant relief from the automatic stay, under certain specified conditions or for cause.

A Chapter 11 debtor may propose a plan providing for the reorganization of the debtor or, as in this case, for the orderly liquidation of the assets of the debtor's estate. A plan provides, among other things, for the treatment of the claims of the debtor's creditors and the interests of the debtor's equity holders.

B.    **Overview of the Debtors' Proposed Plan**.

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan.  For a more detailed description of the terms and provisions of the Plan, see Articles VI and VII below.

With the approval of the Bankruptcy Court, the Debtors sold and assigned to Silver Creek Modular substantially all of the Debtors' assets pursuant to the provisions of the Asset Purchase Agreement.  The Debtors ceased business operations after the closing of the Asset Sale Transaction.  The primary objective of the Plan is to distribute to Creditors Cash that has been or will be received by the Debtors from the Asset Sale Transaction and Cash that has been or that may be received by the Debtors from the liquidation or other disposition of the Debtors' other Assets (primarily the ERTC and any Causes of Action).  By the Plan, the Debtors will continue in existence only as appropriate to complete a liquidation of the Debtors' Assets and a wind-up of the Debtors' financial affairs, for the benefit of Creditors.  The Interests of the Interest Holders will be canceled effective as of the Case Closing Date and the Interest Holders will not receive any Distributions on account of their Interests, except as provided by 5.5 of the Plan.

The Plan designates four Classes of Claims (Class 3 consists of two separate, legally distinct sub-classes of Allowed General Unsecured Claims) and one Class of Interests, which include all Claims against, and Interests in, the Debtors.  These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Classes and Interests.

The following table summarizes the treatment of Claims and Interests under the Plan with a brief description of the treatment provided for in the Plan for each Class of Claims or Interests.

### SUMMARY OF CLAIMS AND INTERESTS UNDER THE PLAN

| Class | Claim/Interest | Summary of Treatment[4] |
|---|---|---|
| N/A | Allowed Administrative Claims | Payment in full, in Cash, on or about the Effective Date or as an Administrative Claim is allowed by the Bankruptcy Court. |
| N/A | Allowed Priority Tax Claims | Payment in full, in Cash, on or about the Effective Date, or as a Priority Tax Claim is allowed by the Bankruptcy Court. |

---

[4] This is only a summary of the treatment of Claims and Interests under the Plan.  Creditors and Interest Holders should refer to Articles VI and VII of this Disclosure Statement for a more complete discussion of the treatment of Allowed Claims and Allowed Interests under the Plan.

| Class | Claim/Interest | Summary of Treatment[4] |
|-------|----------------|--------------------------|
| 1 | Allowed Secured Claims, including any Allowed Secured Claims of CIT | As set forth in Paragraph IV(G)(15) of this Disclosure Statement, subject to the execution of a definitive Settlement Agreement and the approval of the Bankruptcy Court, the Debtors, the Committee and CIT have resolved their differences. If the Settlement is effectuated, any Allowed Secured Claim of CIT will be paid within three (3) Business Days after the finality of an order of the Bankruptcy Court approving the Settlement. If the Settlement is not effectuated, CIT will receive payment in full, in Cash, of any Allowed Secured Claim on or about the Effective Date. Any other Secured Creditor will receive payment in full, in Cash, of any Allowed Secured Claim on or about the Effective Date. |
| 2 | Allowed Priority Non-Tax Claims | Payment in full, in Cash, on or about the Effective Date, or as a Priority Non-Tax Claim is allowed by the Bankruptcy Court. |
| 3 | Allowed General Unsecured Claims including any Allowed Deficiency Claim of CIT. Any Allowed Deficiency Claim of CIT is designated as a Class 3B Claim under the Plan, and constitutes a separate, legally distinct sub-class from the sub-class of all other Allowed General Unsecured Claims, which is designated as Class 3A under the Plan. | Payment of Distributions from the Liquidating Trust over the course of the Plan. The treatment of Allowed Class 3A Claims is as set forth in  5.3.1 of the Plan, and the treatment of any Allowed Class 3B Claim is set forth in  5.3.2 of the Plan. |
| 4 | Allowed Subordinated Claims | Payment only if all other Allowed Claims are paid in full. |
| 5 | Allowed Interests | On the Case Closing Date, the Interests will be canceled. Interest Holders will receive Distributions only if all Allowed Claims, including all Allowed Subordinated Claims, are paid in full. |

Set forth in Paragraph XII(F) hereof is a discussion of the projected recoveries by Creditors.

C. **Plan Confirmation, Voting on the Plan and Objections to the Plan**.

The Bankruptcy Court has not yet confirmed the Plan described in this Disclosure Statement. In other words, the terms of the Plan are not yet binding on the Debtors, Creditors and Interest Holders.  However, if the Bankruptcy Court confirms the Plan, the Plan will be binding on the Debtors and on all Creditors and Interest Holders in the Cases, regardless of whether a Creditor voted to accept or reject the Plan.

As set forth in  6.21 of the Plan, the Plan is proposed as a joint plan for the Debtors and effectuates a substantive consolidation (i.e., a merger) of the Assets, liabilities and financial affairs of the Debtors.  All determinations regarding confirmation of the Plan will be made jointly for each Debtor, including issues regarding voting with respect to the Plan.

1.      **Voting on the Plan**.

A Creditor may vote to accept or to reject the Plan by filling out and mailing to the Debtors' counsel the form of the ballot that has been provided herewith.  Ballots should be mailed or e-mailed to Winthrop Golubow Hollander, LLP, located at 1301 Dove Street, Suite 500, Newport Beach, California 92660 (Attn:  Ms. Jeannie Martinez).

Any Creditor holding Claims in more than one impaired Class must submit one ballot for each such Class.  If a Creditor has received an incorrect ballot, or believes that he is entitled to vote in more than one Class, additional ballots may be obtained upon written request made to WGH (Attn:  Ms. Jeannie Martinez).

In order to vote for or against the Plan, a Creditor must have filed a Proof of Claim against a Debtor on or before the Bar Date, unless his Claim is listed in such Debtor's Bankruptcy Schedules as not being disputed, unliquidated, contingent or unknown as to amount.  Any such Creditor is, to the extent listed in such Debtor's Bankruptcy Schedules, deemed to have filed a Claim, and absent a timely objection to the Claim, such Claim is deemed allowed.  In order to determine whether a Creditor is entitled to vote on the Plan notwithstanding any failure by the Creditor to have filed timely a Proof of Claim, the Creditor should review the Bankruptcy Schedules of the Debtor against which the Creditor asserts its Claim.  If a Creditor's Claim is not scheduled, or, if it is scheduled as contingent, disputed, unliquidated or unknown as to amount and the Creditor did not file a Proof of Claim prior to the Bar Date, the Creditor may not be entitled to vote on the Plan.

The following types of Claims are not entitled to vote on the Plan: (a) Claims that have been disallowed; (b) Claims in an unimpaired Class; and (c) Administrative Claims and Priority Tax Claims.  Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan.  Administrative Claims and Priority Tax Claims are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code.  **EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED IN SUBPARAGRAPHS (b) OR (c)**

**ABOVE, YOU STILL MAY HAVE A RIGHT TO OBJECT TO THE
CONFIRMATION OF THE PLAN.**

     **2.**       **<u>Deadline for Voting for or Against the Plan</u>**.

The Bankruptcy Court has fixed ___, 2023, at 5:00 p.m. Pacific Time, as the last date by which ballots must be received by WGH, the Debtors' general insolvency counsel. Subject to review and determination by the Bankruptcy Court, votes received by WGH after that date may not be counted.  Whether or not a Creditor votes on the Plan, it will be bound by the terms of the Plan and the treatment of its Claim set forth in the Plan if the Plan is confirmed by the Bankruptcy Court.  Absent some affirmative act constituting a vote, a Creditor will not be included in the voting tally.  Allowance of a Claim for voting purposes does not necessarily mean that all or a portion of the Claim will be allowed for distribution purposes.

Since, subject only to any order of the Bankruptcy Court to the contrary, only the votes of those Creditors whose ballots are timely received may be counted in determining whether a Class has accepted the Plan, Creditors are urged to fill in, date, sign and promptly mail the enclosed ballot.

     **3.**       **<u>Time and Place of the Confirmation Hearing</u>**.

1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on the confirmation of the Plan.  The hearing at which the Bankruptcy Court will determine whether to confirm the Plan will take place on ____, 2023, at ___ __.m., in Courtroom 302 of the United States Bankruptcy Court located at 3420 Twelfth Street, Riverside CA 92501.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing.

     **4.**       **<u>Deadline For Objecting to the Confirmation of the Plan</u>**.

1128(b) of the Bankruptcy Code provides that any party-in-interest may object to the confirmation of the Plan.  Objections to the confirmation of the Plan must be in writing and conform to the requirements of the Bankruptcy Rules and must be filed with

the Bankruptcy Court and served upon the following:  counsel to SCI, Winthrop Golubow

Hollander, LLP, Attn: Robert E. Opera, Esq., 1301 Dove Street, Suite 500, Newport

Beach, CA 92660; SCI RS's and SCL's counsel, Ringstad & Sanders, LLP, Attn: Todd C.

Ringstad, Esq., 4910 Birch Street, Suite 120, Newport Beach, CA 92660; the Committee's

counsel, Tucker Ellis, LLP, Attn:  Thomas R. Fawkes, Esq., 233 South Wacker Drive,

Suite 6950, Chicago, IL 60606; and upon the United States Trustee, Attn:  Ali Matin,

Esq., located at U.S. Department of Justice, Office of the U.S. Trustee, 3801 University

Avenue, Suite 720, Riverside, CA 92501 so as to be received by each of them by

5:00 p.m. (Pacific Time) on _____, 2023.  Objections to confirmation of the Plan are

governed by Rule 9014 of the Federal Bankruptcy Rules.  **UNLESS AN OBJECTION

TO CONFIRMATION IS TIMELY AND PROPERLY SERVED AND FILED, IT

MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

        5.    **Plan Confirmation**.

        The Bankruptcy Court will confirm the Plan if the requirements of  1129 of the

Bankruptcy Code are satisfied.    1129 requires, among other things, that:  (a) with respect

to each Class of Claims against the Debtors, each holder of a Claim in that Class has

accepted the Plan, or will receive or retain under the Plan on account of such Claim,

property of a value that is not less than the amount that such holder would receive if the

Debtors were to liquidate their assets under Chapter 7 of the Bankruptcy Code;

(b) confirmation of the Plan is not likely to be followed by a liquidation of the Debtors or

the need for further reorganization of the Debtors unless liquidation or further

reorganization is proposed by the Plan (the Plan does propose a liquidation of the Debtors);

and (c) the Plan be accepted by each Class of Claims that is impaired by the Plan, or the

Plan does not discriminate unfairly and is fair and equitable to any impaired Class that has

not accepted the Plan.

        To confirm the Plan, the Bankruptcy Court must determine whether each

"impaired" Class entitled to vote on the Plan has accepted the Plan.  Pursuant to  1124 of

the Bankruptcy Code, Classes "impaired" by the Plan are those Classes whose legal,

equitable or contractual rights are altered pursuant to the Plan.  Under  1126(c) of the Bankruptcy Code, an impaired Class of Claims is deemed to have accepted the Plan if the Plan is accepted by Creditors in that Class holding at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of Creditors in that Class actually voting on the Plan.

The Debtors intend to request that the Bankruptcy Court confirm the Plan pursuant to the provisions of  1129(a) of the Bankruptcy Code.  However, if any Class of Claims or Interests votes against the Plan, or is deemed to have voted against the Plan, the Debtors will seek to confirm the Plan under  1129(b) of the Bankruptcy Code.  Pursuant to  1129(b), the Plan may be confirmed despite the failure of a Class of Claims or Interests to accept the Plan if the Bankruptcy Court determines that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or Interests that is impaired under, and that has not accepted, the Plan, and determines that the Plan otherwise complies with the requirements of  1129(b) of the Bankruptcy Code.  The condition that the Plan be fair and equitable with respect to such nonaccepting Classes includes certain legal requirements more fully set forth in  1129(b).

**6.** **Identity of Person to Contact for More Information Regarding this Disclosure Statement or the Plan.**

Any interested party desiring further information about this Disclosure Statement or the Plan should contact counsel for SCI, Winthrop Golubow Hollander, LLP,  Attn: Robert E. Opera, 1301 Dove Street, Suite 500, Newport Beach, CA 92660; telephone no. (949) 720-4100; ropera@wghlawyers.com

**IV.**

**BACKGROUND OF THE DEBTORS**

A.    **Description and History of the Debtors and the Debtors' Businesses**.

1.    **General Description of the Debtors.**

SCI was founded in 2005 with the goal of redefining modular construction of buildings. In August 2020, BVA Construction, LLC ("BVA LLC") and BVA

Construction, Inc. ("BVA Inc.") acquired 100% of the Debtors. BVA LLC owns 100% of the membership interests in BVA Inc.  BVA Inc. owns 100% of the membership interests in each Debtor. The managing member of each Debtor is Mr. McGeever. An organization chart showing the affiliations among the BVA LLC, BVA Inc. and the Debtors is attached as **Exhibit "A"** hereto.

BVA LLC is a holding company, with no material assets other than its interest in BVA Inc. BVA Inc. is a holding company, with no material assets other than its interests in the Debtors.

SCI is a California limited liability company. SCI's principal place of business was located in Perris, California. SCI was engaged in the business of manufacturing modular buildings, primarily for schools, commercial projects and for multi-family residential projects. SCI believed that, by manufacturing high-quality, customized modular structures, it could build and deliver school, commercial and residential buildings much more quickly and economically than by traditional onsite construction. From and after SCI's founding in 2005, SCI built and delivered more than 12,000 modules for more than 1000 buildings for 350-plus school districts, as well as many commercial and residential buildings.

SCI RS is a California limited liability company. SCI RS's sole business operations were to provide transportation services to SCI. SCL is a California limited liability company. SCL's sole business operations were to lease machinery and equipment to SCI.

As of December 31, 2022, SCI had about 370 employees. As a result of staffing cuts undertaken by SCI and certain employee defections, however, SCI had about 219 employees as of its Petition Date.

Pursuant to the Asset Sale Transaction, the Debtors sold and assigned to Silver Creek Modular substantially all of the Debtors' Assets. Upon the closing of the Asset Sale Transaction, the Debtors ceased all operations and the Debtors no longer have any employees, except for Mr. McGeever. The Debtors' remaining Assets are addressed in Paragraph IV(G)(14) hereinbelow.

2.    **Financial Performance of SCI.**[5]

SCI's revenues for the past several years were as follows:

    a.    2019 -- $99,567,240.

    b.    2020 -- $122,512,982.

    c.    2021 -- $132,487,840.

    d.    2022 -- $97,944,409.

    e.    January 1, 2023 – March 31, 2023 (est.) – $20,992,101.

Historically, SCI's operations were profitable. SCI generated almost $22.0 million in net income in 2019 and almost $18.0 million in net income in 2020. However, SCI's operations became unprofitable in 2021. SCI had almost $11.0 million in operating losses in 2021 and losses of approximately $31.0 million in 2022. SCI's operations were unprofitable in 2023.

Copies of the Debtors' consolidated balance sheet, as of December 31, 2022, and the Debtors' consolidated balance sheet, as of March 31, 2023, are attached, collectively, as **Exhibit "B"** hereto.

SCI RS's and SCL's operations were devoted exclusively to serving the business needs of their affiliate, SCI. SCI RS's and SCL's balance sheets as of December 31, 2022 are stated on **Exhibit "B"** hereto.

3.    **Secured Claims Asserted Against the Debtors.**

On or about October 19, 2020, the Debtors, as "Borrowers," and CIT executed that Credit Agreement (Main Street Priority Loan Facility), pursuant to which CIT advanced to the Debtors a term loan in the original principal amount of $45.0 million ("CIT Loan").[6] CIT asserts that the Debtors' obligations under the CIT Loan have been guaranteed by BVA LLC and BVA Inc.

---

[5] Information contained herein regarding the financial affairs of SCI for the years 2019 through 2021 are derived from the audited financial statements for SCI.  The financial information for SCI for 2022 and for 2023 derives from unaudited, internally-prepared financial statements. The financial information provided for 2023 are preliminary and not final.

[6] The CIT Loan was made by CIT Bank, N.A., as a lender, and as the administrative agent for MS Facilities LLC, in accordance with the terms and conditions of the Main Street Lending Program established by the Board of Governors of the United States Federal Reserve System pursuant to Section 4027 of the CARES Act.

The CIT Loan was evidenced by a Term Loan Note, dated as of October 19, 2020. CIT asserts that the CIT Loan was secured by a Pledge and Security Agreement and by an Intellectual Property Security Agreement, and that CIT perfected its security interests by, among other things, the filing of UCC-1 financing statements.

CIT asserts that, as of SCI's Petition Date, the Debtors owed to CIT an amount of approximately $70.0 million. CIT asserts that the CIT Loan is secured by substantially all of the Assets of the Debtors (excluding Avoidance Actions).[7]

On June 28, 2023, CIT filed a proof of claim in SCI's Case (Claim #33-1), asserting against SCI a Secured Claim in an amount not less than $62,146,808 as of SCI's Petition Date. CIT's Claim includes an alleged assignment of Mr. McGeever's Claim to CIT in the amount of $21,250,000. CIT's Claim takes into account a $7,750,000 payment made to CIT from the Purchase Price received by the Debtors from the Asset Sale Transaction.

The Debtors and the Committee dispute CIT's Secured Claim. The Debtors and the Committee, on one hand, and CIT, on the other hand, have engaged in negotiations to settle CIT's Secured Claim and the scope and extent of CIT's asserted security interest in the Debtors' Assets. Subject to the execution of the Settlement Agreement and the approval of the Bankruptcy Court, an agreement has been reached among the Debtors the Committee and CIT resolving their disputes regarding the amount and treatment of CIT's Claims. See, Paragraph IV(G)(15) hereinbelow.

The Debtors believe that no other Creditor has a valid Secured Claim. 5.1.2 of the Plan provides that the Confirmation of the Plan will be deemed to be a finding that no Secured Creditor asserting a Lien junior in priority to the Liens of CIT has any Allowed Secured Claim against any Debtor, as determined under 506 of the Bankruptcy Code.

---

[7] The Debtors assert that CIT has no security interest in the Perris Real Property Lease. As set forth in Paragraph IV(G)(15) hereinbelow, subject to the execution of the Settlement Agreement among the Debtors, the Committee and CIT and the approval of the Bankruptcy Court, the Debtors have resolved their disputes with CIT regarding the amount and treatment of CIT's Claims in the Debtors' Cases.

-34-

**B.**     **SCI's Financial Difficulties**.

In 2021, SCI started having financial difficulties.  The causes of SCI's financial difficulties include the following.

**1.**     **COVID-19 Pandemic/Change in Business Mix**.

SCI historically has generated a substantial amount of revenue from manufacturing modular buildings for schools and commercial projects. As a result of the COVID-19 pandemic, however, orders for school projects and commercial projects slowed, resulting in a significant loss of revenue from such projects. In order to try to maintain revenue, SCI took on a larger number of residential projects. The following chart shows the change in business mix during this time period.

**Business Mix By Revenue (approx.)**

|             | 2020 | 2021 | 2022 |
|-------------|------|------|------|
| Schools     | 59%  | 70%  | 46%  |
| Commercial  | 37%  | 7%   | 9%   |
| Residential | 4%   | 23%  | 45%  |

The residential projects generally were lower profitability jobs than the school and commercial projects, resulting in a reduction in profitability of SCI's business.

**2.**     **Losses on Residential Projects**.

In 2021 and 2022, SCI suffered substantial losses on certain residential projects. Factors that led to losses on residential projects include:

**a.**     **Increase in Cost of Materials**. Residential projects generally are bid on a fixed price basis. After the execution of certain residential project contracts, there was a significant increase in materials costs, including wood and finish materials, leading to losses on such projects.

**b.**     **Increase in Cost of Labor/Labor Shortages**. Labor wage rates increased significantly during such period. Furthermore, as a result of COVID-19 restrictions, there was a shortage of workers leading, in part, to delays in

completion of projects.

        **c.**     **Supply Chain Shortages**. During such period, there was significant delay in obtaining materials needed for residential projects. These shortages in materials supply led to delays in completing projects, inefficiencies, additional labor costs to complete projects and the imposition of penalties on SCI.

        **d.**     **Inefficiencies in Execution of Residential Projects**. SCI had substantially more experience building school and commercial projects than residential projects (e.g., revenue from residential projects constituted only about 4% of SCI's total revenue in 2020). SCI's relative inexperience building residential projects led to inefficiencies in executing such projects and resulting losses associated therewith.

SCI's school projects and commercial projects, in the aggregate, continued to be profitable during 2021 and 2022, but SCI's residential projects were unprofitable during 2021 and 2022. The losses on SCI's residential projects caused strain on SCI's cash flow, resulting in SCI's having difficulty meeting its accruing obligations. SCI determined in 2022 not to build new residential projects given the problems associated with the execution of such projects.

        **3.**     **Surety Bond Issues.**

SCI's school projects and many other projects require SCI to provide performance and payment surety bonds. Given the deterioration in SCI's financial affairs, in or about December 2022, SCI's pre-petition surety bond provider, Hartford, gave notice to SCI that Hartford no longer would provide to SCI new surety bonds for SCI's projects. Without surety bond support, SCI could not operate its business in the ordinary course. Despite SCI's efforts, it was unable to obtain a new surety bond provider.

        **4.**     **Burdensome Secured Debt.**

As of SCI's Petition Date, CIT asserted against SCI a Secured Claim in an amount of approximately $70.0 million (inclusive of an alleged assignment to CIT of Mr. McGeever's Claims against the Debtors). As a result of the deterioration in SCI's financial

affairs, SCI was concerned that it would not be able to service timely the amount of such debt.

SCI acted diligently to address its financial difficulties. SCI undertook significant reductions in its workforce, ceased taking on new residential construction jobs, and reduced other operating expenses in order to attempt to return to profitability. While SCI believed that its efforts to return to profitability ultimately would be successful, its debt burdens, cash flow issues and bonding issues remained serious concerns for SCI.

**C.    Debtors' Disputes with CIT.**

CIT asserts that, as of February 10, 2023, the Debtors were in default under the Debtors' loan and security agreements with CIT. CIT asserts, among other things, that the Debtors had failed to comply with certain financial covenants contained in such agreements, and that the Debtors had failed to pay to CIT an interest payment that was owed to CIT in January 2023.

CIT expressed to the Debtors concerns about the deterioration in the Debtors' financial condition and questioned the viability of SCI's business. The Debtors and CIT engaged in discussions regarding the Debtors' financial affairs and the Debtors' ability to pay CIT's Secured Claim. Based upon such discussions and in light of the Debtors' financial difficulties, the Debtors determined to pursue, in Chapter 11, an auction of substantially all of their Assets in order to attempt to maximize the value of the Assets for the benefit of CIT and other Creditors of the Debtors.

**D.    Chapter 11 Filings.**

On April 24, 2023, SCI filed in the Bankruptcy Court a petition for relief under Chapter 11 of the Bankruptcy Code to effectuate a sale of substantially all of its Assets in order to maximize the recovery by its Creditors. On May 22, 2023, SCI RS and SCL filed their Chapter 11 petitions in order to facilitate a sale of their respective Assets.

**E.    Debtors' Postpetition Management.**

Mr. McGeever has served and continues to serve as the managing member of each Debtor. J. Michael Issa and Wen Tan of B. Riley have served as financial advisors to SCI in its Case.

F.    **Debtors' Current Financial Condition**.

Copies of the Debtors' respective Bankruptcy Schedules and monthly operating reports submitted to the United States Trustee are available for review by Creditors. Additional information regarding the Debtors' financial affairs is set forth in Paragraph XII(F) hereof.

G.    **Significant Events During the Cases**.

The following is a list of certain significant events which have occurred during the Cases.

1.    **SCI's "First Day" Motions**.

In order to facilitate an orderly transaction into Chapter 11, SCI filed the following "first-day" motions:

a.    **Emergency Motion for Order Authorizing Use of any Cash Collateral of Secured Claimants ("Cash Collateral Motion") [Docket No. 8]**. On April 25, 2023, SCI filed in the Bankruptcy Court the Cash Collateral Motion, requesting, among other things, that the Bankruptcy Court authorize SCI to use any "cash collateral" (as such term is defined in  363(a) of the Bankruptcy Code) of CIT in the operations of SCI's business. The Bankruptcy Court entered an order granting the Cash Collateral Motion, authorizing SCI's use of cash collateral on an interim basis. The Bankruptcy Court thereafter authorized SCI's use of cash collateral through the closing of the Asset Sale Transaction.

b.    **Emergency Motion for Order Authorizing (1) Payment and Honoring of Pre-Petition Payroll and Benefit Obligations; and (2) Retention of Account Used to Fund Pre-Petition Payroll ("Payroll Motion") [Docket No. 10]**. On April 25, 2023, SCI filed in the Bankruptcy Court the Payroll Motion, requesting, among other things, that the Bankruptcy Court authorize SCI to pay its pre-petition priority payroll obligations. The Bankruptcy Court entered an order granting the Payroll Motion.

c.    **Emergency Motion for Order Authorizing Debtor to Pay in the Ordinary Course Prepetition Claims of Claimants Having Bond Rights, Lien Rights or Comparable Construction Law Rights ("Ordinary Course Motion")**

**[Docket No. 11].**  On April 25, 2023, SCI filed in the Bankruptcy Court the Ordinary Course Motion requesting, among other things, that it be authorized to pay pre-petition Construction Law Claims in the ordinary course of SCI's business. The Bankruptcy Court granted the Ordinary Course Motion on an interim basis, authorizing SCI to pay $1,722,664 in Construction Law Claims on an interim basis, and thereafter authorized SCI to pay an additional $2,500,000 in such Claims (collectively, "Ordinary Course Motion Orders").

2.      **Debtors' Employment of Professionals.**

        a.      **SCI's Application to Employ WGH [Docket No. 98].**  On May 12, 2023, SCI filed in the Bankruptcy Court an application to employ WGH as its general insolvency counsel in its Case.  The Bankruptcy Court entered an order granting such application.

        b.      **SCI's Application to Employ B. Riley [Docket No. 250].**  On June 30, 2023, SCI filed in the Bankruptcy Court an application to employ B. Riley as its financial advisor in its Case.  The Bankruptcy Court entered an order granting such application.

        c.      **Ringstad & Sanders, LLP.**  On June 20, 2023, SCI RS and SCL filed an application to employ Ringstad & Sanders, LLP as their general insolvency counsel in their Cases.  The Bankruptcy Court entered an order granting such application.

3.      **Joint Administration of the Debtors' Cases [Docket No. 147].**

On May 23, 2023, the Debtors filed in the Bankruptcy Court an <u>ex parte</u> motion requesting that the Bankruptcy Court authorize the joint administration of the Debtors' Cases. The Bankruptcy Court entered an order granting such motion.

4.      **Order Establishing Monthly Compensation Procedures [Docket No. 285].**

On July 18, 2023, the Debtors, CIT, the Committee and the U.S. Trustee filed in the Bankruptcy Court a stipulation requesting, among other things, that the Bankruptcy Court

authorize Professionals employed in the Cases to obtain, on a monthly basis, payment of 80% of their fees and 100% of their costs, by complying with the compensation procedures set forth in such stipulation.  The Bankruptcy Court entered an order approving such stipulation ("Monthly Compensation Order") [Docket No. 285]. Professionals employed in the Cases have received compensation during the Cases by complying with the compensation procedures approved by the Bankruptcy Court's Monthly Compensation Order.

**5.**     **Appointment of Committee/Committee's Employment of Counsel.**

On May 5, 2023 the United States Trustee gave notice of the appointment of the Committee. The members of the Committee are: BBMR; Chatfied Clarke, LLC; and B2B Industrial Packaging, LLC. On May 17, 2023, the Committee filed in the Bankruptcy Court an application to employ Tucker Ellis, LLP as its counsel in SCI's Case [Docket No. 112].  The Bankruptcy Court entered an order granting such application.

**6.**     **Filing of Bankruptcy Schedules.**

On June 14, 2023, SCI filed its amended Bankruptcy Schedules [Docker No. 224]. On June 19, 2023, SCL filed its Bankruptcy Schedules [Docket No. 231] and, on June 19, 2023, SCI RS filed its Bankruptcy Schedules [Docket No. 232].

**7.**     **Asset Sale Transaction.**

In April 2023, the Debtors, on one hand, and Silver Creek Modular, on the other hand, entered into a term sheet (subject to the execution of a definitive purchase and sale agreement), pursuant to which the Debtors agreed to sell and assign to Silver Creek Modular, and Silver Creek Modular agreed to acquire from the Debtors, all of the Assets of the Debtors ("Purchased Assets"), except only for the Excluded Assets identified expressly in such term sheet.

**8.**     **Sale Procedures Motion.**

On May 1, 2023, SCI filed in the Bankruptcy Court its Motion for Order Approving (1) Sale and Bidding Procedures in Connection with the Sale of Substantially All of the Assets of the Debtor Free and Clear of Liens and Interests; (2) Approving Break-

1    Up Fee; and (3) Approving Manner of Notice to be Provided to Creditors and Parties-In-

2    Interest in Connection with Sale Motion ("Sale Procedures Motion") [Docket No. 26],

3    requesting, among other things, that the Bankruptcy Court approve sale and bidding

4    procedures with respect to the contemplated sale of the Purchased Assets to Silver Creek

5    Modular. The Bankruptcy Court entered an order granting the Sale Procedures Motion

6    ("Sale Procedures Order").

7        **9.    Sale Motion.**

8        On May 15, 2023, SCI filed in the Bankruptcy Court its Motion for Order

9    Authorizing: (1) Sale of Substantially All of the Assets of the Debtor Free and Clear of

10   Liens and Interests in Accordance with Provisions of Asset Purchase Agreement, Etc.

11   ("Sale Motion") [Docket No. 110], requesting, in part, that the Bankruptcy Court enter an

12   order authorizing the Debtors to sell and assign to Silver Creek Modular the Purchased

13   Assets, free and clear of claims, liens and interests pursuant to  363(f) of the Bankruptcy

14   Code, in accordance with the terms and conditions of the Asset Purchase Agreement.

15       **10.    Bids for Debtors' Assets/Auction.**

16       In accordance with the provisions of the Sale Procedures Order, a deadline for

17   bidders to submit bids for the Debtors' Assets was scheduled for May 24, 2023. The

18   Debtors received two (2) bids for the Debtors' Assets: the bid received from Silver Creek

19   Modular; and a bid received from Silver Creek Acquisition, LLC, an affiliate of Whitley

20   Manufacturing Co., Inc. ("Whitley").

21       In accordance with the provisions of the Sale Procedures Order, an auction of the

22   Debtors' assets was conducted on May 25, 2023 ("Auction"). At the Auction, over the

23   course of about five hours, there was spirited bidding between Silver Creek Modular and

24   Whitley. At the Auction, the proposed Purchase Price for the Debtors' assets was

25   increased substantially. At the conclusion of the Auction, the Debtors, with the

26   concurrence of the Committee and CIT, designated Silver Creek Modular as having

27   provided the highest and best bid for the Debtors' Assets (the winning bid was

28   $20,275,000), and Whitley was designated as the "Backup Bidder."

**11.    Asset Purchase Agreement.**

In accordance with the bidding at the Auction, the Debtors, as the "Sellers," and Silver Creek Modular, as the "Buyer," entered into the Asset Purchase Agreement providing, in part, for the following Purchase Price to be paid by Silver Creek Modular: (a) $17,575,000 Cash; (b) $2,500,000 allocated solely to pay pre-closing Construction Law Claims; and (c) $200,000 allocated solely to pay "Cure Costs" (as defined in the Asset Purchase Agreement) payable by SCI in connection primarily with SCI's assumption and assignment to Silver Creek Modular of the Perris Real Property Lease and another real property lease of SCI. In addition, Silver Creek Modular agreed to honor certain warranty obligations of SCI, to honor certain wage and benefit Claims of SCI employees employed by Silver Creek Modular, and to pay approximately $4,888,550 in liabilities associated with contracts assumed by Silver Creek Modular pursuant to the Asset Purchase Agreement, all in accordance with the provisions of the Asset Purchase Agreement.

**12.    Sale Hearing/Sale Order.**

A hearing on the Sale Motion was conducted on May 30, 2023 ("Sale Hearing"). At the Sale Hearing, the Bankruptcy Court granted the Sale Motion, confirming Silver Creek Modular as the successful bidder for the Purchased Assets. On June 2, 2023, the Bankruptcy Court entered the Sale Order granting the Sale Motion ("Sale Order") [Docket No. 200].

**13.    Closing of Asset Sale Transaction.**

On June 6, 2023, the Asset Sale Transaction among the Debtors, as the "Sellers," on one hand, and Silver Creek Modular, as the "Buyer," on the other hand, closed. Silver Creek Modular has paid to the Debtors the $20,275,000 Cash Purchase Price. On June 8, 2023, the Debtors served notice of the closing of the Asset Sale transaction.[8]

---

[8] In accordance with the provisions of the Sale Order, $7.75 million of the Purchase Price has been paid to CIT, and $2.7 million of the Purchase Price has been released to SCI in order to facilitate SCI's paying Cure Costs and Construction Law Claims. The balance of the Purchase Price, $9,825,000, is being maintained in trust pending a resolution of CIT's and the Debtors' competing claims to such funds.

14.    **Results of Asset Sale Transaction/Debtors' Remaining Assets.**

As a result of the Asset Sale Transaction, the Debtors have ceased all operations, the Purchased Assets have been sold and assigned to Silver Creek Modular and the Debtors no longer have any employees, except for Mr. McGeever.  Mr. McGeever remains as the managing member of each Debtor, and, together with the Debtors' counsel and B. Riley, is acting to wind up the Debtors' financial affairs.

The Debtors' remaining Assets consist of the following: the Debtors' interest in the balance of the Purchase Price, $9,825,000, the extent of which interest is disputed by CIT which asserts a Secured Claim against such funds; and the Debtors' interest in the Excluded Assets, primarily Avoidance Claims and the ERTC. The value of the ERTC is uncertain but could exceed $5.0 million. CIT assets that it has a security interest in the ERTC, and that the Debtors have no valuable interest therein. As set forth in the Paragraph IV(G)(15) directly hereinbelow, subject to the execution of the Settlement Agreement and the approval of the Bankruptcy Court, the Debtors have resolved their disputes with CIT.

15.    **Proposed Settlement with CIT.** Disputes have arisen among the Debtors and the Committee, on one hand, and CIT, on the other hand, regarding, among other things: the amount of CIT's Allowed Claim; the scope and extent of CIT's security interest and the amount of CIT's Allowed Secured Claim; the treatment of CIT's Claims under the Debtors' Plan; and any claims that the Debtors may have against CIT and any defenses that the Debtors may have to the payment of CIT's Claims. Specifically, there have been disputes regarding: the valuation of the Perris Real Property Lease and the amount of the Purchase Price that should be allocated to the Perris Real Property Lease; whether CIT has any security interest in the Perris Real Property Lease and the proceeds from the assignment thereof to Silver Creek Modular pursuant to the Asset Sale Transaction; whether CIT has any security interest in the ERTC claim; and whether CIT has the right to have as a part of its Allowed Claim an assignment of Mr. McGeever's Claims against the Debtors ($21,250,000).

The Debtors, the Committee and CIT engaged in extensive, hard-fought negotiations to attempt to resolve such disputes. After several months of difficult negotiations, the Debtors and the Committee, on one hand, and CIT, on the other hand, have settled their disputes ("Settlement"). As of the date of this Disclosure Statement, the Debtors, the Committee and CIT have reached agreement on the provisions of a term sheet resolving their disputes. A definitive settlement agreement ("Settlement Agreement") is being prepared to commemorate and confirm the Settlement reached by and among the Debtors, the Committee and CIT. The Debtors are preparing, and will file, a motion pursuant to Rule 9019 of the Federal Bankruptcy Rules requesting that the Bankruptcy Court approve the Settlement ("Compromise Motion"), and anticipate that the Compromise Motion will be set for hearing in early to mid-November 2023. Given the Committee's support for the Settlement, the Debtors are optimistic that the Settlement will be approved by the Bankruptcy Court.

Material terms of the proposed Settlement include:[9]

a.    **Acknowledgement of CIT's Allowed Claim.** CIT will agree to discount its Claim from about $70.0 million (less the $7,750,000 paid to CIT pursuant to the Asset Sale Transaction) to $47,397,119, and the Debtors and the Committee will acknowledge and agree that CIT will have an Allowed Claim against the Debtors in that amount.

b.    **CIT's Allowed Secured Claim/CIT's Deficiency Claim.** The Debtors, the Committee and CIT will agree that CIT will have an Allowed Secured Claim in the amount of $2,825,000, plus a reimbursement of $100,000 to compensate CIT for its cash collateral used to pay Cure Costs in connection with SCI's assumption and assignment of the Perris Real Property Lease to Silver Creek Modular ("CIT Reimbursement Claim"), plus, if any, "Net Collections" (as defined in the Settlement Agreement) from accounts receivable generated from contracts

---

[9] The following section is merely a summary of certain material terms of the Settlement and does not reflect all of the terms of the Settlement. In the event of any inconsistency between this summary and the terms of the Settlement Agreement, the terms of the Settlement Agreement will govern.

that were retained by SCI and that were not assigned to Silver Creek Modular

pursuant to the Asset Purchase Agreement. The balance of CIT's Allowed Claim

will be an Allowed General Unsecured Claim.

      c.    **Payment of CIT's Allowed Secured Claim.** CIT's Allowed Secured

Claim will be paid within three (3) Business Days after the finality of an order of the

Bankruptcy Court granting the Compromise Motion; provided that if whether there

are any Net Collections has not been determined within three (3) Business Days

after the finality of an order of the Bankruptcy Court granting the Compromise

Motion, any Net Collections shall be paid to CIT when it has been determined that

there are Net Collections.

      d.    **Payment of CIT's Allowed General Unsecured Claim.** CIT's

Allowed General Unsecured Claim will be paid pursuant to the terms and conditions

of the Plan.

      e.    **Valuation of Perris Real Property Lease/Unencumbered Asset.**

The Debtors, the Committee and CIT will acknowledge and agree that the Perris

Real Property Lease will be valued at $7.0 million and, consequently, that $7.0

million in Cash of the Purchase Price received by the Debtors from the Asset Sale

Transaction will be allocated to the Perris Real Property Lease. CIT will agree that

such $7.0 million in Cash proceeds from the Asset Sale Transaction will be

unencumbered.

      f.    **Any ERTC Recovery Will be Unencumbered.** CIT will agree that

any Net Recovery from the Debtors' pursuit of the ERTC claim will be

unencumbered.

      g.    **Sharing of Any Net Recoveries From Causes of Action.** The

Debtors, the Committee and CIT will agree that any Net Recoveries from the

assertion of Causes of Action, including any Avoidance Claims, will be shared,

between CIT on account of its Allowed General Unsecured Claim and all other

Allowed General Unsecured Claims, as follows: 100% of all Net Recoveries up to

$250,000 will be paid on account of non-CIT Allowed General Unsecured Claims; 75% of all Net Recoveries from $250,000 to $500,000 will be paid on account of non-CIT Allowed General Unsecured Claims and 25% of such Net Recoveries will be paid to CIT; 50% of all Net Recoveries from $500,000 to $1,000,000 will be paid on account of non-CIT Allowed General Unsecured Claims and 50% of such Net Recoveries will be paid to CIT; and any Net Recoveries in excess of $1,000,000 will be paid in accordance with the Pro Rata interests of the holders of Allowed General Unsecured Claims. Notwithstanding anything to the contrary contained in the foregoing, holders of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims will retain their right to assert claims against Net Recoveries from Causes of Action senior to the claims of holders of Allowed General Unsecured Claims.

       **h.**    **Releases.** The Debtors and the Committee, on one hand, and CIT, on the other hand, will settle and release their respective claims against each other, other than the rights and interests retained by them pursuant to the proposed Settlement.

       **i.**    **CIT's Support for Debtor's Plan.** CIT will agree to support, and to vote in favor of, the Debtors' Plan, so long as the terms of the Plan are consistent with the terms of the proposed Settlement.

       **j.**    **Bankruptcy Court Approval of Settlement.** The effectiveness of the proposed Settlement is subject to the Bankruptcy Court's approval of the Settlement, as will be requested by the Compromise Motion.

Thus, subject to the execution of a definitive Settlement Agreement among the Debtors, the Committee and CIT and the Bankruptcy Court's approval of the Settlement pursuant to Rule 9019 of the Federal Bankruptcy Rules, the Debtors, the Committee and CIT will settle and resolve all of their disputes. The proposed Settlement, if approved by the Bankruptcy Court and implemented, will result in the Debtors' obtaining not less than $7.0 million in unencumbered funds, plus any Net Recoveries from the ERTC Claim (estimated to have a value of about $5.0 million) and from

Avoidance Claims, to fund Distributions to unsecured Creditors under the Plan. The Debtors

believe, therefore, that the proposed Settlement, if approved by the Bankruptcy Court and

implemented, will pave the way for largely, if not wholly, consensual Plan Confirmation

proceedings, and a successful resolution of the Debtors' Cases.

**V.**

**LITIGATION AND OBJECTIONS TO CLAIMS**

     A.     **Litigation Commenced Prior to the Petition Date.**

As of the Petition Date, the Debtors were involved in certain litigation as set forth in the

Bankruptcy Schedules. A list of the actions pending as of the Petition Date is attached on **Exhibit**

**"C"** hereto.

     B.     **Litigation Commenced After the Petition Date.**

No litigation was filed against the Debtors after the Petition Date except for motions filed

by Creditors seeking allowance of asserted 503(b)(9) Claims. Those motions have been resolved.

The Debtors are evaluating whether to pursue Avoidance Actions and any other additional

Causes of Action.  Potential Causes of Action are listed in **Exhibit "D"** hereto.  Notwithstanding

any principle of law or equity, including, without limitation, any principle of judicial estoppel, res

judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose,

describe, identify, analyze or refer to any Cause of Action, or potential Cause of Action, in the

Plan, this Disclosure Statement, or any other document filed with the Bankruptcy Court will in no

manner waive, eliminate, modify, release, impair or alter the Liquidating Trust Trustee's right to

assert, commence, prosecute, defend against, settle, and realize upon any Cause of Action that the

Debtors or the Estates have or may have from and after the Effective Date.  Unless otherwise

provided in the Plan or in the Confirmation Order, to the extent that any to-be-filed actions are not

resolved as of the Effective Date, the Liquidating Trust Trustee will have the right to assert,

commence, prosecute, settle, or otherwise resolve or dispose of Causes of Action in the Cases.

The discussion regarding litigation and assertion of Causes of Action contained in this

Disclosure Statement is for informational purposes only.  Nothing contained herein is intended,

nor should be construed, to be any admission or acknowledgement by the Debtors of any matter

-47-

pertaining to Causes of Action in the Cases.  The Debtors, the Committee and the Liquidating Trust Trustee to be employed under the Plan reserve all of their respective rights and remedies with respect to Causes of Action that may be asserted in the Cases.

The Debtors have not completed their review, analysis and investigation as to whether any Causes of Action exist to subordinate any Claims. The Debtors and the Liquidating Trust Trustee to be employed under the Plan reserve the right to assert Causes of Action to subordinate any Claims asserted in the Cases.

Similarly, the Debtors have not completed their review, analysis and investigation of the Proofs of Claim.  The Debtors expect that they (and the Liquidating Trust Trustee after the Effective Date) will pursue objections to Disputed Claims.  Certain material Disputed Claims are listed in Paragraph XII(F)(1)(h) hereof.

Each Debtor reserves the right to amend its Bankruptcy Schedules, including by reducing the amount listed for a Creditor's Claim or by changing a Creditor's Claim to a disputed, unliquidated or contingent Claim or to a Claim in an unknown amount.  Nothing contained herein will preclude the Debtors, other parties-in-interest (until the Effective Date) or the Liquidating Trust Trustee to object, if appropriate, to any Claim, subject only to the Claims Objection Deadline.

## VI.

## DESCRIPTION OF THE PLAN

The following is a brief summary of the Plan and is qualified in its entirety by the full text of the Plan.  The terms of the Plan will be controlling on Creditors in the event that the Plan is confirmed.  Therefore, all Creditors are urged to read the Plan carefully in its entirety rather than relying on this summary.

### A.    Basic Structure of the Plan.

The Plan proposes to pay the Claims of four (4) Classes of Creditors (Class 3 under the Plan consists of Class 3A and Class 3B, which constitute two legally separate and distinct sub-classes under the Plan) in accordance with the provisions of the Plan.  The Plan provides for the establishment of one (1) Class of Interest Holders.

### B.    Classification and Treatment of Claims.

1123 of the Bankruptcy Code requires that the Debtors, with certain exceptions, classify separately in the Plan all Claims.  Pursuant to  1122 of the Bankruptcy Code, the Debtors may place all Claims that are substantially the same in the same Class in the Plan.   1123(a)(4) of the Bankruptcy Code requires that the Plan provide the same treatment for all Claims in the same Class, unless the holder of a particular Claim agrees to a less favorable treatment of that Claim.

1123(a) of the Bankruptcy Code requires that the Debtors specify in the Plan any Class that is not "impaired" by the Plan and specify the treatment of any Class that is impaired by the Plan.  Pursuant to  1124 of the Bankruptcy Code, a Class of Claims is "impaired" by the Plan, unless the Plan (1) leaves unaltered the legal, equitable and contractual rights of holders of the Claims, or (2) cures any defaults with respect to the Claims which occurred before the Petition Date, reinstates the maturity of the Claims, and compensates the holders of the Claims for any damages incurred by them as a result of any reasonable reliance by them on contractual provisions or applicable law entitling them to receive accelerated payment after the occurrence of such defaults, or (3) provides that, on the Effective Date, the holders of such Claims will receive Cash equal to the amount of their Allowed Claims.  Pursuant to  1126(f) of the Bankruptcy Code, a Class of Claims that is not impaired by the Plan is conclusively presumed to have accepted the Plan, and is not entitled to vote on the Plan.  Pursuant to  1126(g) of the Bankruptcy Code, a Class is deemed not to have accepted the Plan if the Plan provides that the Claims or Interests of such Class do not receive or retain any property under the Plan on account of such Claims or Interests.

Classes 1 (any Allowed Secured Claims including any Allowed Secured Claim of CIT) and 2 (Allowed Priority Non-Tax Claims) are not "impaired" under the Plan and, therefore, are not entitled to vote on the Plan.  Classes 3 (Allowed General Unsecured Claims, consisting of separate Classes 3A and 3B), 4 (Allowed Subordinated Claims) and 5 (Interest Holders) are "impaired" under the Plan.  Classes 3, 4 and 5 are entitled to vote on the Plan.

The Plan is a Chapter 11 plan proposed jointly by the Debtors and effectuates a substantive consolidation of the Debtors' financial affairs. Creditors of each Debtor having substantially similar legal Claims will be classified together under the Plan. In effect, the Plan implements a

merger of the Debtors, and treats the Debtors as a single enterprise, in accordance with the terms and conditions of the Plan.

## C.    **Unclassified Claims.**

In accordance with the provisions of  1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified under the Plan.  These Claims are not considered impaired, and they do not vote on the Plan, because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  Accordingly, the Debtors have not placed Administrative Claims and Priority Tax Claims in a Class.  The treatment of these unclassified Claims is as provided below.

### 1.    **Allowed Administrative Claims.**

Administrative Claims generally are Claims for the expenses of administering a Debtor's Case that are allowed under  503(b) of the Bankruptcy Code.  Administrative Claims also include  503(b)(9) Claims.  The Bankruptcy Code requires that all Administrative Claims be paid on the Effective Date of the Plan, unless a particular Creditor agrees to a different treatment of its Claim.

In this case, Administrative Claims are expected to consist primarily of the Claims of the Professionals employed in the Cases, United States Trustee Fees and  503(b)(9) Claims.

The treatment of Administrative Claims under the Plan is as described below.

**a.    Payment.** Except to the extent that the holder of an Allowed Administrative Claim against a Debtor agrees to a less favorable treatment of its Allowed Administrative Claim, and, subject to the Administrative Claims Bar Date set forth in  3.1.2 of the Plan, each holder of an Allowed Administrative Claim will receive, in full satisfaction, exchange and release of its Allowed Administrative Claim a Distribution in an amount equal to such Allowed Administrative Claim, on the latest of (i) the Effective Date, (ii) the fifteenth (15th) Business Day after the date upon which such Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date upon which such Allowed Administrative Claim becomes

due according to its terms; provided, however, that an Ordinary Course Administrative Claim against a Debtor will be paid in full in accordance with the terms and conditions of the agreements giving rise to such Ordinary Course Administrative Claim.

b.    **Administrative Claims Bar Date.**  Except for Pre-Effective Date Professional Fee Claims,  503(b)(9) Claims (the Bar Date for which is the general Bar Date set by the Bankruptcy Court), United States Trustee Fees and Ordinary Course Administrative Claims, and except as set forth in  503(b)(1)(D) of the Bankruptcy Code, all requests for payment of Administrative Claims must be filed with the Bankruptcy Court and served on the Liquidating Trust Trustee and on the Post-Effective Date Notice Parties no later than thirty (30) days after the Effective Date (the "Administrative Claims Bar Date").  Any holder of an Administrative Claim that is required to file a request for payment of its Administrative Claim by the Administrative Claims Bar Date and that does not file by the Administrative Claims Bar Date such a request for payment of its Administrative Claim will be forever barred from asserting such Administrative Claim against the Debtors, any of the Assets of the Debtors, or the Liquidating Trust.

c.    **Deadline for Objections.**  All objections to the allowance of an Administrative Claim that is subject to the Administrative Claims Bar Date must be filed by the Liquidating Trust Trustee no later than one hundred twenty (120) days after the Administrative Claims Bar Date (the "Administrative Claims Objection Deadline").  The Liquidating Trust Trustee may seek from the Bankruptcy Court an order or orders extending the Administrative Claims Objection Deadline on an ex parte basis, without the need for notice to Creditors or a hearing thereon.  If the Liquidating Trust Trustee fails to file, by the Administrative Claims Objection Deadline, an objection to an Administrative Claim that must be filed, and is filed, by the Administrative Claims Bar Date, such Administrative Claim will be deemed allowed as of the Administrative Claims Objection Deadline.

     **d.**     **United States Trustee Fees.**  United States Trustee Fees owed by a Debtor will be paid prior to the Effective Date by such Debtor, and, after the Effective Date by the Liquidating Trust Trustee from the Liquidating Trust, in each case, when due in accordance with applicable law until the entry of a Final Decree.

     **e.**     **Pre-Effective Date Professional Fee Claims.**  Each Pre-Effective Date Professional seeking from the Bankruptcy Court an award with respect to a Pre-Effective Date Professional Fee Claim must file its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the ninetieth (90th) day after the Effective Date or such later date as may be fixed by the Bankruptcy Court or by the Liquidating Trust Trustee.  Such Pre-Effective Date Professional will receive, in full satisfaction, exchange and release of its Pre-Effective Date Professional Fee Claim, a Distribution in such amount as is allowed by the Bankruptcy Court.  All objections to the allowance of a Pre-Effective Date Professional Fee Claim must be filed and served timely in accordance with the requirements of the Bankruptcy Rules.

**2.**     **Priority Tax Claims.**

The IRS has asserted a Priority Tax Claim against the SCI. The State of California also asserts a Priority Tax Claim against SCI.  The Debtors dispute that they have any obligation for Priority Tax Claims.

Pursuant to  3.2 of the Plan, except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment of its Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction, exchange and release of its Allowed Priority Tax Claim, a Distribution in an amount equal to such Allowed Priority Tax Claim, on the _later_ of (a) the Effective Date or (b) the fifteenth (15th) Business Day after such Priority Tax Claim becomes an Allowed Priority Tax Claim.

**D.    Classification of Claims and Interests Under the Plan.**

    **1.    Overview.**

As required by the Bankruptcy Code, the Plan places Claims and Interests into Classes according to their respective legal rights and interests, including their respective rights to priority.  In  4.2 of the Plan, the Debtors list each Class of Claims and Interests established under the Plan and state whether each Class is impaired or is unimpaired by the Plan.  A Class is "unimpaired" by the Plan if the Plan leaves unaltered the legal, equitable and contractual rights to which the holders of Claims or Interests in the Class are entitled, as provided in  1124 of the Bankruptcy Code.  Article V of the Plan sets forth the treatment that each Class will receive under the Plan.

Pursuant to the Plan, a Claim will be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and will be deemed classified in another Class or Classes to the extent that any remainder of the Claim qualifies within the description of such other Class or Classes.  A Claim is classified in a particular Class only to the extent that the Claim is an Allowed Claim in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

    **2.    Designation of Classes.**

The Plan designates the following Classes of Claims and Interests:

    **a.    Allowed Claims**.

        (i)    Class 1:  Any Allowed Secured Claims including any Allowed Secured Claim of CIT.  This Class is not impaired by the Plan.

        (ii)    Class 2:  Any Allowed Priority Non-Tax Claims.  This Class is not impaired by the Plan.

        (iii)    Class 3 (Class 3A and Class 3B):  Allowed General Unsecured Claims including any Allowed Deficiency Claim of CIT.  This Class is impaired by the Plan.

        (iv)    Class 4:  Allowed Subordinated Claims.  This Class is

impaired by the Plan.

    **b.**    **Interests**.

    (v)    <u>Class 5</u>:  Interests of the Interest Holders.  This Class is impaired by the Plan.

    **3.**    **Summary of Classification.**

    The following table summarizes the Classes of Claims and Interests established by the Plan:

| **CLASS** | **DESCRIPTION** | **IMPAIRED/ UNIMPAIRED** | **VOTING STATUS** |
|---|---|---|---|
| Class 1 | Allowed Secured Claims including any Allowed Secured Claim of CIT | Unimpaired | Deemed to Accept Plan |
| Class 2 | Allowed Priority Non-Tax Claims | Unimpaired | Deemed to Accept Plan |
| Class 3 | Allowed General Unsecured Claims including any Allowed Deficiency Claim of CIT (Class 3A and Class 3B) | Impaired | Entitled to Vote on Plan |
| Class 4 | Allowed Subordinated Claims | Impaired | Entitled to Vote on Plan |
| Class 5 | Interests | Impaired | Entitled to Vote on Plan |

    As set forth above, Classes 1 and 2 are unimpaired by the Plan; holders of Claims in these Classes are conclusively presumed to have accepted the Plan and, hence, are not entitled to vote with respect to the Plan.  Classes 3 and 4 are impaired by the Plan, and holders of Claims in these Classes are entitled to vote to accept or reject the Plan.  Interests in Class 5 are impaired; Interest Holders are entitled to vote to accept or reject the Plan.

    The treatment of Claims and Interests under the Plan is in full and complete satisfaction of the legal, contractual, and equitable rights that each Creditor or Interest Holder may have in or against the Debtors or their Assets.  This treatment supersedes and replaces any agreements or rights which those entities have in or against a Debtor or its property.  **NO DISTRIBUTIONS WILL BE MADE, AND NO RIGHTS WILL BE RETAINED, ON ACCOUNT OF ANY CLAIM THAT IS NOT AN ALLOWED CLAIM.**

## VII.

## TREATMENT OF CLASSES UNDER THE PLAN

The following sets forth the treatment of Classes established by the Plan.

A.    **Class 1 -- Any Allowed Secured Claims Including any Allowed Secured Claim of CIT.**

Class 1 consists of any Allowed Secured Claims, including any Allowed Secured Claim of CIT.  Class 1 is unimpaired by the Plan.  In the event that there is more than one holder of an Allowed Class 1 Claim, the Allowed Secured Claim of each such Secured Creditor will be deemed to be classified in a separate sub-class of Class 1, and each such sub-class of Class 1 will be deemed to be a separate Class under the Plan.

CIT has asserted Liens encumbering all or virtually all of the Debtors' remaining Assets, except for any Avoidance Claims. CIT has asserted Liens against the balance of the Purchase Price held by the Debtors ($9,825,000). The Debtors have disputed such Secured Claim, including the merits of CIT's asserted Secured Claim with respect to the ERTC.

As set forth in Paragraph IV(G)(15) hereinabove, subject to the execution of the Settlement Agreement and the approval of the Bankruptcy Court, the Debtors, the Committee and CIT have agreed to settle their differences regarding the amount and scope of CIT's Secured Claim and the treatment thereof under the Plan.

The Debtors believe that there are no Allowed Secured Claims in the Cases except potentially for CIT.

Pursuant to the Plan, the treatment of any Allowed Secured Claims is as follows:

1.    **Treatment of Allowed Secured Claims.**

Under the Plan, within fifteen (15) Business Days after the Effective Date, each Secured Creditor holding an Allowed Class 1 Claim will receive, in full satisfaction, exchange and release of the Allowed Class 1 Claim, a Distribution in the full amount of that Secured Creditor's Allowed Class 1 Claim.

/ / /

/ / /

**2.** **No Junior-Priority Allowed Secured Claim.**

In accordance with the provisions of 5.1.2 of the Plan, Confirmation of the Plan will be deemed to be a finding, for all purposes, that no Secured Creditor asserting a Lien junior in priority to the Liens of CIT as of the Petition Date has any Allowed Secured Claim against any Debtor, as determined under 506 of the Bankruptcy Code.  Upon the Effective Date of the Plan, any and all such junior-priority Liens will be automatically voided and extinguished with no need for any further act of a Debtor, further notice or order of the Bankruptcy Court.

**B.** **Class 2 -- Allowed Priority Non-Tax Claims.**

Class 2 consists of all Allowed Priority Non-Tax Claims.  Class 2 is not impaired by the Plan.  The Debtors believe that as much as $100,000 in Allowed Priority Non-Tax Claims may be owed by the Debtors.

Under the Plan, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment of its Allowed Priority Non-Tax Claim, each holder of an Allowed Priority Non-Tax Claim against a Debtor will receive, in full satisfaction, exchange and release of its Allowed Priority Non-Tax Claim, a Distribution in the full amount of the Allowed Priority Non-Tax Claim on the later of (i) the Effective Date, and (ii) the fifteenth (15th) Business Day after such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim.

**C.** **Class 3 -- Allowed General Unsecured Claims.**

Class 3 consists of all Allowed General Unsecured Claims including any Allowed Deficiency Claim of CIT.  Class 3 is impaired by the Plan.[10]

In the event that CIT has an Allowed Deficiency Claim, the Allowed Deficiency Claim of CIT is classified as the Class 3B Claim under the Plan, as a separate and legally distinct sub-class of Class 3, a Class separate from all other Allowed General Unsecured Claims, which are classified as Class 3A Claims under the Plan. The treatment of Allowed Class 3A Claims is set

---

[10] As set forth in Paragraph IV(G)(15) hereinabove, subject to the execution of the Settlement Agreement and the approval of the Bankruptcy Court, the Debtors, the Committee and CIT have agreed to settle their differences regarding the amount and scope of CIT's Allowed Claims and the treatment thereof under the Plan. CIT has consented to the separate classification of its Deficiency Claim (Class 3B) subject to the execution of a definitive Settlement Agreement and the Bankruptcy Court's approval of the Settlement Agreement.

forth in  5.3.1 of the Plan, and the treatment of any Allowed Class 3B Claim is set forth in  5.3.2 of the Plan.

The treatment of Allowed Class 3A Claims and any Allowed Class 3B Claim under the Plan is as follows:

1. **Allowed General Unsecured Claims Other Than any Allowed Deficiency Claim of CIT (Class 3A).**

Allowed Class 3A Claims are treated as follows under the Plan:

a. **Pro Rata Distributions (Class 3A)**. Subject to the provisions of s 5.3.1.3 and 5.3.1.4 of the Plan, except to the extent that the holder of an Allowed Class 3A agrees to a less favorable treatment of its Allowed 3A Claim, the holder of an Allowed Class 3A Claim will receive, in full and complete satisfaction, exchange and release of its Allowed Class 3A Claim, Pro Rata Distributions of the Liquidating Trust Proceeds available for distribution to holders of all Allowed Class 3 Claims, including any Allowed Class 3B Claim.

b. **Payment of Distributions (Class 3A)**.  The Liquidating Trust Trustee will make Distributions to the holders of Allowed Class 3A Claims from funds available in the Liquidating Trust.  All holders of Allowed Class 3A Claims will receive an initial Distribution of their Pro Rata share of available Liquidating Trust Proceeds within ninety (90) days following the Effective Date, and will receive thereafter Distributions of their Pro Rata share of available Liquidating Trust Proceeds by each subsequent 180th-day anniversary of the Effective Date. Holders of Allowed Class 3A Claims will receive any final Distribution of their Pro Rata share of available Liquidating Trust Proceeds within ten (10) days after the filing of the Liquidating Trust Trustee Certification, or as soon thereafter as is practicable.

c. **Postpetition Interest (Class 3A)**. In accordance with  726(a)(5) of the Bankruptcy Code, under the Plan, an Allowed Class 3A Claim will not include Postpetition Interest on account of such Allowed Class 3A Claim, except to the

extent that all of the following Claims against and expenses of the Debtors are satisfied and paid in full:  (i) all Allowed Administrative Claims; (ii) all Allowed Priority Tax Claims; (iii) all Allowed Priority Non-Tax Claims; (iv) all Allowed Secured Claims; (v) all Allowed General Unsecured Claims (including all Allowed Class 3A Claims and any Allowed Class 3B Claim); (vi) all Late-Filed Claims; (vii) all Post-Effective Date Plan Expenses; and (viii) all Allowed  726(a)(4) Claims.  Under the Plan, any Postpetition Interest that may be payable on an Allowed General Unsecured Claim will be calculated from the Petition Date through the date on which such Allowed General Unsecured Claim is paid in full.

        **d.**     **Conditions to Payment of Allowed Class 3A Claims**.

Notwithstanding any provision to the contrary contained in the Plan, no Distribution will be made on account of an Allowed Class 3A Claim until each of the following occurs:  (i) all Administrative Claims are paid or are reserved for; (ii) all Priority Tax Claims are paid or are reserved for; (iii) all Priority Non-Tax Claims are paid or are reserved for; (iv) all Secured Claims are paid or are reserved for; (v) any outstanding Distribution to which the holder of the Class 3B Claim is entitled is paid or reserved for; (vi) the Disputed Claims Reserve is adequately funded; and (vii) all outstanding Post-Effective Date Plan Expenses have been paid in full and an adequate Reserve is established by the Liquidating Trust Trustee providing for full payment of the estimated amount of all Post-Effective Date Plan Expenses through the Case Closing Date, in an amount to be determined by the Liquidating Trust Trustee in the exercise of his reasonable business judgment.

    **2.**     **Any Allowed Deficiency Claim of CIT (Class 3B).**

Any Allowed Deficiency Claim of CIT (Class 3B) is treated as follows under the Plan:

        **a.**     **Pro Rata Distributions (Class 3B)**.  Subject to the provisions of s 5.3.2.3 and 5.3.2.4 of the Plan, except to the extent that the holder of any Allowed Class 3B Claim agrees to a less favorable treatment of its Allowed Class 3B Claim,

the holder of any Allowed Class 3B Claim will receive, in full and complete satisfaction, exchange and release of its Allowed Class 3B Claim, Pro Rata Distributions of the Liquidating Trust Proceeds available for distribution to holders of all Allowed Class 3 Claims, including Allowed Class 3A Claims.

b.      **Payment of Distributions (Class 3B)**.  Under the Plan, the Liquidating Trust Trustee will make Distributions to the holder of any Allowed Class 3B Claim from funds available in the Liquidating Trust.  The holder of any Allowed Class 3B Claim will receive an initial Distribution of its Pro Rata share of available Liquidating Trust Proceeds by the <u>later</u> of the sixtieth (60th) day after the Effective Date, or the fifteenth (15th) day after the date upon which such Class 3B Claim becomes an Allowed Class 3B Claim, and will receive thereafter Distributions of its Pro Rata share of available Liquidating Trust Proceeds by each subsequent 180th-day anniversary of such Distribution date.  Under the Plan, the holder of any Allowed Class 3 Claim will receive a final Distribution of its Pro Rata share of available Liquidating Trust Proceeds within ten (10) days after the filing of the Liquidating Trust Trustee Certification, or as soon thereafter as is practicable.

c.      **Postpetition Interest (Class 3B)**. In accordance with  726(a)(5) of the Bankruptcy Code, under the Plan, any Allowed Class 3B Claim will not include Postpetition Interest on account of such Allowed Class 3B Claim, except to the extent that all of the following Claims against and expenses of the Debtors are satisfied and paid in full:  (i) all Allowed Administrative Claims; (ii) all Allowed Priority Tax Claims; (iii) all Allowed Priority Non-Tax Claims; (iv) all Allowed Secured Claims; (v) all Allowed General Unsecured Claims (including Allowed Class 3A Claims and any Allowed Class 3B Claim); (vi) all Late-Filed Claims; (vii) all Post-Effective Date Plan Expenses; and (viii) all Allowed  726(a)(4) Claims.  Any Postpetition Interest that may be payable on any Allowed Class 3B

Claim will be calculated from the Petition Date through the date on which such Allowed Class 3B Claim is paid in full.

**d.** **Conditions to Payment of Any Allowed Class 3B Claim**.

Notwithstanding any provision to the contrary contained in the Plan, no Distribution will be made on account of any Allowed Class 3B Claim until each of the following occurs:  (i) all Administrative Claims are paid or are reserved for; (ii) all Priority Tax Claims are paid or are reserved for; (iii) all Priority Non-Tax Claims are paid or are reserved for; (iv) all Secured Claims are paid or are reserved for; (v) all outstanding Distributions to which holders of the Allowed Class 3A Claims are entitled are paid or reserved for; (vi) the Disputed Claims Reserve is adequately funded; and (viii) all outstanding Post-Effective Date Plan Expenses have been paid in full and an adequate Reserve is established by the Liquidating Trust Trustee providing for full payment of the estimated amount of all Post-Effective Date Plan Expenses through the Case Closing Date, in an amount to be determined by the Liquidating Trust Trustee in the exercise of his reasonable business judgment.

**D.** **Class 4 -- Allowed Subordinated Claims**.

Class 4 under the Plan consists of all Allowed Subordinated Claims, including any Allowed  726(a)(4) Claims.  As of the filing of this Disclosure Statement, no action to subordinate a Claim had been filed by a Debtor and no order of the Bankruptcy Court had been entered subordinating a Claim. The Debtors believe, though, that grounds may exist to subordinate certain Claims, including contingent Claims for indemnification.

Class 4 is impaired by the Plan. Under the Plan, the treatment of any Allowed Class 4 Claim is as follows:

**1.** **Any Distribution (Class 4)**.

Subject to the provisions of s 5.4.3 and 5.4.4 of the Plan, except to the extent that the holder of an Allowed Subordinated Claim agrees to a less favorable treatment of its Allowed Subordinated Claim, in the event that all Allowed General Unsecured Claims are

paid in full under the Plan, the holder of an Allowed Subordinated Claim will receive, in full and complete satisfaction, exchange and release of its Allowed Subordinated Claim, a Pro Rata Distribution of any remaining Liquidating Trust Proceeds available for distribution to holders of Allowed Class 4 Claims.

**2.      Payment of Any Distribution (Class 4)**.

Under the Plan, a holder of an Allowed Class 4 Claim will receive, in full and complete satisfaction, exchange and release of its Allowed Class 4 Claim, a Distribution of its Pro Rata share of any Liquidating Trust Proceeds available for distribution to holders of Allowed Class 4 Claims within ten (10) days after the filing of the Liquidating Trust Trustee Certification, or as soon thereafter as is practicable.

**3.      Postpetition Interest (Class 4)**.

An Allowed Subordinated Claim will not include Postpetition Interest on account of such Allowed Subordinated Claim, except to the extent that all of the following Claims against and expenses are satisfied and paid in full:  (a) all Allowed Administrative  Claims; (b) all Allowed Priority Tax Claims; (c) all Allowed Priority Non-Tax Claims; (d) all Allowed Secured Claims; (e) all Allowed General Unsecured Claims; (f) all Late-Filed Claims; (g) all Post-Effective Date Plan Expenses; (h) all Allowed  726(a)(4) Claims; and (i) all Allowed Subordinated Claims.  Under the Plan, any Postpetition Interest that may be payable on an Allowed Subordinated Claim will be calculated from the Petition Date through the date on which such Allowed Subordinated Claim is paid in full.

**4.      Conditions to Payment of Allowed Class 4 Claims**.

Notwithstanding any provision to the contrary contained in the Plan, no Distribution will be made on account of an Allowed Subordinated Claim until each of the following occurs:  (a) all Administrative Claims are paid; (b) all Priority Tax Claims are paid; (c) all Priority Non-Tax Claims are paid; (d) all Secured Claims are paid; (e) all Allowed General Unsecured Claims are paid; and (f) all Post-Effective Date Plan Expenses are paid in full.

E.      **Class 5 -- Allowed Interests.**

Class 5 under the Plan consists of all Allowed Interests.  Class 5 is impaired under the Plan.

All Interests will be canceled effective as of the Case Closing Date.  Interest Holders will not receive any Distributions on account of their Interests; provided, however, that, in the event that each Allowed Claim against each Debtor plus any Postpetition Interest to which the holder thereof is entitled is paid in full, each holder of an Interest in a Debtor will receive, in full and complete satisfaction, exchange and release of such Interest, Pro Rata Distributions of any Liquidating Trust Proceeds remaining in the Liquidating Trust, payable as soon as practicable as the Liquidating Trust Trustee determines in the exercise of his reasonable business judgment.

The Debtors believe that it is extremely unlikely that Interest Holders will receive any Distribution on account of their Interests.

## VIII.

## MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN

A.      **Overview.**

The Plan provides that, from and after the Effective Date, each Debtor's Assets, including, without limitation, any Causes of Action of the Debtor, will be transferred to and vest in the Liquidating Trust, for the benefit of Creditors of the Debtors.  The Liquidating Trust Assets will be distributed to the holders of Allowed Claims against the Debtors in accordance with the provisions of the Plan.  The Liquidating Trust Trustee will be responsible for maintaining the Liquidating Trust Assets, liquidating Liquidating Trust Assets, prosecuting or settling Causes of Action, and making Distributions in payment of Allowed Claims against the Debtors in accordance with the provisions of the Plan.

B.      **Condition Precedent to Plan Confirmation.**

The only condition precedent to the confirmation of the Plan is that a Confirmation Order, on terms and conditions satisfactory to the Debtors and the Committee, will have been entered by the Bankruptcy Court.

C.    **Conditions Precedent to the Effectiveness of the Plan.**

The following are the conditions precedent to the effectiveness of the Plan and the occurrence of the Effective Date:  (1) the Confirmation Order, on terms and conditions satisfactory to the Debtors and the Committee, will have been entered by the Bankruptcy Court; (2) the Confirmation Order will have become a Final Order; (3) all documents, instruments and agreements, in form and substance satisfactory to the Debtors and the Committee provided for by or appropriate to implement the Plan including, without limitation, the Liquidating Trust Agreement, will have been executed and delivered by the parties thereto.

The Debtors may, with the consent of the Committee, waive the condition to the effectiveness of the Plan and to the occurrence of the Effective Date set forth in Paragraph VIII(C)(2) hereinabove, without the need for any prior notice or hearing with respect thereto. Without limiting the generality of the foregoing, in the event that an appeal, petition for certiorari or motion for reargument or rehearing or comparable post-confirmation relief is filed with respect to the Confirmation Order, and no stay of the effectiveness of the Confirmation Order is obtained, the Debtors may elect, with the consent of the Committee, to waive the condition set forth in Paragraph VIII(C)(2) hereof, and to proceed with the Effective Date of the Plan and to commence to consummate the Plan, by filing and serving notice of such election upon the United States Trustee and the party seeking such post-confirmation relief.

The failure of any such condition to be satisfied constitutes under the Plan good and sufficient cause for the Debtors to have the Plan not become effective regardless of the circumstances giving rise to the failure of such condition to be satisfied.

D.    **Implementation of Plan.**

On or soon as practicable after the Effective Date, the following will occur with respect to the implementation of the Plan:  (1) all acts, documents and agreements appropriate to implement the Plan will be effected or executed; (2) the Liquidating Trust Trustee, as Disbursing Agent under the Plan, will make all Distributions required to be made on or about the Effective Date of the Plan; and (3) the Liquidating Trust Trustee, as Disbursing Agent under the Plan, will fund the Reserves required to be funded on or about the Effective Date of the Plan.

E.      **Corporate Action.**

Upon the Effective Date, all transactions and matters provided for under the Plan will be deemed to have been authorized and approved by the Debtors without any requirement of further action by the Debtors.

F.      **Liquidating Trust/Liquidating Trust Trustee.**

In accordance with the provisions of 6.6 of the Plan, on the Effective Date, the Liquidating Trust will be established for the purpose of implementing the provisions of the Plan, including the making of Distributions under the Plan, pursuant to the provisions of the Plan. In accordance with the provisions of 6.6.1 of the Plan, on the Effective Date, the Liquidating Trust Trustee will be appointed who will have the rights, powers and duties provided for by the Plan, the Liquidating Trust Agreement and the Confirmation Order. In accordance with the provisions of 6.6.2 of the Plan, from and after the Effective Date, the Liquidating Trust Assets will be administered by the Liquidating Trust Trustee.

1.      **Employment of Liquidating Trust Trustee.**

On the Effective Date, the Liquidating Trust Trustee will be appointed to administer the Liquidating Trust Assets in accordance with the provisions of the Plan and the Liquidating Trust Agreement and to make Distributions in accordance with the provisions of the Plan. The Liquidating Trust Trustee will have the rights, powers and duties provided for by the Plan, the Liquidating Trust Agreement and by the Confirmation Order. The Liquidating Trust Trustee, in the exercise of his reasonable business judgment, will be responsible for liquidating the remaining Assets of each Debtor, winding up the financial affairs of each Debtor, and for making Distributions to Creditors of the Debtors in as efficient, effective and economical manner as is reasonably practicable so as to produce for Creditors as favorable a recovery on their Claims as is reasonably possible under the circumstances of the Debtors' Cases.

/ / /

/ / /

**2.      Identity of Liquidating Trust Trustee/Service of Liquidating Trust Trustee.**

Pursuant to  6.6.2 of the Plan, on the Effective Date of the Plan, Mr. Issa will be appointed to serve as Liquidating Trust Trustee under the Plan and the Liquidating Trust Agreement.  Mr. Issa's compensation will be as provided in the Liquidating Trust Agreement.  Mr. Issa will serve as the Liquidating Trust Trustee during the term of the Plan; provided, however, that, (a) for cause shown, the Debtors may terminate Mr. Issa's employment as Liquidating Trust Trustee after giving not less than fourteen (14) days' notice to the Post-Effective Date Notice Parties, and (b) upon motion made after notice and an opportunity for a hearing given to the Post-Effective Date Notice Parties, the Advisory Committee or any other party-in-interest will be entitled to request, for cause shown, that the Bankruptcy Court terminate Mr. Issa's employment as Liquidating Trust Trustee. Upon any termination of Mr. Issa's employment as Liquidating Trust Trustee, he will be replaced with another person or entity, who will have all of the rights, powers and duties provided to the Liquidating Trust Trustee by the Plan, the Liquidating Trust Agreement and the Confirmation Order and by the provisions of the Final Order of the Bankruptcy Court appointing such replacement Liquidating Trust Trustee.

**3.      Resignation of Liquidating Trust Trustee.**

Pursuant to  6.6.3 of the Plan, upon any resignation of the Liquidating Trust Trustee, the Debtors may appoint a replacement Liquidating Trust Trustee approved by the Advisory Committee, which approval will not be unreasonably withheld, and after giving notice to the Post-Effective Date Notice Parties.  In the event that no replacement Liquidating Trust Trustee is appointed within sixty (60) days after a resignation of the Liquidating Trust Trustee, the United States Trustee may, after notice and an opportunity for hearing, request that the Bankruptcy Court grant appropriate relief for Creditors, including the appointment of a replacement Liquidating Trust Trustee selected by the United States Trustee or the conversion of the Debtors' Chapter 11 Cases to ones under Chapter 7 of the Bankruptcy Code

**G.      Responsibilities of Debtors' Managers.**

Upon the Effective Date, except as set forth expressly to the contrary in the Liquidating Trust Agreement, the Debtors' managers will be relieved of all further powers, duties and responsibilities with respect to the Debtors, and the Liquidating Trust Trustee will be solely responsible for administering the Liquidating Trust Assets and for making the Distributions required by the terms of the Plan, in accordance with the terms and conditions of the Plan and the Liquidating Trust Agreement.

**H.      Liquidating Trust Assets/Plan Administration.**

**1.      Distributions of Liquidating Trust Assets.**

Distributions of Liquidating Trust Assets will be made solely to the holders of Allowed Claims, and, in accordance with the provisions of 5.5 of the Plan, in the event that holders of Allowed Claims are paid in full, to Interest Holders.  The holders of Allowed Claims will receive Distributions from the Liquidating Trust solely as provided by the Plan.

**2.      Liquidating Trust Trustee's Implementation of Plan.**

Pursuant to 6.8.2 of the Plan, the Liquidating Trust Trustee will be authorized to, and will, take all acts appropriate to implement the provisions of the Plan as are contemplated to be taken by the Liquidating Trust Trustee under the Plan, including, without limitation, liquidating or otherwise disposing of Liquidating Trust Assets, making Distributions to holders of Allowed Claims, objecting to Disputed Claims, and prosecuting or settling Causes of Action.

**3.      Representative of the Estates.**

Pursuant to 6.8.3 of the Plan, effective as of the Effective Date, the Liquidating Trust Trustee will be appointed as the representative of each Debtor's Estate pursuant to s 1123(a)(5), 1123(a)(7) and 1123(b)(3)(B) of the Bankruptcy Code and, as such, will be vested with the authority and power, subject to the provisions of the Plan and the Liquidating Trust Agreement, to take, among others, the following acts on behalf of the Debtors:  (a) managing, administering and disposing of Liquidating Trust Assets for the

benefit of holders of Allowed Claims; (b) filing, litigating, prosecuting, settling, adjusting, enforcing, collecting and abandoning Causes of Action of the Debtors in the name of, and for the benefit of, the Debtors' Estates; (c) making all Distributions to Creditors provided for by the Plan; and (d) such  other acts as may be appropriate to administer, wind-down, and close the Debtors' Cases.  As the representative of each Debtor's Estate, the Liquidating Trust Trustee will succeed to all of the rights and powers of each Debtor and its Estate with respect to all Causes of Action of the Debtor, and will be substituted for, and will replace, each Debtor as the party-in-interest in all such litigation pending as of the Effective Date.

### 4.      **Liquidating Trust Agreement**.

Attached as **Exhibit "1"** to the Plan is a copy of the Liquidating Trust Agreement. The Confirmation of the Plan will be deemed to constitute approval of the Liquidating Trust Agreement.

### 5.      **No Liability of the Liquidating Trust Trustee, the Committee, the Advisory Committee or the Debtors**.

Pursuant to  6.8.5 of the Plan, to the maximum extent permitted by law, and excepting for any act or omission constituting gross negligence or willful misconduct, the Liquidating Trust Trustee, the Committee, the Advisory Committee and the Debtors, and their respective Representatives, will not have or incur liability to any Creditor, Interest Holder, party-in-interest or to any other entity for an act taken or omission in good faith in connection with or related to the administration of the Assets, the Liquidating Trust Assets, the implementation of the Plan and the making of Distributions under the Plan.

### 6.      **Funding of Post-Effective Date Plan Expenses**.

All Post-Effective Date Plan Expenses will be expenses of the Liquidating Trust. The Liquidating Trust Trustee will have no personal liability for any Post-Effective Date Plan Expenses.  The Liquidating Trust Trustee will disburse Liquidating Trust Assets from the Liquidating Trust for the purpose of funding the Post-Effective Date Plan Expenses.

**I.    Powers and Duties of the Committee After the Effective Date/Appointment of Advisory Committee.**

As of the Effective Date, the Committee will be relieved of all powers, rights, duties and responsibilities granted to the Committee by the Bankruptcy Code or any order of the Bankruptcy Court.  Pursuant to the Liquidating Trust Agreement, upon the Effective Date, the Advisory Committee will be established to provide advice and consultation to the Liquidating Trust Trustee.

**J.    Powers and Duties of the Debtors After the Effective Date.**

**1.    Corporate Powers.**

The Debtors will continue to exist after the Effective Date of the Plan, and will have all of the powers and rights of a limited liability company under the laws of the State of California, and, except as set forth in the Plan expressly to the contrary, will continue to have all corporate powers and rights accorded to them under their Governance Agreements.

**2.    Managing Member of the Debtors.**

From and after the Effective Date, the Liquidating Trust Trustee will be the managing member of each Debtor, subject to the terms and conditions of the Liquidating Trust Agreement.

**3.    Powers, Rights and Duties of Members of the Debtors.**

From and after the Effective Date, the powers, rights, duties and responsibilities of each member of the Debtors will be determined by the Liquidating Trust Trustee.

**K.    Causes of Action.**

A list of potential Causes of Action is attached as **Exhibit "D"** hereto.

Under the Plan, all right, title and interest in and to all Causes of Action of each of the Debtors, and the right to enforce, file, litigate, prosecute, settle, adjust, enforce, collect and abandon on behalf of the Debtors and their Estates any and all Causes of Action, including, but not limited to, any Avoidance Claims, are deemed automatically transferred on the Effective Date from the Debtors' Estates to the Liquidating Trust, and, from and after the Effective Date, only the

1    Liquidating Trust Trustee will have the right to enforce, file, litigate, prosecute, settle, adjust,

2    enforce, collect and abandon any Cause of Action.

3      Notwithstanding the rights of the Liquidating Trust Trustee with respect to Causes of

4    Action, nothing in the Plan will require the Liquidating Trust Trustee to file or to prosecute any

5    Cause of Action, both of which may be determined by the Liquidating Trust Trustee, in the

6    exercise of his reasonable business judgment, after consultation with the Advisory Committee.

7      **THE DEBTORS HAVE NOT COMPLETED THEIR INVESTIGATION**

8    **REGARDING THE EXISTENCE OF CAUSES OF ACTION.  THE INVESTIGATION IN**

9    **THIS REGARD IS ONGOING.  AS A RESULT, ALL PARTIES-IN-INTEREST ARE**

10    **HEREBY ADVISED THAT, NOTWITHSTANDING THE FACT THAT THE**

11    **EXISTENCE OF ANY PARTICULAR CAUSE OF ACTION MAY NOT BE LISTED,**

12    **DISCLOSED OR SET FORTH IN THIS DISCLOSURE STATEMENT, A CAUSE OF**

13    **ACTION MAY BE FILED AGAINST ANY CREDITOR OR OTHER ENTITY AS THE**

14    **LIQUIDATING TRUST TRUSTEE MAY DETERMINE, IN THE EXERCISE OF HIS**

15    **REASONABLE BUSINESS JUDGMENT.**

16      L.  **Liquidating Trust Trustee's Right to Retain Professionals and Non-**

17    **Professionals**

18        1.  **Post-Effective Date Professional Fees.**

19      The Liquidating Trust Trustee may employ, without any need to give notice to

20    Creditors or other parties-in-interest or obtain any approval of the Bankruptcy Court, any

21    Professional to aid the Liquidating Trust Trustee in performing the Liquidating Trust

22    Trustee's duties under the Plan as the Liquidating Trust Trustee deems appropriate in the

23    exercise of his sole and absolute discretion, including Professionals who were employed by

24    a Debtor or by the Committee.  Such retention may be on an hourly, contingency or other

25    basis, based on the circumstances of the case and the reasonable business judgment of the

26    Liquidating Trust Trustee.  Any Professional employed by the Liquidating Trust Trustee

27    after the Effective Date will be entitled to obtain from the Liquidating Trust payment of the

28    Professional's fees and costs as a Post-Effective Date Plan Expense, in the ordinary course,

without any need to give notice to Creditors or other parties-in-interest or to obtain any approval of the Bankruptcy Court.

 **2.     Liquidating Trust Trustee's Retention of Non-Professionals.**

The Liquidating Trust Trustee may retain any independent contractor, service provider, agent or other non-Professional person or entity including Mr. McGeever, in the ordinary course, to aid the Liquidating Trust Trustee in performing the Liquidating Trust Trustee's duties under the Plan as the Liquidating Trust Trustee deems appropriate in the exercise of his sole and absolute discretion, and may pay reasonable compensation to them, all without any need to give notice to Creditors or other parties-in-interest or to obtain any approval of the Bankruptcy Court.

**M.     Disposition of Liquidating Trust Assets.**

Pursuant to  6.13 of the Plan, from and after the Effective Date, the Liquidating Trust Trustee will have the right to manage, administer, use, liquidate, collect, sell, transfer, assign, encumber or otherwise dispose of any interest in any of the Liquidating Trust Assets for the benefit of holders of Allowed Claims and to take all acts appropriate to effectuate the same, free of any restrictions imposed by the Bankruptcy Code or Bankruptcy Rules and without any need to give notice to Creditors or parties-in-interest or to obtain any approval of the Bankruptcy Court; provided, however, that the Liquidating Trust Trustee is required to consult with the Advisory Committee regarding any proposed sale, assignment or encumbering of Liquidating Trust Assets by the Liquidating Trust Trustee.

**N.     Compromise of Controversies.**

Pursuant to  6.14 of the Plan, from and after the Effective Date, the Liquidating Trust Trustee will be entitled to compromise any objections to Disputed Claims, or any controversies relating to Causes of Action or other litigation pending after the Confirmation Date, without any need to give notice to Creditors or parties-in-interest or to obtain any approval of the Bankruptcy Court.  Notwithstanding anything to the contrary contained in the foregoing, under the Plan, the Liquidating Trust Trustee is required to consult with the Advisory Committee regarding

1   settlements of any Disputed Claims having a filed or scheduled amount exceeding $50,000 or

2   Causes of Action where the amount at issue exceeds $100,000.

3        **O.**      **Bankruptcy Court Approval Relative to Post-Confirmation Matters.**

4            Nothing contained in the Plan will be deemed to impair in any manner the right of the

5   Liquidating Trust Trustee or any party-in-interest to seek at any time after the Effective Date

6   orders of the Bankruptcy Court approving actions to be taken, or granting relief, consistent with

7   the Plan as may be necessary or desirable to effectuate the provisions of the Plan.  Without

8   limiting the generality of the foregoing, any party-in-interest will have the right to request that the

9   Bankruptcy Court enter orders directing the Liquidating Trust Trustee to act in a manner

10  consistent with the provisions of the Plan and/or in furtherance of the interests of Creditors, or to

11  refrain from acting in a manner inconsistent with the provisions of the Plan or contrary to the

12  interests of Creditors.

13       **P.**      **Liquidating Trust Trustee Certification**.

14           Pursuant to  6.16 of the Plan, on or before the date upon which the Liquidation Trust

15  Trustee determines that all Causes of Action of the Debtors and objections to Disputed Claims

16  have been resolved by Final Order, that all Liquidating Trust Assets of the Debtors have been

17  liquidated or otherwise disposed of, and that all Distributions required to be made under the Plan

18  have been made to Creditors or that final Distributions to Creditors will be made within ten (10)

19  days or as soon thereafter as is practicable by the Liquidating Trust Trustee, after consultation with

20  the Advisory Committee, the Liquidating Trust Trustee is required to file with the Bankruptcy

21  Court, and serve upon the Post-Effective Date Notice Parties, a certification attesting to such

22  determination ("Liquidating Trust Tr ustee Certification").

23       **Q.**      **Final Decree.**

24           Pursuant to  6.18 of the Plan, unless earlier filed by the Liquidating Trust Trustee, by the

25  thirtieth (30th) day after the filing of the Liquidating Trust Trustee Certification, the Liquidating

26  Trust Trustee is required to file, in accordance with Rule 3022 of the Federal Bankruptcy Rules, an

27  application with the Bankruptcy Court to obtain a Final Decree to close the Debtors' Cases.

28

MAINDOCS-#268093-V4-SILVER_CREEK_-_1ST_AMENDED_DISCLOSURE_STATEMENT.DOC

**R.    Substantive Consolidation.**

The Plan is proposed as a joint plan of the Debtors.  The Plan is premised upon, and effectuates, a substantive consolidation and merger of the Assets, liabilities and financial affairs of the Debtors.  The Debtors believe that a substantive consolidation of the Debtors is warranted, in part, because: SCI RS and SCL were formed for the sole purpose of serving the operations of SCI, and SCI RS and SCL had no operations apart from their transactions with SCI; CIT asserts its Secured Claim jointly against the Debtors; apart from any liability of SCI RS and SCL to CIT, SCI RS and SCL have very little debt; SCI RS and SCL assert substantial Claims against SCI arising from their transactions with SCI; and the Debtors maintained consolidated financial reporting and filed consolidated tax returns. In effect, the Debtors operated pre-Petition Date as a single, consolidated enterprise. The Debtors believe, therefore, that substantively consolidating the financial affairs of the Debtors is a fair and equitable result in the Cases

Pursuant to  6.21 of the Plan, the Assets and liabilities of the Debtors will be combined, and Claims against each Debtor having substantially similar legal rights, interests and priorities will be classified in the same Class under the Plan and will receive the same treatment thereunder. The Confirmation of the Plan will be deemed to effectuate the substantive consolidation of the Debtors.

**S.    Implementation of Liquidating Trust.**

**1.    Liquidating Trust Account.**  Pursuant to  6.23.1 of the Plan, on or as soon as practicable after the Effective Date, the Liquidating Trust Trustee is required to establish a Liquidating Trust Account into which the Liquidating Trust Trustee will deposit all Cash belonging to each Debtor, including all Cash allocated to such Debtor pursuant to the Asset Purchase Agreement.  The Liquidating Trust Trustee will commingle such Cash, and is not be required to maintain any separate accounts for each Debtor.

**2.    Funding of Liquidating Trust.**  The Liquidating Trust will be funded for the benefit of Creditors, in part, by the following: (a) each Debtor's Cash as of the Effective Date; (b) any Cash to which the Debtors may be entitled from the sale, assignment, collection, recovery, transfer or other disposition of Excluded Assets; (c) any

1    Net Recoveries received by the Debtors from the assertion of any Causes of Action; and

2    (d) any additional payment of the Purchase Price that may be received by a Debtor.

3    **T.    Inter-Company Claims.**

4    Upon the Effective Date of the Plan, all Claims that a Debtor may assert against another

5    Debtor will be waived, released, extinguished and deemed disallowed in full.

6    **U.    Distributions.**

7    **1.    Designation and Role of the Disbursing Agent.**

8    **a.    Liquidating Trust Trustee to Serve as Disbursing Agent.**  The

9    Liquidating Trust Trustee will serve as the Disbursing Agent under the Plan.  The

10    Disbursing Agent will be responsible for making all Distributions on account of

11    Allowed Claims under the Plan.  The terms of the employment of the Liquidating

12    Trust Trustee, including the compensation of the Liquidating Trust Trustee as

13    Disbursing Agent under the Plan, are disclosed in the Liquidating Trust Agreement

14    (**Exhibit "1"** to the Plan) and will be deemed to be approved by the Bankruptcy

15    Court pursuant to the Confirmation of the Plan.

16    **b.    Payment of Fees and Expenses of Disbursing Agent.**  The fees

17    and expenses incurred by the Liquidating Trust Trustee, in connection with the

18    performance of his duties as Disbursing Agent under the Plan, will be paid from the

19    Liquidating Trust Assets.

20    **2.    Distribution of Property Under the Plan.**

21    **a.    Cash Distributions.**  All Distributions under the Plan will be in

22    Cash.  Cash Distributions made pursuant to the Plan will be in United States funds,

23    by checks drawn on a domestic bank, or, if the Liquidating Trust Trustee so elects,

24    in the exercise of his sole and absolute discretion, by wire transfers from a domestic

25    bank.

26    **b.    Setoffs and Recoupment.**  As set forth in  7.2.2 of the Plan,

27    pursuant to  553 of the Bankruptcy Code or applicable non-bankruptcy law, the

28    Liquidating Trust Trustee, as Disbursing Agent under the Plan, may set off, recoup

or withhold against any Allowed Claim and Distribution to be made pursuant to the Plan on account of such Allowed Claim any pre-Petition Date or post-Petition Date account stated, claim, right or Cause of Action which a Debtor or its Estate may possess against the holder of such Allowed Claim.

      c.      **Timeliness of Distributions.** Any Distribution required to be made under the Plan will be deemed timely if made as soon as practicable after the due date thereof but, in any event, within fourteen (14) days after such date. Any Distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no longer being a Disputed Claim will be deemed timely if made as soon as practicable thereafter but, in any event, within fourteen (14) days thereafter.

      d.      **Limitation on Liability.** To the maximum extent permitted by law, neither the Debtors, the Committee, the Advisory Committee the Liquidating Trust Trustee, nor any of their respective Representatives will be liable for (i) any acts or omissions (except for gross negligence or willful misconduct) in connection with implementing the Distribution provisions of the Plan and the making or withholding of Distributions pursuant to the Plan, or (ii) any change in the value of Distributions made pursuant to the Plan resulting from any delays in making such Distributions in accordance with the terms of the Plan (including, but not limited to, any delays caused by the resolution of Disputed Claims).

      e.      **Further Assurances Regarding Distributions.** In accordance with the provisions of  13.22 of the Plan, as a condition to obtaining Distributions under the Plan, each Creditor must execute and deliver to the Liquidating Trust Trustee, or join in the execution and delivery of, any agreement or instrument appropriate for the consummation of the Plan.

      f.      **Creditor's Payment of Obligations or Turn Over of Property to the Liquidating Trust Trustee**. As a condition to obtaining Distributions under the Plan, any Creditor from which property is recoverable pursuant to a Final Order of the Bankruptcy Court under s 542, 543, 550 or 553 of the Bankruptcy Code, or

otherwise, or that is a transferee of a transfer avoidable pursuant to a Final Order of the Bankruptcy Court under s 522, 544, 545, 547, 548 or 549 of the Bankruptcy Code or otherwise, must pay to the Liquidating Trust Trustee the amount, or turn over to the Liquidating Trust Trustee any such property, for which such Creditor is liable to a Debtor.

## V.    Objections to Disputed Claims.

### 1.    Exclusive Right to Object to Claims.

Subject to the provisions of 6.14 of the Plan, from and after the Effective Date, the Liquidating Trust Trustee will have the sole and exclusive right to file, litigate and settle objections to Disputed Claims.  As the representative of each Debtor's Estate, the Liquidating Trust Trustee will succeed to all of the rights and powers of each Debtor and its Estate with respect to all objections to Disputed Claims against the Debtor, and will be substituted for, and will replace, each Debtor and its Estate as the party-in-interest in all litigation regarding Disputed Claims pending as of the Effective Date.

### 2.    Claims Objection Deadline.

Unless another date is established by order of the Bankruptcy Court, an objection to a Claim must be filed with the Bankruptcy Court and served on the Creditor holding such Claim on or before the Claims Objection Deadline.  The Liquidating Trust Trustee will have the right to request, on an ex parte basis, that the Bankruptcy Court extend the Claims Objection Deadline.

### 3.    Investigation Regarding Disputed Claims.

After the Effective Date, the Liquidating Trust Trustee will have the sole and exclusive right to investigate, and if appropriate file objections to, Disputed Claims. Notwithstanding the fact that the Liquidating Trust Trustee will have, after the Effective Date, the sole and exclusive right to file objections to Disputed Claims, nothing contained in the Plan will be deemed to obligate the Liquidating Trust Trustee to file an objection to a Claim, which action will be determined by the Liquidating Trust Trustee in the exercise of his reasonable business judgment.

**THE DEBTORS HAVE NOT COMPLETED THEIR INVESTIGATION REGARDING THE CLAIMS IN THE CASES AND THE FILING OF OBJECTIONS TO DISPUTED CLAIMS.  THIS INVESTIGATION IS ONGOING AND, SUBJECT ONLY TO THE CLAIMS OBJECTION DEADLINE, MAY OCCUR AFTER THE CONFIRMATION DATE.  AS A RESULT, CREDITORS AND OTHER PARTIES-IN-INTEREST ARE HEREBY ADVISED THAT AN OBJECTION TO A DISPUTED CLAIM MAY BE FILED AT ANY TIME, SUBJECT ONLY TO THE CLAIMS OBJECTION DEADLINE.  THE LIQUIDATING TRUST TRUSTEE WILL HAVE THE RIGHT TO OBJECT TO AMOUNTS THAT HAVE BEEN SCHEDULED BY THE DEBTORS, OR THAT ARE REFLECTED IN THE DEBTORS' BOOKS AND RECORDS, AND WHICH ARE FOUND TO BE OBJECTIONABLE IN ANY RESPECT.**

W.    **Treatment of Disputed Claims.**

　　　1.    **No Distribution Pending Allowance.**

All Distributions under the Plan will be made only on account of Allowed Claims. If any portion of a Claim is a Disputed Claim, no Distribution provided for under the Plan will be made on account of such Claim unless and until such Claim becomes an Allowed Claim and is no longer a Disputed Claim.

　　　2.    **Distribution After Allowance.**

Within fourteen (14) days following the date on which a Disputed Claim becomes an Allowed Claim and is no longer a Disputed Claim, the Liquidating Trust Trustee, as Disbursing Agent under the Plan, will distribute to the Creditor holding such Allowed Claim any Cash or other property that would have been distributable to such Creditor as if, at the time of the making of any Distribution to the Class of which such Creditor is a member, such Claim had been an Allowed Claim and not a Disputed Claim.  Except as set forth expressly to the contrary in the Plan, no interest will be paid on such Claim.

### 3.   Reserve for Disputed Claims.

On or as soon as practicable after the Effective Date, the Liquidating Trust Trustee, as Disbursing Agent under the Plan, is required to establish, in a segregated, interest-bearing account a reserve ("Disputed Claims Reserve") for, or to otherwise separately account for, any Disputed Claim asserted against a Debtor in an amount equal to 100% of the Distribution to which the holder of the Disputed Claim would be entitled under the Plan based upon the liquidated, face amount of its non-duplicative Disputed Claim unless such Claim is estimated by a Final Order of the Bankruptcy Court; provided, however, that the Liquidating Trust Trustee, as Disbursing Agent under the Plan, will have the right to seek from the Bankruptcy Court an order reducing the amount of such Reserve pending the resolution of the Disputed Claim.  If the Disputed Claim does not set forth a liquidated amount of such Claim, no Reserve need be established on account of such Disputed Claim unless the Bankruptcy Court orders otherwise.  If the Disputed Claim is estimated, the amount of the Reserve to be established on account of such Disputed Claim will be the Distribution with respect to the estimated amount of such Disputed Claim as determined by a Final Order of the Bankruptcy Court, and such estimated amount will set forth the maximum amount of the Distribution on account of such Disputed Claim.

### 4.   No Distribution Until Allowance of Disputed Claim.

Pursuant to  8.4.4 of the Plan, no disbursement of funds from a Disputed Claims Reserve will be made on account of a Disputed Claim until such Disputed Claim has been determined by a Final Order of the Bankruptcy Court.  Any amount of a Claim which is disallowed pursuant to an order of the Bankruptcy Court will be deemed to be extinguished and no Distribution of any amount will be paid on account thereof.  The amount reserved for any Disputed Claim asserted against a Debtor (plus any interest thereon) which has been disallowed by the Bankruptcy Court will be released to the Liquidating Trust Trustee for the purpose of funding further Distributions to Creditors under the Plan.

### 5.   Bar Date for Filing Avoidance Action Payment Claims.

Any Avoidance Action Payment Claim will be forever barred, will not be enforceable against a Debtor or its Estate and will not be entitled to any Distribution under the Plan, unless a Proof of Claim for such Avoidance Action Payment Claim is filed and served by the <u>later</u> of (a) the Bar Date, or (b) the thirtieth (30th) day after the date of entry of the order of the Bankruptcy Court adjudging the Creditor's liability to such Debtor on account of such Avoidance Action; provided, however, that the Liquidating Trust Trustee may, in his reasonable discretion, stipulate to the allowance of Avoidance Action Payment Claims in a settlement agreement of the underlying Avoidance Action.

**X.     Litigation.**

**1.     Liquidating Trust Trustee's Authorization to Assert Causes of Action.**

Pursuant to 9.1 of the Plan, as of the Effective Date, the Liquidating Trust Trustee will be authorized to exercise and to perform the rights, powers and duties held by each Debtor's Estate with respect to the Causes of Action of such Debtor, and, from and after the Effective Date, the Liquidating Trust Trustee will have the sole and exclusive right, after consultation with the Advisory Committee, to file, litigate, prosecute, settle, adjust, enforce, collect and abandon claims and interests of each Debtor's Estate with respect to the Causes of Action, without any further order of the Bankruptcy Court.

**2.     Liquidating Trust Trustee's Evaluation of Causes of Action.**

The Liquidating Trust Trustee will make the decision, in the exercise of his reasonable business judgment and after consultation with the Advisory Committee, whether to prosecute or to continue to prosecute any Cause of Action. This decision will be based, in part, upon the Liquidating Trust Trustee's evaluation of the merits of the Causes of Action as well as the costs required to prosecute such Causes of Action. The Liquidating Trust Trustee will be entitled to determine, in the exercise of his reasonable business judgment after consultation with the Advisory Committee, not to prosecute, or to abandon, any Cause of Action.

/ / /

/ / /

3.    **Retention of Professionals**.

The Liquidating Trust Trustee may retain Professionals to represent him in prosecuting Causes of Action, including Professionals who were employed by a Debtor or by the Committee.  The Liquidating Trust Trustee will determine the terms of the retention of Professionals, in the exercise of his reasonable business judgment, and will be entitled to retain counsel on a contingency fee basis to prosecute some or all of the Causes of Action, and may seek to finance any costs relating to the prosecution of Causes of Action.

4.    **Preservation of Causes of Action**.

Unless a Cause of Action is expressly waived, relinquished, released, compromised, or settled in the Plan or in any Final Order, each Cause of Action, including, but not limited to, each Cause of Action set forth in **Exhibit "D"** to this Disclosure Statement, is expressly reserved for later adjudication by the Liquidating Trust Trustee (including, without limitation, Causes of Action of which the Debtors presently may be unaware, or which may arise or exist by reason of facts or circumstances unknown to the Debtors at this time, or facts or circumstances which may change or be different from those which the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches will apply, based on this Disclosure Statement, the Plan, or the Confirmation Order, to the Liquidating Trust Trustee's prosecution of Causes of Action.  Without limiting the generality of the foregoing, any entity with respect to which a Debtor has incurred an obligation or which has received goods or services from a Debtor or a transfer of money or property from a Debtor, or which has transacted business with a Debtor, should assume that such obligation, transfer, or transaction may be evaluated by the Liquidating Trust Trustee subsequent to the Effective Date and may be the subject of an Avoidance Action or other action or proceeding filed after the Effective Date.

**Y.**   **Executory Contracts And Unexpired Leases.**

    **1.**   **Executory Contracts and Unexpired Leases Being Assumed Under the Plan.**

Effective as of, and conditioned on, the occurrence of the Effective Date, the Debtors will assume under the Plan all of the executory contracts and unexpired leases listed in **Exhibit "2"** to the Plan.  The Debtors may amend, through and including the Confirmation Hearing Date, **Exhibit "2"** to add thereto any executory contract or unexpired lease, in accordance with the terms and conditions of  10.1 of the Plan.

    **2.**   **Executory Contracts and Unexpired Leases Being Rejected Under the Plan.**

Effective as of, and conditioned on, the occurrence of the Effective Date, the Debtors will reject under the Plan all of the executory contracts and unexpired leases of the Debtors not listed in **Exhibit "2"** to the Plan, including, without limitation, those executory contracts and unexpired leases listed in **Exhibit "3"** to the Plan.  The Debtors may amend, through and including the Confirmation Hearing Date, **Exhibit "3"** to add thereto any executory contract or unexpired lease, or to delete therefrom any executory contract or unexpired lease, in accordance with the terms and conditions of  10.2 of the Plan.  Any executory contract or unexpired lease not listed in **Exhibit "2"** or in **Exhibit "3"** to the Plan will be deemed to be rejected on the Effective Date.

    **3.**   **Bar Date for Rejection Claims.**

Any Rejection Claim will be forever barred, will not be enforceable against any Debtor or its Estate, and will not be entitled to any Distribution under the Plan, unless a Proof of Claim for such Rejection Claim is filed and served by the later of (a) the Bar Date, or (b) the thirtieth (30th) day after the date of entry of the order of the Bankruptcy Court approving the rejection of the executory contract or unexpired lease.

    **4.**   **Cure Claims Schedule.**

A schedule of the amounts necessary to cure any defaults under each executory contract and unexpired lease assumed under the Plan ("Cure Claims") is set forth in

**Exhibit "2"** to the Plan ("Cure Claims Schedule").  Any objection to the amount of any Cure Claim set forth in the Cure Claims Schedule must be filed and served upon counsel for the Debtors on or before the fourteenth (14th) day prior to the Confirmation Hearing Date.  In the event that any such objection to the amount stated for a Cure Claim in the Cure Claims Schedule is not filed and served as set forth in the Plan, the amount of the Creditor's Cure Claim will be deemed forever to be the amount set forth in the Cure Claims Schedule, and any Cure Claim in excess of the amount set forth in the Cure Claims Schedule will be waived and will be forever barred in the Cases, without further notice.

**Z.      Post-Effective Date Notice.**

From and after the Effective Date, any entity that desires to obtain notice of any pleading or document filed in the Cases, or of any hearing in the Bankruptcy Court, or of any matter as to which notice is to be provided under the Plan, must file a request for post-Effective Date notice and serve such request on the Liquidating Trust Trustee and any counsel for the Liquidating Trust Trustee; provided, however, that the United States Trustee, the Debtors, CIT, the Advisory Committee and the Liquidating Trust Trustee each will be deemed to have requested such post-Effective Date notice.

**AA.      Miscellaneous Plan Provisions.**

Other provisions of the Plan, including provisions pertaining to the Liquidating Trust Trustee's duty to file after the Effective Date reports regarding the status of implementation of the Plan, the Debtors' right to revoke the Plan prior to the Confirmation Date, the governing law relating to the Plan, the Bankruptcy Court's retention of jurisdiction over the Cases and the Plan after the Effective Date, the Debtors' not making any De Minimis Distributions under the Plan, and the Debtors' right to seek to modify the Plan are set forth in Article XIII of the Plan.

**IX.**

**EFFECT OF CONFIRMATION OF THE PLAN**

**A.      1141.**

Confirmation of the Plan will have all of the effects provided by 1141 of the Bankruptcy Code which are not inconsistent with the terms of the Plan.  The Distributions and rights that are

1  provided in the Plan will be in complete satisfaction, settlement and release, effective as of the

2  Effective Date, of all known or unknown Claims and Administrative Claims against, rights

3  against, liabilities of, obligations of, and any Liens encumbering each, Debtor's Assets, including

4  but not limited to, Claims of the kind specified in s 502(g), 502(h) and 502(i) of the Bankruptcy

5  Code, in each case whether or not (1) a Proof of Claim based upon such Claim is filed or deemed

6  filed under  501 of the Bankruptcy Code, (2) such Claim is allowed under  502 of the Bankruptcy

7  Code, or (3) the holder of such Claim accepted the Plan.  Any obligations to Creditors and to

8  Interest Holders of a Debtor imposed by the Plan will be compensable only from Distributions of

9  Cash made from the Liquidating Trust.

10  **B.** **Injunction/Release.**

11  On the Effective Date, an injunction against Creditors' acts will be issued in accordance

12  with the provisions of 11.2 of the Plan, and Claims will be released in accordance with the

13  provisions of 11.3 of the Plan.

14  **C.** **Binding Effect of Plan.**

15  Upon the Effective Date, the provisions of the Plan will be binding upon the Debtors, the

16  Liquidating Trust Trustee and each Creditor and Interest Holder.

17  **D.** **Vesting of Assets.**

18  Upon the Effective Date, all Assets of a Debtor and its Estate will vest in, and will be

19  property of, the Liquidating Trust, for the benefit of Creditors, to be administered by the

20  Liquidating Trust Trustee in accordance with the terms and conditions of the Plan.

21  **E.** **No Discharge of a Debtor.**

22  Notwithstanding anything to the contrary contained in the Plan, no Debtor will obtain a

23  discharge under the Plan. The injunction provided by 11.2 of the Plan will terminate and expire

24  automatically on the Case Closing Date.

25  / / /

26  / / /

27

28

# X.

## LIMITATION OF LIABILITY

### A.    No Liability for Solicitation or Participation.

As specified in  1125(e) of the Bankruptcy Code, entities that solicit acceptances or rejections of the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, will not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

### B.    Good Faith.

Confirmation of the Plan will constitute a finding that the Plan was proposed, and that acceptances of the Plan were solicited, in good faith and in compliance with applicable provisions of the Bankruptcy Code.

### C.    Limitation of Liability Regarding Plan Confirmation.

Effective as of the Effective Date, neither the Debtors, the Committee, the Advisory Committee, the Liquidating Trust Trustee, nor any of their respective Representatives (including, without limitation, any Professionals) will have or incur any liability to any Creditor or Interest Holder or to any other party-in-interest or entity for any good faith act or omission in connection with or arising out of the negotiation, preparation and pursuit of confirmation of the Plan, the approval of this Disclosure Statement, the consummation of the Plan, the administration of the Plan, the Cases or the making of Distributions under the Plan (except only for any act or omission constituting gross negligence or willful misconduct), to the fullest extent permitted by applicable statutory and case law, except only that the Liquidating Trust Trustee will be responsible for making the Distributions provided for by the Plan.

# XI.

## CERTAIN RISK FACTORS TO BE CONSIDERED

Holders of Claims and Interests entitled to vote on the Plan should read and consider carefully the factors set forth below, as well as other information set forth in this Disclosure

Statement and the documents delivered herewith and/or incorporated by reference herein, prior to voting to accept or reject the Plan.

**A.    Risk that the Debtors Will Have Insufficient Cash for the Plan to Become Effective.**

The Plan cannot be confirmed by the Bankruptcy Court unless the Debtors have Cash sufficient by the Effective Date to pay, or to reserve for the payment of, all Allowed Secured Claims, Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims, unless Creditors holding such Claims agree to a deferred payment of their Claims.  The Debtors believe that, at the time of the Confirmation Hearing, the Debtors will have Cash sufficient to pay, or to reserve for the payment of, all such Claims.  For a further discussion of this issue, please refer to Paragraph XII(F) hereof.

**B.    Risk Regarding the Distributions to Be Made to Creditors.**

While the Debtors have endeavored to project pursuant to Paragraph XII(F) of this Disclosure Statement what they believe are likely to be the Distributions to be made to Creditors, there can be no certainty that those projections will be accurate and that Creditors will receive the Distributions projected in this Disclosure Statement.  The projections contained in this Disclosure Statement will be affected by, among other things: (1) the amount of any Net Recoveries that the Liquidating Trust Trustee generates from prosecuting Causes of Action; (2)  the amount of Allowed Claims including the amount of Allowed Administrative Claims and the amount of any Allowed General Unsecured Claim of CIT; (3) the outcome of objections to Disputed Claims; (4) the costs of administering the Plan; and (5) the amount of the remaining Purchase Price and the amount of Excluded Assets (including the ERTC) to which the Debtors (as opposed to CIT) are entitled. [11]

**C.    Bankruptcy Risks.**

If a Class of Claims or Interests that is entitled to vote with respect to the Plan votes not to accept the Plan, the Debtors will need to "cram down" on that Class pursuant to 1129(b) of the

---

[11] As set forth in Paragraph IV(G)(15) hereinabove, subject to the execution of the Settlement Agreement and the approval of the Bankruptcy Court, the Debtors, the Committee and CIT have agreed to settle their differences regarding the amount and scope of CIT's Secured Claim and the treatment thereof under the Plan.

-84-

1   Bankruptcy Code in order to obtain confirmation of the Plan.  The cram down provisions of

2    1129(b) of the Bankruptcy Code are fairly complex, and require, among other things, that the

3   Plan and the Debtors comply with the provisions of s 1129(a)(1)-(7), and (9)-(16) of the

4   Bankruptcy Code as applicable, and that the Plan not discriminate unfairly and be fair and

5   equitable with respect to each Class of Claims or Interests that is impaired under and that has not

6   accepted the Plan.  While the Debtors believe that the Plan satisfies all of the requirements for

7   confirmation of a plan under 1129(b), there is no assurance that the Bankruptcy Court will make

8   such a determination.

9                                          **XII.**

10                       **CONFIRMATION OF THE PLAN**

11          **A.      Introduction.**

12          A CREDITOR CONCERNED WITH CONFIRMATION OF THE PLAN OR THE

13   PROVISIONS OF THE PLAN SHOULD CONSULT WITH ITS OWN ATTORNEYS

14   BECAUSE THE LAW WITH RESPECT TO CONFIRMING A PLAN IS COMPLEX.  The

15   following discussion is intended solely for the purpose of alerting Creditors about basic

16   confirmation issues which they may desire to consider. The Debtors CANNOT and DO NOT

17   represent that the discussion contained below is a complete summary of the law on this topic and

18   is not providing any legal opinions with respect thereto.

19          Many requirements must be met before a bankruptcy court can confirm a Chapter 11 plan.

20   Such requirements include that the plan must be accepted by at least one impaired class

21   established by the plan, that the plan be feasible and that the distributions to non-accepting

22   creditors in impaired classes must be at least as much as such creditors would receive in a Chapter

23   7 liquidation.  These requirements are not the only requirements for confirmation.

24          **B.      Votes Necessary to Confirm the Plan.**

25          A bankruptcy court cannot confirm a Chapter 11 plan unless (1) all impaired classes under

26   the plan have voted to accept the plan, or (2) at least one impaired class has accepted the plan

27   without counting the votes of any insiders within that class, and the plan is eligible to be

28   confirmed by "cramdown" on non-accepting classes pursuant to  1129(b) of the Bankruptcy Code.

C.    **Votes Necessary for a Class to Accept the Plan.**

A class of claims is deemed to have accepted a Chapter 11 plan where more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the claims that actually vote, vote in favor of the plan.

D.    **Treatment of Non-Accepting Classes.**

As noted above, even if there are impaired classes that do not accept a Chapter 11 plan, a bankruptcy court may nonetheless confirm the plan if the non-accepting classes are treated in the manner required by the Bankruptcy Code and there is at least one impaired class that accepts the plan.  The process by which a plan can be confirmed and become binding on non-accepting classes is commonly referred to as "cramdown."  The Bankruptcy Code allows a plan to be "crammed down" on non-accepting classes of claims or interests if the plan meets all of the requirements for confirmation, except the voting requirements of  1129(a)(8) of the Bankruptcy Code, and if the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired class that has not voted to accept the plan, as provided in  1129(b) of the Bankruptcy Code and applicable case law.

In this case, the Debtors will seek to have the Plan confirmed notwithstanding any rejection of the Plan by any impaired Class of Creditors or by the Class of Interests.  To obtain such confirmation, the Debtors must demonstrate to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each such dissenting impaired Class.  A Chapter 11 plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class, and if no class receives more than that to which it is entitled for its claims or interests.  The Debtors believe that the Plan satisfies this requirement and, specifically, that the Plan does not discriminate unfairly against separate Classes 3A or Class 3B, and that the treatment of Classes 3A and 3B under the Plan is fair and equitable.

The Bankruptcy Code establishes different "fair and equitable" tests for unsecured Claims and Interests.

1.    **Unsecured Claims.**

In order to meet the "fair and equitable" requirements of 1129(b) related to the treatment of a Class of unsecured Claims (Class 3A, Class 3B or Class 4), either (a) each Holder of the unsecured Claim must receive or retain under the Plan property of a value, as of the Effective Date, equal to the amount of its Allowed Claim, or (b) the holders of Claims and Interests that are junior in priority to the unsecured Claims must not receive any property under the Plan.

2.    **Interests.**

In order to meet the fair and equitable requirements of 1129(b) relative to the treatment of the Class of Interests (Class 5), either (a) each Interest Holder must receive or retain under the Plan property of a value, as of the Effective Date, equal to the greatest of (i) the allowed amount of any fixed liquidation preference to which such Interest Holder is entered, (ii) any redemption price to which the Interest Holder is entitled; or (iii) the value of the Interests, or (b) the holders of any Interests that are junior to the dissenting Class of Interests will not receive or retain any property under the Plan.

THE DEBTORS BELIEVE THAT THE PLAN MAY BE CONFIRMED ON A NONCONSENSUAL (CRAMDOWN) BASIS PROVIDED THAT AT LEAST ONE IMPAIRED CLASS OF CLAIMS -- CLASS 3A, CLASS 3B OR CLASS 4 -- VOTES TO ACCEPT THE PLAN. ACCORDINGLY, IN THE EVENT THAT AN IMPAIRED CLASS OF CLAIMS OR INTERESTS DOES NOT VOTE IN FAVOR OF THE PLAN, THE DEBTORS INTEND TO ATTEMPT TO DEMONSTRATE AT THE CONFIRMATION HEARING THAT THE PLAN SATISFIES THE REQUIREMENTS OF 1129(b) OF THE BANKRUPTCY CODE AS TO ANY SUCH NON-ACCEPTING CLASS.

E.    **Request for Confirmation Despite Non-Acceptance by Impaired Class(es).**

The Debtors will ask the Bankruptcy Court to confirm the Plan by cramdown on any impaired Class if such Class does not vote to accept the Plan. In this regard, it is important to note that the Debtors have established under the Plan a Class of Allowed Subordinated Claims

(Class 4) which may not exist in the Cases (as of the date of this Disclosure Statement, no Claim had been subordinated by order of Bankruptcy Court).  Pursuant to 13.16 of the Plan, at the election of the Debtors, any Class of Claims that does not have a holder of an Allowed Claim or a Claim temporarily allowed under Rule 3018 of the Federal Bankruptcy Rules as of the date of the Confirmation Hearing will be deemed to be eliminated from the Plan for the purpose of voting with respect to the Plan and for the purpose of determining acceptance or rejection of the Plan by such Class pursuant to 1129(a)(8) of the Bankruptcy Code; accordingly, the Bankruptcy Court may confirm the Plan pursuant to the provisions of 1129(a) of the Bankruptcy Code despite any otherwise deemed non-acceptance of the Plan by such Class of Claims. Notwithstanding anything to the contrary contained in the foregoing, the Debtors reserve the right to seek to subordinate any Claim.

F.    **Feasibility of the Plan.**

1.    **Feasibility Analysis**.

1129(a)(11) of the Bankruptcy Code requires that, for the Plan to be confirmed as to a Debtor, the Bankruptcy Court find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of such Debtor, unless such liquidation or further reorganization is proposed in the Plan.  In effect, 1129(a)(11) requires that the Bankruptcy Court find that the Plan is "feasible."

In this case, the Plan contemplates that all Assets of each Debtor ultimately will be liquidated, sold, transferred, abandoned, or otherwise disposed of by the Liquidating Trust Trustee, and that all Liquidating Trust Assets will be distributed to Creditors and, in the (very unlikely) event that there is sufficient value to pay in full Allowed Claims (plus Postpetition Interest thereon), to Interest Holders pursuant to the terms of the Plan.  Such provisions of the Plan contemplate, then, an orderly liquidation of each Debtor's Assets and a distribution of the value realized therefrom to Creditors.

The Debtors have prepared an analysis, set forth hereinbelow, of the feasibility of the Plan in order to demonstrate that the Plan satisfies the feasibility requirements of 1129(a)(11) of the Bankruptcy Code ("Feasibility Analysis").  The Feasibility Analysis

sets forth, among other things, the Debtors' estimate of the resources available to fund the Distributions required by the Plan.

THE FEASIBILITY ANALYSIS REPRESENTS A PREDICTION OF FUTURE EVENTS BASED UPON CERTAIN ASSUMPTIONS MADE BY THE DEBTORS, AS SET FORTH HEREINBELOW.  WHILE THE DEBTORS ARE CONFIDENT THAT IT WILL BE FEASIBLE TO MAKE THE DISTRIBUTIONS TO CREDITORS PROVIDED BY THE PLAN, THERE IS NO GUARANTY OR OTHER ASSURANCE THAT THE FEASIBILITY ANALYSIS WILL PROVE TO BE ACCURATE.  BY REASON OF THE UNCERTAINTIES INHERENT IN THE PREDICTION OF FUTURE EVENTS, THE FINANCIAL RESULTS MAY WELL BE DIFFERENT FROM THOSE PREDICTED, AND SUCH A DIFFERENCE MAY BE MATERIAL AND ADVERSE TO THE INTERESTS OF CREDITORS.

THE FEASIBILITY ANALYSIS CONTAINS PROJECTIONS REGARDING, AMONG OTHER THINGS, THE RESOURCES THAT WILL BE AVAILABLE TO THE DEBTORS TO FUND THE DISTRIBUTIONS REQUIRED BY THE PLAN, THE NET RECOVERIES FROM THE ASSERTION OF AVOIDANCE CLAIMS, THE VALUE OF THE ERTC CLAIM, THE SCOPE AND EXTENT OF CIT'S LIENS, THE ALLOWED AMOUNT OF CLAIMS INCLUDING ADMINISTRATIVE CLAIMS AND GENERAL UNSECURED CLAIMS, AND THE AMOUNT OF POST-EFFECTIVE DATE PLAN EXPENSES. SUCH PROJECTIONS ARE MADE SOLELY FOR THE PURPOSE OF THIS DISCLOSURE STATEMENT, IN ORDER TO FACILITATE CREDITORS' EVALUATION OF THE MERITS OF THE PLAN. THE DEBTORS HEREBY MAKE NO ADMISSIONS REGARDING ANY OF THE MATTERS CONTAINED IN THE FEASIBILITY ANALYSIS, WILL NOT BE BOUND BY ANY PROJECTION CONTAINED IN THE FEASIBILITY ANALYSIS AND RESERVE ALL RIGHTS, CLAIMS, INTERESTS AND REMEDIES REGARDING ANY CLAIMS PROJECTED IN THE FEASIBILITY ANALYSIS, THE ALLOWANCE OF ANY

1  CLAIMS, AND REGARDING ANY OTHER MATTERS CONTAINED IN THE

2  FEASIBILITY ANALYSIS. [12]

3          Significant assumptions underlying the Feasibility Analysis include the following:

4          a.    **Effective Date of the Plan.**  For the purpose of this Disclosure

5  Statement only, the Debtors project that the Confirmation Date will occur in or

6  about December 2023 and that the Effective Date will occur in or about December

7  2023.  Payments to Creditors, then, will commence to be funded in or about

8  December 2023 or January 2024.

9          b.    **Debtors' Cash Resources and Other Resources to Fund the Plan**

10  **($12.5 million-$13.5 million).**[13]  As of August 31, 2023, the primary Assets of the

11  Debtors were:

12          i.    Balance of Purchase Price. SCI's counsel is holding in trust

13  $9,825,000 in Cash, constituting the Cash balance of the Purchase Price

---

[12] As set forth in Paragraph IV(G)(15) hereof, the Debtors, the Committee and CIT have settled their differences regarding CIT's Allowed Claims and the treatment thereof. The Settlement reached among the Debtors, the Committee and CIT is subject to the execution of a definitive Settlement Agreement and the approval of the Bankruptcy Court. As of the date of this Disclosure Statement, the definitive Settlement Agreement had not yet been executed by the Debtors, the Committee and CIT, and the Compromise Motion requesting Bankruptcy Court approval of the Settlement had not yet been filed. While the Debtors are very optimistic that the Settlement Agreement will be executed and that the Bankruptcy Court will enter an order approving the Compromise Motion, in an abundance of caution, the Debtors will not assume herein that the Settlement will be implemented and, accordingly, the Feasibility Analysis that follows does not reflect the terms of the Settlement. If the Settlement is implemented, the Settlement will have, among others, the following effects on the Feasibility Analysis:
- CIT's total Allowed Claim will be fixed in the amount of $47,397,119.
- CIT's Allowed Secured Claim will be fixed in the amount of $2,825,000, plus CIT will be entitled to be paid the $100,000 CIT Reimbursement Claim. CIT's Allowed General Unsecured Claim will be in the amount of $44,472,119;
- The Perris Real Property Lease will be valued at $7.0 million. $7.0 million from the $9,825,000 Cash balance of the Purchase Price will be unencumbered and will be released to the Debtors to fund the Plan.
- Any Net Recoveries from the pursuit of the ERTC claim will be unencumbered.
- Any Net Recoveries obtained from the assertion of Avoidance Claims and other Causes of Action will be split between CIT and not-CIT unsecured Creditors as set forth in Paragraph IV(G)(15)(g) hereof.
- Mr. McGeever's Claims will be allowed in the total amount of $6.0 million.
Creditors and parties-in-interest should take the foregoing into account when reviewing the Feasibility Analysis.

[13] As of August 15, 2023, SCI had approximately $2.2 million cash. These funds derived from a $2.5 million payment made by Silver Creek Modular pursuant to the Asset Purchase Agreement. These funds are earmarked to pay Construction Law Obligations. For the purpose of this Disclosure Statement only, the Debtors assume that these funds will be applied solely to reduce Construction Law Obligations and will not be available to fund other Distributions under the Plan, and, accordingly, are not included in assessing the resources available to the Debtors to fund the Plan. The use of such funds to pay Construction Law Obligations, though, will reduce the amount of Allowed General Unsecured Claims against the Debtors.

paid by Silver Creek Modular pursuant to the Asset Sale Transaction. CIT asserts a Secured Claim against those funds. The Debtors dispute such Claim.

A primary Asset of SCI's Estate was the Perris Real Property Lease. SCI believes that the rent under the Perris Real Property Lease was substantially below market. Pursuant to the Asset Sale Transaction, SCI assumed and assigned to Silver Creek Modular the Perris Real Property Lease. Under the Asset Purchase Agreement, $8.0 million of the Purchase Price was allocated to the Perris Real Property Lease. The Debtors believe strongly that CIT had no Lien against the Perris Real Property Lease and, accordingly, that the proceeds from the assignment of the Perris Real Property Lease are <u>unencumbered</u>. A dispute exists between SCI and CIT regarding the valuation of the Perris Real Property Lease and, hence, the proper amount of value allocated thereto pursuant to the Asset Purchase Agreement. The Debtors are confident, though, that substantial value will be allocated to the Perris Real Property Lease (either by the Settlement reached with CIT or, if the Settlement is not approved or consummated, a determination made by the Bankruptcy Court in litigation regarding the valuation of the Perris Real Property Lease) and that such allocated value will be unencumbered and available to fund Distributions to Creditors under the Plan.

ii.    <u>Excluded Assets</u>. The primary Excluded Asset retained by the Debtors is the ERTC.[14] The value of the ERTC is uncertain, but the Debtors believe that potentially at least $5.0 million may be recoverable from the submission of a claim for the ERTC. CIT asserts that its Liens

---

[14] SCI has a substantial amount of accounts receivable with respect to contracts retained by SCI pursuant to the Asset Purchase Agreement, but SCI believes that, taking into account set-off claims and Construction Law Claims associated with such contracts, and Secured Claims asserted by CIT against such accounts receivable, the Debtors' interests in such accounts receivable may not have significant value; therefore, for the purpose of this Disclosure Statement only, such accounts receivable are not considered in assessing the resources available to the Debtors for the funding of the Plan.

1    encumber the ERTC. The Settlement provides that the ERTC claim will be

2    unencumbered, but, if the Settlement is not approved or consummated,

3    litigation regarding CIT's interest in the ERTC claim may be required. The

4    Debtors anticipate that they will submit to the IRS a claim for the ERTC

5    during the fourth quarter of 2023, and believe that any recovery on account

6    of the ERTC can be obtained with six to twelve months thereafter.

7            iii.        <u>Avoidance Claims</u>.  CIT has <u>no</u> Lien against any Avoidance

8    Claims of the Debtors' Estates. The Debtors have not yet completed a

9    thorough evaluation of the viability of Avoidance Claims in the Cases. The

10    Debtors cannot estimate with any degree of precision, therefore, the value

11    of the Avoidance Claims. For the purpose of this Disclosure Statement only,

12    the Debtors project that they will obtain $500,000 in Net Recoveries from

13    the assertion of Avoidance Claims.

14    The Debtors and the Committee, on one hand, and CIT, on the other hand,

15    have negotiated a Settlement of their differences, including settlements of the

16    valuation of the Perris Real Property Lease and CIT's asserted Lien with respect to

17    the ERTC. While there is no assurance that the Settlement will be approved or

18    consummated, the Debtors are cautiously optimistic that the Settlement will be

19    approved and consummated.

20    Based upon the foregoing, for the purpose of this Disclosure Statement

21    only, the Debtors project that: the valuation of the Perris Real Property Lease will

22    be $7.0 million to $8.0 million; CIT's Secured Claim against the $9,825,000 Cash

23    balance of the Purchase Price will be $1,825,000 to $2,825,000 and that CIT will

24    be paid that amount; the Net Recovery from the ERTC will be $5.0 million and that

25    such Net Recovery will be unencumbered; and that there will be $500,000 in Net

26    Recoveries from the assertion of Avoidance Claims and that such Net Recoveries

27    will be unencumbered. Therefore, for the purpose of this Disclosure Statement

28    only, the Debtors project that there will be a total of $12.5 million to $13.5 million

available to fund Distributions under the Plan. **THE DEBTORS CAUTION, HOWEVER, THAT THERE IS NO ASSURANCE THAT THE DEBTORS' PROJECTIONS IN THIS REGARD WILL BE ACCURATE, OR THAT, GIVEN CIT'S ASSERTED SECURED CLAIMS, THE DEBTORS WILL BE ABLE TO RETAIN THE PROJECTED AMOUNT OF FUNDS FREE AND CLEAR OF CIT'S SECURED CLAIMS.**

c.    **Allowed Secured Claims ($1,825,000-$2,825,000).**  For the purpose of this Disclosure Statement only, the Debtors project that CIT will have an Allowed Secured Claim in the amount of $1,825,000-$2,825,000.  In accordance with the provisions of 5.1.2 of the Plan, the Debtors believe that any other Secured Claims are valueless and, consequently, will be voided and stripped off automatically pursuant to 506 of the Bankruptcy Code.  Based thereon, the Debtors believe that there are no other Allowed Secured Claims in the Cases.

d.    **Allowed Administrative Claims ($1.63 million).**  The Debtors' projection of the Administrative Claims which will have to be paid on or about the Effective Date derives, in large part, from information provided to the Debtors by the Professionals employed in the Debtors' Cases, and the Debtors' evaluation of the  503(b)(9) Claims asserted in the Cases.  The Debtors project that, after Professionals resort to any pre-petition retainers that they may have and obtain compensation in compliance with the Monthly Compensation Order, there will be a balance of approximately $1.0 million in unpaid fees owed to Professionals as of the Effective Date. The projection of Administrative Claims of Professionals is only an estimate for the purpose of this Disclosure Statement, and should not be construed as any agreement by the Debtors as to the amount or reasonableness of such fees.  The actual fees of the Professionals which may be allowed by the Bankruptcy Court and which will have to be paid on or soon after the Effective Date may be higher or lower than the amount projected by the Debtors.

Based upon the 503(b)(9) Claims asserted against SCI, and SCI's assessment of the amount of such Claims which will be paid as Construction Law Obligations by Silver Creek Modular pursuant to the Asset Purchase Agreement, the Debtors project, for the purpose of this Disclosure Statement only, that approximately $600,000 in 503(b)(9) Claims will need to be paid by the Debtors.

The Debtors estimate that they will need to pay less than $30,000 in transfer taxes resulting from the Asset Sale Transaction.

**e.**    **Cure Claims ($0).**  The Debtors project that the Debtors will owe no amount of Cure Claims.  Such projection derives from the Debtors' analysis of the Debtors' remaining contracts and unexpired leases and their present determination that they will not assume any remaining executory contract or unexpired lease under the Plan.

**f.**    **Allowed Priority Non-Tax Claims ($100,000).**  Pursuant to the Payroll Motion, SCI paid a substantial amount of priority wage obligations of SCI. The Debtors project that a balance of approximately $100,000 of Priority Non-Tax Claims will be owed by the Debtors.

**g.**    **Allowed Priority Tax Claims ($500,000).**  The IRS has asserted against SCI a Priority Tax Claim in the amount of $263,327.  The Debtors dispute such Claim.  The Debtors believe that the California Franchise Tax Board may assert a Priority Tax Claim in an amount as much as $590,000 against SCI, but the Debtors dispute such Claim. For the purpose of this Disclosure Statement only, the Debtors project that $500,000 in Priority Tax Claims will be allowed in the Cases.

**h.**    **Allowed General Unsecured Claims ($42,171,808 - $44,071,808).**  For the purpose of this Disclosure Statement only, the Debtors project that approximately $42,171,808 to $44,071,808 in Allowed General Unsecured Claims will be owed by the Debtors.[15]  This projection includes, for the purpose of this

---

[15] Apart from CIT's Claim which CIT asserts is owed jointly by the Debtors, these General Unsecured Claims are essentially Claims asserted against SCI. SCL estimates that only about $25,000 in General Unsecured Clams will be asserted against SCL, and SCI RS estimates that only about $72,593 in General Unsecured Claims will be asserted against SCI RS.

Disclosure Statement only, a projected Deficiency Claim of CIT in the amount of $38,071,808 to $39,071,808. [16]

Substantial Disputed General Unsecured Claims include:

(i)    CIT -- not less than $21,250,000 of CIT's Claim is disputed.

(ii)    BBMR -- $10.0 million.

(iii)    Mr. McGeever -- $21,250,000.

(iv)    XL Construction, LLC -- $2,525,285

Certain General Unsecured Claims are Construction Law Obligations asserted pursuant to executory contracts which were assumed by SCI and assigned to Silver Creek Modular pursuant to the Asset Purchase Agreement. Pursuant to the Asset Purchase Agreement, Silver Creek Modular is required to pay approximately $4,888,550 in Construction Law Obligations in accordance with the terms and conditions of the Asset Purchase Agreement. A substantial amount of the General Unsecured Claims, therefore, will be paid by Silver Creek Modular. The projection of Allowed General Unsecured Claims contained herein is net of: (i) the Construction Law Obligations for which Silver Creek Modular is liable; (ii) the Construction Law Claims that SCI will pay from the $2.2 million fund maintained by SCI that is earmarked to pay Construction Law Claims; and (iii) Construction Law Claims that will be paid by SCI from SCI's collection of accounts receivable on contracts retained by SCI and not assigned to the Buyer.

In addition to the General Unsecured Claims that will be paid by Silver Creek Modular, certain General Unsecured Claims are bonded claims that may be paid by Hartford. Hartford may assert against SCI claims for subrogation and/or indemnity for any Claims paid by it on behalf of SCI. Any valid Claims asserted by

---

[16] CIT filed a Proof of Claim (Claim No. 33) asserting a Claim against the Debtors in the amount of $62,146,808. CIT's Claim includes CIT's Secured Claim. For the purpose of this Disclosure Statement only, the Debtors project that CIT will have an Allowed Secured Claim in an amount of $1,825,000 to $2,825,000. CIT's Claim also includes an alleged assignment to CIT of Mr. McGeever's General Unsecured Claims in the amount of $21,250,000; the Debtors dispute such asserted assignment and believe that Mr. McGeever's Claim is subject to disallowance. Thus, for the purpose of this Disclosure Statement only, the Debtors project that CIT will have an Allowed General Unsecured Claim in the amount of $38,071,808 to $39,071,808 (i.e., $62,146,808 less a Disputed Claim of $21,250,000, less a Secured Claim of $1,825,000 to $2,825,000).

Hartford will be treated as Allowed Class 3A Claims under the Plan.

THE DEBTORS AND THE LIQUIDATING TRUST TRUSTEE TO BE APPOINTED UNDER THE PLAN MAKE NO ADMISSIONS REGARDING THE VALIDITY OF ANY GENERAL UNSECURED CLAIM OR ANY OTHER CLAIM, AND RESERVE THE RIGHT TO OBJECT TO ANY CLAIM, INCLUDING ANY CLAIM NOT LISTED AS DISPUTED, CONTINGENT OR UNLIQUIDATED IN A DEBTOR'S BANKRUPTCY SCHEDULES.

**i.** **Post-Effective Date Plan Expenses ($250,000).** The Debtors have ceased all business operations. The Debtors will have no operations after the Effective Date, and, hence, will incur no material operating expenses after the Effective Date. The Liquidating Trust Trustee will incur, however, costs with respect to administering the Plan and winding up the financial affairs of the Debtors, including the following expenses: accruing United States Trustee Fees; compensation for his services as Liquidating Trust Trustee in accordance with the provisions of the Liquidating Trust Agreement; legal expenses associated with administering the Plan, objecting to Disputed Claims and asserting Causes of Action; and accounting expenses including for Tax matters. For the purpose of this Disclosure Statement only, the Debtors project that the expenses of administering the Plan and winding up the Debtors' financial affairs will be in an amount not less than $250,000. The Post-Effective Date Plan Expenses may be higher or lower than the amount projected herein.

The Debtors make no admissions herein regarding the allowance of any Claim, including the amount of Pre-Effective Date Professional Fee Claims that will be allowed by the Bankruptcy Court nor the amount of Post-Effective Date Plan Expenses that will be incurred by the Liquidating Trust Trustee.

The projections contained in the Feasibility Analysis are subject to a variety of unpredictable outside forces and circumstances which could affect adversely such projections. The Debtors caution that such projections may prove to be inaccurate and that

the recoveries realized by the holders of Allowed General Unsecured Claims may be less than those projected herein.

**2.    Funding of Distributions Required by the Plan.**

The Feasibility Analysis indicates that the Debtors will have Cash sufficient to pay the expenses which will be incurred in connection with the administration of the Plan and to make all Distributions required to be made pursuant to the Plan.

**a.    Distributions Payable on or Soon After the Effective Date.**

Given the nature of the Plan -- a "pot" plan pursuant to which holders of Allowed General Unsecured Claims receive their Pro Rata share of a fund (the Liquidating Trust Proceeds), rather than fixed, guaranteed Distributions -- the primary issue relative to the feasibility of the Plan is whether the Debtors will have Cash sufficient to fund the Distributions that are required to be made on or soon after the Effective Date of the Plan.  On or about the Effective Date, the Debtors must pay Allowed Secured Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, United States Trustee Fees, and any Cure Claims.  The Debtors estimate that, on or about the Effective Date, the Debtors will have Cash sufficient to pay such Claims.

The Debtors project that the Debtors will have approximately $7.0 million to $8.0 million Cash available to them to pay Allowed Claims on or soon after the Effective Date.

The Debtors project that the Debtors will have to pay, on or soon after the Effective Date, the following obligations:

| | |
|---|---|
| (i)   Allowed Secured Claims | $1,825,000 - $2,825,000 |
| (ii)  Allowed Administrative Claims | $1,630,000 |
| (iii) Allowed Priority Tax Claims | $500,000 |
| (iv)  Allowed Priority Non-Tax Claims | $100,000 |
| (v)   United States Trustee Fees | $32,440 - $40,440 |
| (vi)  Cure Costs | $0 |
| **TOTAL:** | **$4,087,440 - $5,095,440** |

The Feasibility Analysis indicates, therefore, that the Debtors will have Cash sufficient to fund the Distributions required to be paid to Creditors on or about the Effective Date.

**b.** __Ongoing Distributions Under the Plan__.  After payment of Allowed Secured Claims, Allowed Administrative Claims, any Cure Claims, United States Trustee Fees, Allowed Priority Tax Claims, and any Allowed Priority Non-Tax Claims, the only remaining material Claims to be paid pursuant to the Plan are Allowed General Unsecured Claims (Class 3A and Class 3B).[17]

Recovery by Class 3 Creditors will depend, in part, on the following:

i. __The Amount of Allowed Secured Claims, Allowed Administrative Claims, Cure Claims, United States Trustee Fees, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims__.  The Debtors project that the aggregate amount of such Claims as of the Effective Date will be approximately $4,087,440 to $5,095,440.  The Debtors project that, after paying such Claims, and taking into account the projected $5.0 million Net Recovery from the ERTC claim and the projected Net Recovery of $500,000 from Avoidance Claims, there will be approximately $8,404,560 to $9,412,560 Cash remaining available to fund the Liquidating Trust for the benefit of Class 3A and Class 3B Creditors.  If the amount of such Claims is higher than projected, recoveries by the Class 3A and Class 3B Creditors may be reduced.

ii. __Purchase Price and Excluded Assets__.  As set forth hereinabove, for the purpose of this Disclosure Statement only, the Debtors project that they will have about $12.5 million to $13.5 million in Liquidating Trust Assets to distribute to Creditors holding unsecured Claims (exclusive of the $2.2 million fund earmarked to pay Construction Law Obligations). This projection will be affected adversely, in part, if (i) a

[17] For the purpose of this Disclosure Statement only, the Debtors project that there will be no Distributions made on account of Allowed Subordinated Claims.

recovery on account of the ERTC is less than the $5.0 million projected hereby, and (ii) the Settlement is not approved or consummated and CIT prevails in any dispute with the Debtors regarding the scope of its Liens asserted against the ERTC and the balance of the Purchase Price held in trust for the benefit of Creditors, and, consequently, CIT recovers any of the funds projected hereunder to belong to the Debtors and to be available to fund the Liquidating Trust.

iii.    Recoveries from Causes of Action.  For the purpose of this Disclosure Statement only, the Debtors project that they will obtain $500,000 in Net Recoveries from the prosecution of Causes of Action. If the Debtors obtain less than $500,000 in Net Recoveries from the prosecution of Causes of Action, recoveries by Class 3A and Class 3B Creditors will be adversely affected. On the other hand, if, the Debtors obtain more than $500,000 in Net Recoveries from the prosecution of Causes of Action, recoveries by Class 3A and Class 3B Creditors will be favorably affected.

iv.    Amount of Allowed General Unsecured Claims.  As stated hereinabove, a substantial amount of disputed General Unsecured Claims have been asserted against the Debtors.  The Debtors anticipate that objections will be filed to disputed General Unsecured Claims.  Given the substantial amount of disputed General Unsecured Claims, and the fact that the Debtors have not yet reconciled such Claims, it is not possible at the time of the filing of this Disclosure Statement to project with any exactness the amount of General Unsecured Claims that will be asserted or allowed in the Cases.

For the purpose of this Disclosure Statement only, the Debtors make, in part, the following assumptions regarding the amount of General Unsecured Claims that will be allowed in the Cases:

- CIT will have an Allowed General Unsecured Claim in the amount of $38,071,808 to $39,071,808.
- Mr. McGeever will have no Allowed General Unsecured Claim.
- Any Claim of BBMR will be subordinated and BBMR will have no Allowed General Unsecured Claim against the Debtors.
- After Silver Creek Modular's payment of Construction Law Obligations and SCI's payment of Construction Law Claims in accordance with the provisions of the Ordinary Course Motion Orders, General Unsecured Claims will be allowed in the aggregate amount of approximately $42,171,808 to $44,071,808.

Upon SCI's payment of approximately $4,272,664 in Construction Law Claims pursuant to the Ordinary Course Motion Orders and, Silver Creek Modular's payment of $4,888,500 in Construction Law Obligations pursuant to the Asset Purchase Agreement, approximately $9,161,214 in General Unsecured Claims will be paid in the Cases.  Based upon the Debtors' analysis of the remaining General Unsecured Claims asserted against the Debtors, the assumptions contained in the Feasibility Analysis and the provisions of the Plan, and taking into account projected $250,000 in Post-Effective Date Plan Expenses and approximately $67,236 to $75,300 in additional United States Trustee Fees, the Debtors project, for the purpose of this Disclosure Statement only, that the remaining holders of Allowed General Unsecured Claims against the Debtors (including CIT on account of its very large General Unsecured Claim) will receive about a 18.3%-21.6%  recovery on account of their Claims.

**The Debtors caution, however, that, if any of the material assumptions underlying the Feasibility Analysis proves to be materially inaccurate and adverse to the interests of Creditors, the recovery by holders of Allowed General Unsecured Claims against the Debtors may prove to be less favorable than that projected.  In particular, if the amount of Administrative Claims or**

1    **Priority Claims allowed against the Debtors is higher than the amount**

2    **projected herein by the Debtors, the Net Recovery from the ERTC claim is less**

3    **than the amount projected herein, or CIT recovers more of the remaining**

4    **Assets on account of its Secured Claim than the amount projected herein, the**

5    **recovery by holders of Allowed General Unsecured Claims could be less**

6    **favorable than that projected.  Conversely, if the Debtors' assumptions prove**

7    **to be too conservative, or if recoveries from Causes of Action are higher than**

8    **projected, or if the amount of Allowed General Unsecured Claims is lower**

9    **than projected, the recovery by holders of Allowed General Unsecured Claims**

10   **could be more favorable than projected.**

11   **G.    Liquidation Analysis.**

12   Pursuant to  1129(a)(7) of the Bankruptcy Code, a plan cannot be confirmed unless the

13   bankruptcy court determines that distributions under the plan to all holders of claims who have not

14   accepted the plan, and whose claims are classified in classes that are impaired under the plan, are

15   not less than those which they would receive in a liquidation case under Chapter 7. This test must

16   be satisfied even if a plan is accepted by each impaired class of claims.  This test, which is often

17   referred to as the "Best Interests of Creditors" test, requires the bankruptcy court to find either that

18   (1) all holders of claims in an impaired class of claims have accepted the plan, or (2) the plan will

19   provide to each holder of a claim in an impaired class who has not accepted the plan a recovery of

20   property of a value, as of the effective date of the plan, that is not less than the amount that such

21   holder would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

22   To satisfy the "Best Interests of Creditors" test, the bankruptcy court must reach a

23   conclusion regarding the probable distribution to the holders in each impaired class of claims if the

24   debtor were liquidated in a Chapter 7 case.  The first step in this process is to determine the

25   "liquidation value" that would be generated from a forced sale of the debtor's assets by a

26   Chapter 7 trustee. The second step requires the application of the projected liquidation proceeds in

27   accordance with the various rights of any creditors holding liens on the assets.  If such proceeds

28

1    are sufficient to retire any such liens, then the excess would be made available to satisfy the claims

2    of unsecured creditors.

3    Once all of the claims secured by liens on assets of a debtor's estate are deducted from the

4    projected liquidation proceeds of the sale of the creditor's collateral, then the costs and expenses

5    associated with the liquidation of the estate incurred by the Chapter 7 trustee must be paid.  These

6    costs would include the compensation of the trustee, as well as compensation of counsel and other

7    professionals retained by the trustee and asset disposition expenses.

8    After payment of the costs and expenses associated with the Chapter 7 liquidation are paid,

9    all unpaid administrative expenses incurred by the debtor in its Chapter 11 case (such as

10   compensation of attorneys employed by the debtor),  503(b)(9) Claims and all unpaid claims

11   arising during the pendency of the Chapter 11 case must be paid.

12   After the payment of Chapter 11 administrative expenses, the remaining liquidation

13   proceeds would be used to pay priority unsecured claims, such as tax and wage claims that are

14   entitled to priority under the Bankruptcy Code. Thereafter, the remaining liquidation proceeds

15   would be made available to pay general unsecured claims.  Finally, to the extent that any proceeds

16   remain after paying all allowed claims, such proceeds would be distributed to interest holders.

17   The Debtors have estimated the probable liquidation value of the Debtors' Assets and have

18   estimated the Claims against the Debtors in a Chapter 7 liquidation in an effort to quantify what

19   each Class of Creditors would receive in a Chapter 7 liquidation of the Debtors ("Liquidation

20   Analysis").  Any Liquidation Analysis of this nature entails a significant degree of estimation and

21   projection regarding both probable asset value and probable Allowed Claim totals.  For example,

22   in preparing the Liquidation Analysis, the Debtors have been required to evaluate the substantial

23   amount of Disputed Claims asserted against the Debtors and have necessarily quantified what they

24   believe will be the Allowed Claims against the Debtors.  Although this quantification was based

25   upon a thorough assessment of the information contained in the Debtors' books and records and

26   the Debtors' review of the Disputed Claims asserted against the Debtors, as of the date of the

27   filing of this Disclosure Statement, it was not possible to quantify exactly the amount of Allowed

28   Claims given the substantial amount of Disputed Claims, the fact that no judicial determinations

had been made regarding the merits of the Disputed Claims and the fact that the Bar Date had not passed in the Cases.

On the valuation side of the Liquidation Analysis, the Debtors have estimated the liquidation value of the Debtors' Assets utilizing their best estimate of the value of the Debtors' Assets in a Chapter 7 liquidation.

Material assumptions underlying the Liquidation Analysis include the following:[18]

**1.**     **Potentially Reduced Value of Assets in Liquidation.**

Liquidation values for many types of assets are typically lower than going concern values for such assets.  In this case, the Debtors' primary Assets are the following: (i) $9,825,000 in Cash, paid by Silver Creek Modular as a portion of the Purchase Price, held in trust pending a resolution of CIT's and the Estates' respective interests therein, (ii) the ERTC, and (iii) Causes of Action.  The Debtors' assessment of the value of their Assets in a Chapter 7 liquidation is as follows:

a.     **Cash.**  Cash is fully recoverable either in a going concern scenario or in a liquidation scenario. However, in this case, the $9,825,000 Cash held in trust by the Debtors derived from the Purchase Price paid by Silver Creek Modular pursuant to the Asset Purchase Agreement, and is subject to the competing Secured Claim of CIT. The Debtors believe that a Chapter 7 trustee may lack knowledge of the disputes with CIT sufficient to prosecute effectively and efficiently the Estates' claims for such Cash. Accordingly, while the Debtors project that they would recover about $7.0 million to 8.0 million of the $9,825,000 Cash balance of the Purchase Price, by the Liquidating Analysis, the Debtors apply a twenty-five

---

[18] As set forth in Paragraph IV(G)(15) hereof, subject to the execution of a definitive Settlement Agreement and the approval of the Bankruptcy Court, the Debtors, the Committee and CIT have settled their differences. While the Debtors are optimistic that the Settlement will be implemented, in an abundance of the caution, the Debtors will not assume that the Settlement will be implemented and, accordingly, the Liquidation Analysis that follows does not reflect the terms of the Settlement. Absent the implementation of the Settlement, there is a risk that the valuation of the Perris Real Property Lease will be determined to be less than $7.0 million, that CIT will be determined to have a valid security interest in the Perris Real Property Lease and that CIT will be determined to have a valid security interest in any recovery from the assertion of the ERTC claim, each of which results would have a materially adverse impact on the recovery by unsecured creditors.

percent (25%) discount on the recovery of the Cash to account for the impediments that the trustee may encounter resolving the disputes with CIT in that regard.

      **b.**     **ERTC.**  Assertion of the ERTC will require substantial knowledge of the Debtors' operations and tax situation. A Chapter 7 trustee would lack knowledge of the Debtors' financial affairs, and may not  be in a position to obtain the cooperation of the Debtors' managers and employees necessary to pursue effectively a claim for the ERTC. While the Debtors project that they would recover about $5.0 million from pursuing a claim for the ERTC, by the Liquidation Analysis, the Debtors apply a thirty-three percent (33%) discount on that claim in light of the impediments that the trustee may encounter pursuing the claim and the increased risks associated with a recovery thereof.

      **c.**     **Causes of Action.**  The Debtors believe that there would be a potential difference in the value of the Causes of Action if the Cases were converted to a Chapter 7 liquidation.  If the Debtors remain in Chapter 11, the Liquidating Trust Trustee will prosecute Causes of Action for the benefit of Class 3A and Class 3B Creditors.  On the other hand, the Debtors believe that, in a Chapter 7 liquidation, a trustee would not have any knowledge of the Causes of Action and, accordingly, may not be inclined to prosecute Causes of Action and may abandon the Causes of Action. Even if the trustee were to pursue Causes of Action, the trustee's lack of knowledge of the Causes of Action may impede the trustee's efforts to obtain recoveries on the Causes of Action.  The Debtors believe that, as a result thereof, the value of the Debtors' Causes of Action in a Chapter 7 liquidation would be less than the value thereof in the Debtors' Chapter 11 Cases.

    **2.**     **Increased Amount of Claims in Liquidation.**

As set forth hereinabove, a liquidation of the Debtors' Assets very likely would result in a reduction of the value of the Debtors' Assets.  In a Chapter 7 liquidation, Creditors' interests also would be impaired by the creation of a substantial amount of

Claims, including substantial Administrative Claims, that otherwise would not be asserted against the Debtors.

In a Chapter 7 liquidation, holders of Allowed Claims against a Debtor would receive Distributions based on the liquidation of the Debtor's Assets. Such Assets are the same Assets being liquidated under the Plan. However, the proceeds from the liquidation of the Assets available for funding Distributions to Creditors would be reduced by the fee payable to the Chapter 7 trustee and by the fees and expenses of the Professionals who would be retained by the trustee and who would be required to "get up to speed" in the Chapter 7 cases, and, hence, likely to incur fees in excess of the accruing fees of the Professionals now employed in the Chapter 11 Cases.

The Debtors have few remaining Assets to reduce to Cash, primarily the ERTC and Causes of Action that may be prosecuted in the Cases. Therefore, except for the expense attributable to the fees and costs of pursuing a claim for the ERTC and prosecuting Causes of Action, the Debtors already have absorbed a substantial amount of the expense of liquidating the Debtors' Assets. In a Chapter 7 case, the trustee would be entitled to seek a sliding scale fee based upon the Cash that would be distributed by the trustee to Creditors, even though the Debtors already have accumulated virtually the entire amount of such Cash ($9,825,000 subject to the asserted Liens of CIT), and the Debtors already have incurred the expense associated with generating such Cash. Accordingly, there is a likelihood that Creditors would "pay again" for the Cash accumulated by the Debtors in the Cases because the Chapter 7 trustee would be entitled to receive a fee for distributing the Cash "handed over" to the trustee by the Debtors.

In addition, a Chapter 7 trustee would employ Professionals and assistants who would add additional administrative expense that would be paid prior to payment of Allowed General Unsecured Claims. The Debtors already have legal counsel and financial advisors who are very knowledgeable about the Cases, the material issues concerning the Cases, the Causes of Action and the resolution of Claims asserted against the Debtors. By reason of the knowledge of the Professionals already employed in the

Cases, they likely can complete the work necessary to resolve the Cases much more efficiently and economically than a new set of Professionals who would be employed by a trustee. The costs of familiarizing the trustee, the trustee's new Professionals, and the trustee's new staff with issues relating to the Cases very likely will increase the Administrative Claims that must be paid before payment of Allowed General Unsecured Claims.

It also must be noted that the issues related to the Claims adjudication process in the Cases, and particularly bond claims asserted against SCI, are fairly complex. The Debtors believe that the process of adjudicating Disputed Claims in the Cases is best handled by the Liquidating Trust Trustee, with the assistance of Mr. McGeever and the Estates' existing Professionals, who are expected to be retained by the Liquidating Trust Trustee to ensure continuity. Mr. McGeever's substantial knowledge of the Debtors' business and financial affairs and the Debtors' transactions with their Creditors will be invaluable in the Claims adjudication process. Moreover, the Debtors' existing Professionals already have commenced evaluating the Disputed Claims asserted in the Cases. Mr. McGeever's and the Debtors' Professionals' knowledge of the Claims asserted in the Cases will help to ensure that the Claims adjudication process will be handled in an efficient and expeditious manner. The Debtors believe that there is a significant risk that, in a Chapter 7 liquidation, with a loss of the "institutional knowledge" of the Debtors' financial affairs and the Claims asserted against the Debtors possessed by Mr. McGeever and by the existing Professionals in the Cases, the process of resolving Disputed Claims will be affected adversely to the interests of Creditors and that a greater amount of Disputed Claims would be allowed in Chapter 7 cases than in these Chapter 11 Cases.

The Debtors' Plan provides for a liquidation of the Debtors' Assets. Both the Debtors' Plan and a Chapter 7 scenario, therefore, contemplate a liquidation. The Debtors believe that the primary differences in recoveries by Creditors between a winding up of the Debtors' financial affairs pursuant to the Plan versus a conversion of the Debtors' Cases to Chapter 7 liquidations would be: (a) the substantial fees to which a Chapter 7 trustee would

be entitled under  326(a) of the Bankruptcy Code; (b) the additional administrative expense associated with the need to have the professionals employed by the Chapter 7 trustee "get up to speed" in the Cases; (c) the risk that additional Claims would be allowed in the Cases because neither the Chapter 7 trustee nor his professionals would have any knowledge of the Disputed Claims; and (d) the projected reduced recoveries from a liquidation of the Debtors' Assets in Chapter 7.

In addition, it is likely that there would be significant delay in Creditors' receiving Distributions in a Chapter 7 scenario.  Pursuant to the Plan, holders of Allowed Secured Claims, Allowed Administrative Claims, Allowed Priority Non-Tax Claims and Allowed Priority Tax Claims will receive Distributions on or soon after the Effective Date, and holders of Class 3A Allowed General Unsecured Claims will receive Distributions commencing on the ninetieth (90th) day after the Effective Date.  On the other hand, in a Chapter 7 scenario, a trustee would have no knowledge of the Debtors' Cases, the Debtors' financial affairs or the Claims asserted against the Debtors and so it is likely that no Distributions to Creditors would be made for many months, and possibly for well more than a year, after the conversion of the Cases to Chapter 7.

Although there are difficulties inherent in quantifying, with any exactness, the potential recoveries that the Debtors' Creditors would receive in a Chapter 7 liquidation of the Debtors, the Debtors believe that, in a Chapter 7 liquidation scenario, a significantly smaller Distribution would be paid on account of Allowed General Unsecured Claims against the Debtors compared with the Distributions pursuant to the Plan, and that Distributions would be delayed significantly in a Chapter 7 liquidating scenario.

Based on the foregoing, the Debtors believe that it will be advantageous to Creditors to finish the liquidation of the Debtors' Assets and the resolution of the Cases in Chapter 11, rather than in Chapter 7.

While the Debtors' conclusions regarding the results of a liquidation scenario are unavoidably speculative and depend upon a number of variables, the Debtors believe that there is a good basis for them to believe that, pursuant to the Plan, Creditors will be able to

recover significantly more on account of their Claims than they would in Chapter 7 liquidation proceedings.  Accordingly, the Debtors have concluded that the Plan is the best alternative for Creditors, and will maximize recoveries by Creditors.

## XIII.

## CERTAIN UNITED STATES FEDERAL TAX CONSEQUENCES OF THE PLAN

### A.    Introduction.

**CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITIES SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR OTHER TAX ADVISORS.**

The following disclosure of possible tax consequences of the Plan is intended solely for the purpose of alerting Creditors to possible tax issues that the Plan may present to the Debtors. The Debtors CANNOT and DO NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Internal Revenue Code embodies many complicated rules which make it difficult to state completely and accurately all of the tax implications of any action.

### B.    Consequences to the Debtors.

In general, the Internal Revenue Code provides that a debtor in a bankruptcy case is not taxable on cancelation of debt ("COD") income, but must reduce certain of its tax attributes (such as its net operating loss carryforwards and its tax basis in its assets) by the amount of COD income.  COD income results when the amount of debt discharged exceeds the consideration given in exchange therefor, and is equal to such excess amount.  In this case, it is likely that certain cancelation of debt will be deemed to occur on the Effective Date of the Plan.  Any reduction in tax attributes does not occur, however, until the end of a Debtor's taxable year or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD is incurred.

### C.    Withholding of Taxes.

All Distributions to holders of Allowed Priority Non-Tax Claims and Allowed General Unsecured Claims are subject to any applicable tax withholding, including employment tax

1  withholding.  Under federal income tax law, interest, dividends, and other reportable payments

2  may, under certain circumstances, be subject to "backup withholding" at the then applicable

3  withholding rate.  Backup withholding generally applies if the holder (1) fails to furnish its social

4  security number or other taxpayer identification number ("TIN"), (2) furnishes an incorrect TIN,

5  (3) fails properly to report interest or dividends, or (4) under certain circumstances, fails to

6  provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct

7  number and that it is not subject to backup withholding.  Backup withholding is not an additional

8  tax but merely an advance payment, which may be refunded to the extent that it results in an

9  overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain

10 circumstances, corporations and financial institutions.

11        THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL

12 PURPOSES ONLY.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO

13 CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR OTHER TAX

14 ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND OTHER TAX

15 CONSEQUENCES OF THE PLAN.

16                                      **XIV.**

17                **RECOMMENDATION AND CONCLUSION**

18        The Debtors believe that confirmation and implementation of the Plan are preferable to

19 any other alternative because, in their view, the Plan will provide holders of Allowed Claims with

20 the maximum recovery possible on their Allowed Claims in as prompt a manner as possible.

21 Accordingly, the Debtors urge Creditors to vote to accept the Plan.

22 Dated: October 12, 2023              **SILVER CREEK INDUSTRIES, LLC**
                                       As a Debtor and Debtor-in-Possession
23

24                                     By: _____TO BE PROVIDED_____
                                       Name: _____
25                                     Its: _____

26 [Signatures on next page]

27

28

1

**SILVER CREEK INDUSTRIES RS, LLC**
As a Debtor and Debtor-in-Possession

2

3

By:        TO BE PROVIDED
Name:
Its:

4

5

**SILVER CREEK LEASING, LLC**
As a Debtor and Debtor-in-Possession

6

7

By:        TO BE PROVIDED
Name:
Its:

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"

# ORGANIZATION CHART

# BVA/SILVER CREEK CORPORATE STRUCTURE



1

**<u>EXHIBIT "B"</u>**

**<u>CONSOLIDATED BALANCE SHEETS FOR DEBTORS</u>**

**<u>(12/31/2022 AND 3/31/2023)</u>**

| BVA Construction Consolidated Balance Sheet | SCI LLC Dec-22 | SCI Leasing Dec-22 | SCI RS Dec-22 | Eliminations/BVA Dec-22 | Consolidation Dec-22 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **CURRENT ASSETS** | | | | | |
| CASH IN BANK | (788,742) | 246,136 | 989832.74 | | 447,226 |
| INVESTMENT IN SECURITIES | - | | | | |
| UNREALIZED GAIN/LOSS - SECURITIES | - | | | | |
| Inventory Asset | 5,460,054 | | | | 5,460,054 |
| Allowance - Obsolete Inventory | (1,944,490) | | | | (1,944,490) |
| Global Purchases | - | | | | |
| Accounts Receivable | 25,430,437 | 1,606,706 | 1213369.5 | (2,820,076) | 25,430,437 |
| Retention Receivable | 9,922,642 | | | | 9,922,642 |
| Allowance for Doubtful AR | (232,450) | | | | (232,450) |
| Other Receivable | 15,967 | | | | 15,967 |
| Employee Advance | - | | | | |
| Receivable PCW&COBRA | 886 | | | | 886 |
| Note Receivable-PCW | - | | | | |
| Note Receivable-ParkerLaneTruckee | | | | | |
| Revenue in Excess of Billings | 5,921,530 | | | | 5,921,530 |
| Bid Deposits | - | | | | |
| Prepaid Insurance | 207,953 | | 4347.24 | | 212,300 |
| Prepaid Income Taxes | 882,132 | 6,800 | 9200 | | 898,132 |
| Prepaid Rent | - | | 0 | | - |
| Prepaid Property Tax | - | 23,384 | 72092.35 | | 95,476 |
| Prepaid Expenses | | | 0 | | - |
| Deposits - Other | 54,034 | | 50579.86 | | 104,614 |
| Note Receivable-Hoffman | 1,000,000 | | | | 1,000,000 |
| **TOTAL CURRENT ASSETS** | 45,929,954 | 1,883,026 | 2,339,422 | (2,820,076) | 47,332,326 |
| | 792,986.87 | | | | |
| **FIXED ASSETS** | | | | | |
| Construction In Progress | - | | | | - |
| Intangible Assets | 80,569,556 | | | | 80,569,556 |
| Land | - | | | | - |
| Vehicles - Trucks | - | 483,766 | 641,784 | | 1,125,551 |
| Machinery & Equipment | - | 5,171,257 | - | | 5,171,257 |
| Tools | - | 8,828 | - | | 8,828 |
| Computers & Office Equipment | - | 270,885 | - | | 270,885 |
| Tenant Improvements | 308,645 | 22,594 | - | | 331,238 |
| Tenant Improvements - Restroom | - | | | | - |
| **Accumulated Depreciation** | (150,289) | (3,562,067) | (499,166) | | (4,211,522) |
| **Accumulated Amortization** | (18,928,267) | - | | | (18,928,267) |
| **NET FIXED ASSETS** | 61,799,645 | 2,395,263 | 142,619 | - | 64,337,527 |
| **RGHT OF USE-OPERATING LEASES** | | | | | |
| Operating Leases - ROU | 2,912,766 | | | | 2,912,766 |
| Asset Amortization - ROU | (543,861) | | | | (543,861) |
| **NET ROU OPERATING LEASES** | 2,368,905 | - | - | - | 2,368,905 |
| Investment in Archway Captive | 36,000 | | | | 36,000 |
| Investment-Union Holdings LLC | 196,934 | | | | 196,934 |
| CIT MMA 12504 | 860,886 | | | | 860,886 |
| Note Receivable-ParkerLaneTruckee LT | | | | | - |
| Escrow Deposit-National | | | | | - |
| Promissory Note-Silver Creek RS | | | - | | - |
| Affiliate Loan LT | | 3,000,000 | | (3,000,000) | - |
| Investment in Subsidiary | | | | - | - |
| **TOTAL ASSETS** | 111,192,325 | 7,278,289 | 2,482,040 | (5,820,076) | 115,132,578 |

EXHIBIT B - PAGE 1

**BVA Construction**
**Consolidated Balance Sheet**

| | SCI LLC Dec-22 | SCI Leasing Dec-22 | SCI RS Dec-22 | Eliminations/BVA Dec-22 | Consolidation Dec-22 |
|---|---|---|---|---|---|
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | |
| **CURRENT LIABILITIES** | | | | | |
| Accounts Payable - Trade | 18,971,291 | | 18,555 | (2,820,076) | 16,169,771 |
| Refundable Deposits | 1,250,000 | | - | | 1,250,000 |
| Retention Payable | 3,622,960 | | | | 3,622,960 |
| ACCRUED PAYROLL EXPENSES | 1,579,543 | | 28,144 | | 1,607,687 |
| Credit Card Clearing Acct | - | | - | | - |
| Billings in Excess of Revenue | 11,762,828 | | | | 11,762,828 |
| Deferred Revenue-Value Adj | (1,666,000) | | | | (1,666,000) |
| Accum Amort-Deferred Revenue | 1,666,000 | | | | 1,666,000 |
| Accrued Current Liabilities | 9,933,979 | | | | 9,933,979 |
| Short Term Lease Liability | 540,518 | | | | 540,518 |
| Sales tax Payable | 196,095 | | | | 196,095 |
| Accrued Commissions | 66,237 | | | | 66,237 |
| COBRA Premium | - | | | | - |
| Employee Medical | - | | | | - |
| Employee Dental | - | | | | - |
| Income Tax Payable | - | | | | - |
| Insurance Payable | - | | | | - |
| Banner Bank - SBA PPP Loan | - | | | | - |
| Affiliate Loan Liab | | | | - | - |
| Note Payable-SC Leasing | 3,000,000 | | | (3,000,000) | - |
| Deferred Tax Liability | - | | | | - |
| Accrued Interest Payable | 648,603 | | | | 648,603 |
| Note Payable -Member Interest | 10,000,000 | | | | 10,000,000 |
| Line of Credit | - | | | | - |
| **TOTAL CURRENT LIABILITIES** | 61,572,053 | - | 46,700 | (5,820,076) | 55,798,677 |
| | | | | | |
| **LONG TERM LIABILITIES** | | | | | |
| CIT Loan Payable | 46,382,336 | - | - | | 46,382,336 |
| Prepaid Loan Fees | (792,987) | | | | (792,987) |
| Long Term Lease Liability | 1,828,387 | | | | 1,828,387 |
| **TOTAL LONG TERM LIABILITIES** | 47,417,737 | - | - | - | 47,417,737 |
| | | | | | |
| **TOTAL LIABILITIES** | 108,989,790 | - | 46,700 | (5,820,076) | 103,216,414 |
| | | | | | |
| **STOCKHOLDERS' EQUITY** | | | | | |
| Contributions to BVA | 52,146,899 | 6,605,000 | 1,248,101 | | 60,000,000 |
| Purchase BVA Member Interests | (10,000,000) | | | | (10,000,000) |
| Fixed Asset Contributions | | 461,074 | | (461,074) | - |
| Net Distributions-BVA | (461,074) | - | | 461,074 | (0) |
| Retained Earnings | (8,452,004) | 181,795 | (528,095) | | (8,798,304) |
| Net Distributions-BVA | - | - | | - | - |
| Comprehensive Income/Loss | (0) | - | | | - |
| CURRENT PERIOD INCOME | (31,031,287) | 30,421 | 1,715,335 | | (29,285,531) |
| **TOTAL STOCKHOLDERS' EQUITY** | 2,202,534 | 7,278,289 | 2,435,341 | (0) | 11,916,164 |
| | | | | | |
| **TOTAL LIABILITIES & STOCKHOLDERS' EC** | 111,192,325 | 7,278,289 | 2,482,040 | (5,820,076) | 115,132,578 |
| | - | - | (0) | (0) | (0) |
| | (3) | (1) | 0 | - | (623,187) |
| | | | | | |
| Working Capital | (15,642,099) | 1,883,026 | 2,292,722 | | (8,466,351) |

**BVA Construction**
**Consolidated Balance Sheet**

| | SCI LLC Mar-23 | SCI Leasing Mar-23 | SCI RS Mar-23 | Eliminations/BVA Mar-23 | Consolidation Mar-23 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **CURRENT ASSETS** | | | | | |
| CASH IN BANK | 2,742,150 | 20,736 | 308 | | 2,763,193 |
| INVESTMENT IN SECURITIES | - | | | | |
| UNREALIZED GAIN/LOSS - SECURITIES | | | | | |
| Inventory Asset | 3,403,297 | | | | 3,403,297 |
| Allowance - Obsolete Inventory | (1,944,490) | | | | (1,944,490) |
| Global Purchases | - | | | | |
| Accounts Receivable | 15,549,048 | 2,017,495 | 1,246,290 | (3,263,784) | 15,549,048 |
| Retention Receivable | 6,607,184 | | | | 6,607,184 |
| Allowance for Doubtful AR | (4,673,652) | | | | (4,673,652) |
| Other Receivable | 15,967 | | | | 15,967 |
| Employee Advance | - | | | | - |
| Receivable PCW&COBRA | 53,807 | | | | 53,807 |
| Note Receivable-PCW | - | | | | - |
| Note Receivable-ParkerLaneTruckee | | | | | |
| Revenue in Excess of Billings | 6,836,466 | | | | 6,836,466 |
| Bid Deposits | - | | | | - |
| Prepaid Insurance | (36,773) | | 4,347 | | (32,426) |
| Prepaid Income Taxes | (1,001) | 14,400 | 9,200 | | 22,599 |
| Prepaid Rent | - | | | | - |
| Prepaid Property Tax | 25,866 | 15,589 | 72,092 | | 113,547 |
| Prepaid Expenses | | | - | | - |
| Deposits - Other | 55,736 | | 50,580 | | 106,316 |
| Note Receivable-Hoffman | | | | | |
| **TOTAL CURRENT ASSETS** | 28,633,605 | 2,068,220 | 1,382,817 | (3,263,784) | 28,820,857 |
| | | | | | |
| **FIXED ASSETS** | 29,024,600 | | | | |
| Construction In Progress | - | | | | - |
| Intangible Assets | 80,569,556 | | | | 80,569,556 |
| Land | - | | | | - |
| Vehicles - Trucks | - | 445,335 | 641,784 | | 1,087,120 |
| Machinery & Equipment | - | 5,171,257 | | | 5,171,257 |
| Tools | - | 8,828 | | | 8,828 |
| Computers & Office Equipment | - | 270,885 | | | 270,885 |
| Tenant Improvements | 308,645 | 22,594 | | | 331,238 |
| Tenant Improvements - Restroom | - | | | | - |
| **Accumulated Depreciation** | (162,612) | (3,789,360) | (552,648) | | (4,504,620) |
| **Accumulated Amortization** | (19,317,117) | | | | (19,317,117) |
| **NET FIXED ASSETS** | 61,398,472 | 2,129,539 | 89,137 | - | 63,617,148 |
| | | | | | |
| **RGHT OF USE-OPERATING LEASES** | | | | | |
| Operating Leases - ROU | 2,912,766 | | | | 2,912,766 |
| Asset Amortization - ROU | (685,218) | | | | (685,218) |
| **NET ROU OPERATING LEASES** | 2,227,547 | - | - | - | 2,227,547 |
| | | | | | |
| Investment in Archway Captive | 36,000 | | | | 36,000 |
| Investment-Union Holdings LLC | 196,934 | | | | 196,934 |
| CIT MMA 12504 | 862,266 | | | | 862,266 |
| Note Receivable-ParkerLaneTruckee LT | | | | | - |
| Escrow Deposit-National | - | | | | - |
| Promissory Note-Silver Creek RS | | 250,000 | | (250,000) | - |
| Affiliate Loan LT | | 3,000,000 | 800,000 | (3,800,000) | - |
| Investment in Subsidiary | | | | | - |
| | | | | | |
| **TOTAL ASSETS** | 93,354,824 | 7,447,759 | 2,271,953 | (7,313,784) | 95,760,752 |
| | | | | | |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | |
| **CURRENT LIABILITIES** | | | | | |
| Accounts Payable - Trade | 11,711,443 | | 19,529 | (3,263,784) | 8,467,188 |
| Refundable Deposits | 1,250,000 | | | | 1,250,000 |
| Retention Payable | 3,142,312 | | | | 3,142,312 |
| ACCRUED PAYROLL EXPENSES | 1,729,742 | | 35,190 | | 1,764,932 |
| Credit Card Clearing Acct | (41,209) | | | | (41,209) |
| Billings in Excess of Revenue | 4,696,130 | | | | 4,696,130 |
| Deferred Revenue-Value Adj | (1,666,000) | | | | (1,666,000) |
| Accum Amort-Deferred Revenue | 1,666,000 | | | | 1,666,000 |
| Accrued Current Liabilities | 11,006,995 | | | | 11,006,995 |
| Short Term Lease Liability | 540,518 | | | | 540,518 |
| Sales tax Payable | 590,372 | | | | 590,372 |
| Accrued Commissions | 66,237 | | | | 66,237 |
| COBRA Premium | - | | | | - |

**BVA Construction**
**Consolidated Balance Sheet**

| | SCI LLC Mar-23 | SCI Leasing Mar-23 | SCI RS Mar-23 | Eliminations/BVA Mar-23 | Consolidation Mar-23 |
|---|---|---|---|---|---|
| Employee Medical | - | | | | - |
| Employee Dental | - | | | | - |
| Income Tax Payable | - | 27,237 | | | 27,237 |
| Insurance Payable | - | | | | - |
| Banner Bank - SBA PPP Loan | - | | | | - |
| Affiliate Loan Liab | | | | - | - |
| Note Payable-SC Leasing | 3,000,000 | | | (3,000,000) | - |
| Note Payable-Silver Creek RS | 800,000 | | | (800,000) | - |
| Deferred Tax Liability | - | | | | - |
| Accrued Interest Payable | 1,517,635 | | | | 1,517,635 |
| Note Payable -Member Interest | 10,000,000 | | | | 10,000,000 |
| Line of Credit | | | | | - |
| **TOTAL CURRENT LIABILITIES** | 50,010,177 | 27,237 | 54,719 | (7,063,784) | 43,028,348 |
| | | | | | |
| **LONG TERM LIABILITIES** | | | | | |
| CIT Loan Payable | 46,382,336 | | | | 46,382,336 |
| Shareholder Loan | 250,000 | | | (250,000) | - |
| Prepaid Loan Fees | (721,973) | | | | (721,973) |
| Long Term Lease Liability | 1,828,387 | | | | 1,828,387 |
| **TOTAL LONG TERM LIABILITIES** | 47,738,751 | - | - | (250,000) | 47,488,751 |
| | | | | | |
| **TOTAL LIABILITIES** | 97,748,927 | 27,237 | 54,719 | (7,313,784) | 90,517,099 |
| | | | | | |
| **STOCKHOLDERS' EQUITY** | - | | | | |
| Contributions to BVA | 52,146,899 | 6,605,000 | 1,248,101 | | 60,000,000 |
| Purchase BVA Member Interests | (10,000,000) | - | | | (10,000,000) |
| Fixed Asset Contributions | | 461,074 | | (461,074) | - |
| Net Distributions-BVA | (461,074) | | | 461,074 | - |
| Retained Earnings | (39,483,290) | 317,437 | 1,187,240 | | (37,978,614) |
| Net Distributions-BVA | | - | | - | - |
| Comprehensive Income/Loss | (0) | | | | (0) |
| CURRENT PERIOD INCOME | (6,596,637) | 37,011 | (218,107) | | (6,777,733) |
| **TOTAL STOCKHOLDERS' EQUITY** | (4,394,103) | 7,420,522 | 2,217,234 | - | 5,243,653 |
| | | | | | |
| **TOTAL LIABILITIES & STOCKHOLDERS' EQ** | 93,354,824 | 7,447,759 | 2,271,953 | (7,313,784) | 95,760,752 |
| | - | - | - | | - |
| | 1 | - | (0) | | |
| | | | | | |
| Working Capital | (21,376,571) | 2,040,983 | 1,328,097 | | (14,207,492) |

# EXHIBIT C

# EXHIBIT "C"

## LITIGATION PENDING AS OF PETITION DATE

| Case Name | Case Number | Litigation |
|---|---|---|
| BBMR Enterprises, Inc. vs. Silver Creek | | Lawsuit from previous owners |
| Marco Araiza v. Silver Creek Industries, Inc. | CVRI2201295 Riverside Superior Court | Wrongful Termination |
| Diaz Monreal v. Silver Creek Industries, LLC | CVRI2100248 Riverside Superior Court | |
| HN Construction Services vs. Silver Creek Industries LLC, Hartford Fire Insurance Company, DOES Surety 1 – 50 | CVRI2301621 Riverside Superior Court | Breach of Contract, Quantum Meruit, Prompt Payment Penalties, Common Count - Account Stated, Common Count - Open Book, Enforce Public Works Stop Notice, On Public Works Payment Bond, On Contractors License Bond |

# EXHIBIT D

# **EXHIBIT "D"**

## **POTENTIAL CAUSES OF ACTION**

Potential Causes of Action may include:

- An objection to CIT's Claim.

- An objection to Mr. McGeever's Claim.

- An objection to XL Construction, LLC's Claim.

- Objections to any Proof of Claim filed by a Creditor whose Claim is listed in a Debtor's Bankruptcy Schedules as disputed, unliquidated, contingent or for an unknown amount.

- Objections to any Claim asserted against Hartford or against Philadelphia Indemnity by a Creditor whose Claim is disputed by SCI.

- An objection to, and/or an action to subordinate, any Claim of BBMR and any contingent Claim for reimbursement, contribution or indemnity.

- Actions to recover payments made by a Debtor within ninety (90) days prior to the Petition Date as preferential payments under  547 of the Bankruptcy Code.

- An action to recover payments made to BBMR, under s 544 and/or 548 of the Bankruptcy Code or otherwise.

- Any Cause of Action that the Liquidating Trust Trustee believes is appropriate to be filed, in the exercise of his reasonable business judgment.

## CERTIFICATE OF SERVICE

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 1301 Dove Street, Suite 500 Newport Beach, CA 92660.

A true and correct copy of the foregoing document entitled: **DEBTORS' JOINT DISCLOSURE STATEMENT ACCOMPANYING DEBTORS' FIRST AMENDED JOINT CHAPTER 11 PLAN** will be served or was served in the manner stated below:

**1.  <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On <u>**October 12, 2023**</u> I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**SEE ATTACHED LIST**

**2.  <u>SERVED BY UNITED STATES MAIL</u>**:  On **\_\_\_, 2023**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**3.  <u>SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL</u>** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 12, 2023 | Jeannie Martinez | /s/ Jeannie Martinez |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

## NEF SERVICE LIST

- **Kristina S Azlin**    Kristina.Azlin@hklaw.com, ericka.mendez@hklaw.com;hapi@hklaw.com
- **Maria Cho**    Maria.Cho@faegredrinker.com, liliana.hernandez@faegredrinker.com
- **Theodore A Cohen**    tcohen@sheppardmullin.com, mtzeng@sheppardmullin.com
- **Martin P Eramo**    MPEramo@aol.com
- **Thomas R Fawkes**    thomas.fawkes@tuckerellis.com, Christine.Cassidy@tuckerellis.com
- **Abram Feuerstein**    abram.s.feuerstein@usdoj.gov
- **James Ficenec**    james.ficenec@ndlf.com, alex.reel@ndlf.com
- **Clifford Kerry Fields**    ckfields@fieldslg.com, marnellb@fieldslg.com
- **M Douglas Flahaut**    flahaut.douglas@arentfox.com
- **Ronald E Gold**    rgold@fbtlaw.com, eseverini@fbtlaw.com;jkleisinger@fbtlaw.com
- **Richard H Golubow**    rgolubow@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com
- **Michael I. Gottfried**    mgottfried@elkinskalt.com, cavila@elkinskalt.com,lwageman@elkinskalt.com,docketing@elkinskalt.com
- **Everett L Green**    everett.l.green@usdoj.gov
- **Jennifer C Hayes**    jhayes@mckennalong.com, aworthing@mckennalong.com
- **Leslie R Horowitz**    leslie.horowitz@offitkurman.com, arvin.setaghaian@offitkurman.com
- **Lance N Jurich**    ljurich@loeb.com, pmatsuda@loeb.com;ladocket@loeb.com;ljurich@ecf.courtdrive.com
- **Matthew I Kaplan**    matthew.kaplan@tuckerellis.com, sofia.escalante@tuckerellis.com
- **Jane G Kearl**    jkearl@watttieder.com
- **Peter W Lianides**    plianides@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com
- **Zi Chao Lin**    zi.lin@tuckerellis.com, kristin.mccarthy@tuckerellis.com;thomas.fawkes@tuckerellis.com;jason.ben@tuckerellis.com
- **Douglas L Mahaffey**    dougm@mahaffeylaw.com, stephen@mahaffeylaw.com
- **Ali Matin**    ali.matin@usdoj.gov, carolyn.k.howland@usdoj.gov
- **Christopher E Ng**    cng@gglts.com
- **Robert E Opera**    ropera@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com
- **Jennifer Pruski**    jpruski@trainorfairbrook.com
- **Cameron C Ridley**    Cameron.Ridley@usdoj.gov
- **Todd C. Ringstad**    becky@ringstadlaw.com, arlene@ringstadlaw.com
- **Edward Rubacha**    er@jhkmlaw.com, docket@jhc.law;am@jhc.law
- **Peter T Steinberg**    mr.aloha@sbcglobal.net
- **Dana Sykulski**    dsykulski@yahoo.com
- **United States Trustee (RS)**    ustpregion16.rs.ecf@usdoj.gov
- **Kirsten A Worley**    worleyk@higgslaw.com, vanpeltj@higgslaw.com
- **Dylan J Yamamoto**    dylan.yamamoto@arentfox.com
- **S Christopher Yoo**    cyoo@fbtlaw.com, vdelgado@fbtlaw.com